**LABATON SUCHAROW LLP**
Jonathan Gardner (*pro hac vice* forthcoming)
Alfred L. Fatale III (admitted *pro hac vice*)
Jeffrey A. Dubbin (admitted *pro hac vice*)
Lisa Strejlau (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
afatale@labaton.com
jdubbin@labaton.com
lstrejlau@labaton.com

*Lead Counsel for Lead Plaintiff*

**KEMP JONES, LLP**
Don Springmeyer (SBN 1021)
3800 Howard Hughes Parkway
Wells Fargo Tower, 17th Floor
Las Vegas, NV 89169
Telephone: (702) 385-6000
d.springmeyer@kempjones.com

*Liaison Counsel*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IN RE PLAYAGS, INC. SECURITIES LITIGATION | Case No.: 2:20-cv-01209-JCM-NJK |
| | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| | **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................ 2

    A.    Overview of PlayAGS's Business ......................................................... 2

    B.    Overview of the Exchange Act Claims ................................................ 2

    C.    Overview of the Securities Act Claims ................................................ 6

II.   JURISDICTION AND VENUE ........................................................................ 9

III.  PARTIES ............................................................................................................ 10

    A.    Lead Plaintiff ....................................................................................... 10

    B.    Defendant PlayAGS ............................................................................ 11

    C.    The Individual Defendants ................................................................. 11

    D.    The Apollo Defendants ....................................................................... 12

    E.    The Underwriter Defendants ............................................................. 12

IV.   ADDITIONAL BACKGROUND FOR PLAYAGS AND ITS BUSINESS .................. 16

V.    EXCHANGE ACT ALLEGATIONS ................................................................ 20

    A.    Oklahoma Was a Key Focus for the Company ................................... 20

    B.    Prior to and During the Class Period, PlayAGS Touted its Pursuit of
        Acquisitions as a Competitive Strength ............................................. 21

    C.    Defendants' Fraudulent Scheme to Inflate Growth Leading Up to and
        After Its IPO ......................................................................................... 22

        1.    The Company's IPO Prospectus Connected the Subjects of its
            Fraudulent Scheme to its Offering Price ................................... 22

        2.    The Company and Executive Defendants Engaged in a
            Fraudulent Scheme to Inflate its IPO Price .............................. 24

    D.    PlayAGS Purportedly Employed Optimization Strategy to Compete
        Amongst Dominant Industry Players ................................................. 26

    E.    Unbeknownst to Investors, PlayAGS Placed Immense Pressure on
        Oklahoma Sales Team to Maintain Post-IPO Momentum ................. 27

    F.    During the Class Period, the PlayAGS Defendants Repeatedly Revised
        Guidance Upward Based on a Forced Increase in EGM Placement and
        Sales Manipulation ............................................................................. 30

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

i

G.   The PlayAGS Defendants Continued to Tout the Company's M&A Strategy Amid Problematic Acquisitions ........................................ 33

H.   PlayAGS Assures Investors its Oklahoma "Misstep" is Short-Lived ................ 36

I.   Investors Finally Learn That the Build in EGM Placement Was Not Sustainable and That PlayAGS Could Not Afford to Maintain its Footprint ........................................................................................ 38

J.   Additional Allegations of Scienter ..................................................... 39

K.   Defendants' Materially False and Misleading Statements and Omissions ..................................................................................... 44

1.   March 14, 2018 – 4Q18 Financial Results .............................. 45

2.   May 3, 2018 – 1Q18 Financial Results ................................... 48

3.   August 2, 2018 – 2Q18 Financial Results ............................... 50

4.   November 8, 2018 – 3Q18 Financial Results ........................... 53

5.   March 5, 2019 – 4Q18 and FY2018 Financial Results ............... 57

6.   May 8, 2019 – 1Q19 Financial Results ................................... 61

L.   The Fraud Begins to Cause Investor Losses, but Defendants Continue to Mislead the Market ................................................................. 63

1.   August 7, 2019 – 2Q19 Financial Results (First Partial Losses Caused by the Fraud) ....................................................... 63

2.   November 7, 2019 – 3Q19 Financial Results (Second Partial Losses Caused by the Fraud) ............................................. 66

M.   PlayAGS's Fraud Continues to Cause Investor Losses ......................... 69

N.   Loss Causation ............................................................................ 72

O.   Presumption of Reliance ............................................................... 74

P.   Inapplicability of the Statutory Safe Harbor ...................................... 76

VI.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .......................................... 77

FIRST CLAIM FOR RELIEF Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated  Thereunder Against PlayAGS and the Executive Defendants .......................................... 77

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

ii

SECOND CLAIM FOR RELIEF Violation of Section 20(a) of the Exchange Act Against the Executive Defendants and the Apollo Defendants ........................................................................... 79

VII.   SECURITIES ACT ALLEGATIONS ............................................................ 81

A.   PlayAGS Could Not Maintain the Financial Condition of its EGM Business at the Time of the SPOs Because of its Undisclosed and Unsustainable Sales Tactics ................................................................. 81

1.   PlayAGS's IPO Prospectus Tells A Growth Narrative Prior to the SPOs ....................................................................... 81

B.   PlayAGS's Growth Strategy was Unsustainable Prior to and During the SPOs ............................................................................ 88

1.   Undisclosed Problems with PlayAGS's Acquisition of Cadillac Jack Undermined PlayAGS's Growth Narrative Leading Up to the SPOs ....................................................................... 88

2.   PlayAGS Continued Its Unsustainable Acquisition Strategy and False Growth Narrative by Acquiring Integrity Leading Up to the SPOs ..................................................................... 89

C.   The SPOs ............................................................................. 91

D.   Defendants' False and Misleading Shelf Registration Statement ........................ 94

E.   The Shelf Registration Statement Falsely Portrayed PlayAGS's Competitive Strengths ............................................................... 95

F.   The Shelf Registration Statement Falsely Portrayed PlayAGS's Ability to Grow and Its Success with Its Growth Strategy ............................... 104

G.   The Shelf Registration Statement Failed to Disclose and Misrepresented Significant Risks that Made the SPOs More Speculative and Risky ............................................................... 108

H.   Post-SPO Events ................................................................... 117

VIII.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 123

THIRD CLAIM FOR RELIEF For Violation of Section 11 of the Securities Act Against Defendant PlayAGS, the Individual Defendants, and Underwriter Defendants .................................... 123

FOURTH CLAIM FOR RELIEF For Violation of Section 12(a)(2) of the Securities Act Against All Defendants ....................................... 126

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

iii

FIFTH CLAIM FOR RELIEF For Violation of Section 15 of the
Securities Act Against the Individual Defendants and the Apollo
Defendants ............................................................................................ 128

IX.    CLASS ACTION ALLEGATIONS ............................................................ 130

X.     PRAYER FOR RELIEF ............................................................................ 132

XI.    JURY TRIAL DEMANDED ...................................................................... 132

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

iv

1   Lead Plaintiff Oklahoma Police Pension and Retirement System, individually and on

2   behalf of a class of similarly situated persons and entities, by its undersigned counsel, allege the

3   following against PlayAGS, Inc. ("PlayAGS" or the "Company"); David Lopez and Kimo

4   Akiona (the "Executive Defendants" and together with PlayAGS, the "PlayAGS Defendants");

5   David Sambur, Daniel Cohen, Eric Press, Yvette Landau, Adam Chibib, Geoff Freeman (the

6   "Director Defendants" and, together with the Executive Defendants, the "Individual

7   Defendants"); Apollo Global Management, LLC, Apollo Gaming Holdings, L.P., Apollo

8   Investment Fund VIII, L.P., and AP Gaming VoteCo, LLC (the "Apollo Defendants"); Credit

9   Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Jefferies LLC, Macquarie Capital

10  (USA) Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Citigroup Global Markets Inc., Stifel,

11  Nicolaus & Company Inc., SunTrust Robinson Humphrey, Inc., Nomura Securities International,

12  Inc., Roth Capital Partners, LLC, Union Gaming Securities LLC, The Williams Capital Group,

13  L.P., Apollo Global Securities, LLC, Morgan Stanley & Co. LLC (the "Underwriter Defendants"

14  and, together with PlayAGS, the Individual Defendants, and the Apollo Defendants, the

15  "Defendants").  The allegations herein are based on Lead Plaintiff's personal knowledge as to its

16  own acts, and on information and belief as to all other matters, such information and belief

17  having been informed by the investigation conducted by and under the supervision of Lead

18  Counsel, Labaton Sucharow LLP, which includes a review of: (i) U.S. Securities and Exchange

19  Commission ("SEC") filings by PlayAGS; (ii) securities analysts' reports and advisories about

20  the Company; (iii) press releases and other public statements issued by the Company; (iv) media

21  reports about the Company; (v) interviews with former employees of PlayAGS and others with

22  knowledge of the matters alleged herein;[1] (vi) consultation with relevant experts and consultants;

23  and (vii) other publicly available information.  Lead Counsel's investigation into the matters

24  alleged herein is ongoing and many relevant facts are known only to, or are exclusively within

25  the custody or control of, the Defendants.  Lead Plaintiff believes that substantial additional

26

27

28  [1]   Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2).  All
CWs will be described in the masculine to protect their identities.

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Lead Plaintiff alleges as follows:

## I.        NATURE OF THE ACTION

### A.        Overview of PlayAGS's Business

1.        PlayAGS is a designer and supplier of electronic gaming machines ("EGMs") and other products and services for the gaming industry.  PlayAGS operates primarily in the North American gaming market, which includes U.S. commercial casinos, Native American casinos, Canadian casinos, video lottery terminals ("VLT") and Mexican casinos.

2.        Of the Company's three business segments—EGMs, table products, and interactive games—PlayAGS's EGM business accounts for 95 percent of the Company's revenue. Native American casinos represent a significant portion of the EGM market, and PlayAGS derives a significant amount of its revenues from EGMs that are placed in Native American casinos located in Oklahoma.

3.        Based in Las Vegas, Nevada, PlayAGS describes itself as a "leading" designer and supplier of EGMs, primarily to Native American tribal customers.

4.        Most of the Company's EGMs are electronic slot machines that generate revenue for the Company through percentage-based fee-sharing agreements with casinos or fixed-price leasing arrangements.  The revenue the Company receives from these agreements is often called revenue-per-day or "RPD."

### B.        Overview of the Exchange Act Claims

5.        This securities class action is brought against PlayAGS and the Executive Defendants and in part alleges fraud by these defendants for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This class action is brought on behalf of all persons and entities who or which purchased or otherwise acquired publicly traded PlayAGS common stock during the period from January 26, 2018 through March 4, 2020, inclusive (the "Class Period"), and were damaged thereby.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

2

6.      Congress passed the Exchange Act during the Great Depression, to substitute a philosophy of full disclosure for the then-prevailing philosophy of *caveat emptor* and, thus, to achieve a high standard of business ethics in the securities industry that remains the default rule to this day.  The Exchange Act gives rise to liability for false, misleading, and incomplete statements made in connection with the purchase or sale of securities, as well as fraudulent schemes in connection with the same, to maintain confidence in our public securities markets.  It is designed with flexibility in mind, "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *SEC v. W. J. Howey Co.*, 328 U. S. 293, 299 (1946).

7.      Prior to and during the Class Period, the Company was incredibly focused on its performance in Oklahoma.  PlayAGS touted its Oklahoma market as a "key jurisdiction" for the Company and the Company's largest customer—the Chickasaw Nation—is Oklahoma-based. Beginning in 2018, as the Company prepared to conduct its string of public offerings, PlayAGS was focused on increasing sales and EGM placements in Oklahoma, and seemingly achieved its goals when the Company reported record-breaking growth and the "most EGM sales revenue" in Company history quarter after quarter.  PlayAGS also sought to improve its business by employing an optimization strategy, which PlayAGS claimed consisted of installing newer and more competitive game content on PlayAGS's older EGMs.  This strategy—in theory—would grow PlayAGS's recurring revenue and provide its long-term customers with newer and more profitable products.

8.      Unbeknownst to investors, however, the Company's appearance of record-breaking growth was a product of a fraudulent scheme to inflate its sales metrics and growth projections—particularly in Oklahoma.  When the Company was preparing its all-important growth projections for its January 30, 2018 initial public offering (the "IPO"), its executives determined that their internal projections were "not enough" and arbitrarily multiplied the numbers provided to Wall Street by four, with one high-level executive telling the employee who performed the original internal analysis: "Don't mention this to anyone."  After the Company went public, it continued to inflate investor expectations with exaggerated quarterly financial

guidance.  When PlayAGS was routinely short on such sales at the end of each quarter, PlayAGS management would regularly ask salespeople to move sales from the future quarter to the previous quarter to make up the shortfall. In one particularly egregious example, a group of PlayAGS management including Chief Executive Officer Defendant Lopez took the sale of 400 units for various customers scheduled for the first quarter of 2019 and instead recorded that sale for the fourth quarter of 2018.  For context, 400 units would constitute a material portion of the Company's false report of record-breaking growth for that quarter and year—Defendant Lopez himself would falsely tout that entire quarter's purported sales as 1,159 units, and annual sales of 4,300 units, despite knowing that 400 of these sales (fully 35 percent of the quarter's supposed growth and 9 percent of the year's) had not actually occurred that quarter or year.  This practice of inflating projections and manipulating sales was regularly discussed at forecasting and financial review meetings with the finance team and executive leadership, including Defendant Lopez and Chief Financial Officer Defendant Kimo Akiona.

9.     The baselessly inflated sales projections and overstated sales results were two sides of the same scheme: to give the market a false understanding of the Company's growth profile, and to make it seem there was substance to that illusion with inflated sales results along the way, to artificially inflate the Company's share price ahead of its IPO and subsequent secondary offerings.

10.     As PlayAGS and its officers were engaging in its sales manipulation practices and in furtherance of their fraudulent scheme, the Company was reporting to investors what appeared to be continued record-breaking growth and EGM placement after the Company's IPO, boasting the "most EGM sales revenue in [the] Company's history"—achieved by the Company's manipulative and unsustainable sales practices.  What is more, quarter after quarter, the Company revised its guidance upward based on its supposed success and purported "greater visibility" into its future sales.  Unsurprisingly, investors were assured by PlayAGS's growth story despite its mounting internal issues that Defendants actively concealed.

11.     To continue the illusion of strong growth after its IPO, PlayAGS acquired Integrity Gaming Corp. ("Integrity")—a regional slot route operator with over 2,500 gaming

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

4

1   machines in operation across over 33 casinos in Oklahoma and Texas—during the first quarter of

2   2019.  PlayAGS touted this acquisition as a "great example" of the Company's commitment to

3   "strategically grow [its] EGM installed base."

4          12.     What investors did not know, however, was that the appearance of growth from

5   the Integrity acquisition would come at disastrous costs.  For example, even though the

6   acquisition would increase the Company's EGM installed base, Integrity's EGMs had a

7   substantially lower revenue per day ("RPD") than PlayAGS's average, meaning that the

8   acquisition would have a disastrous impact on the Company's Oklahoma RPD.  Further, after

9   sending one of its employees to evaluate the Integrity acquisition, PlayAGS was informed that

10  this acquisition would result in the oversaturation of PlayAGS's products in Oklahoma.  Despite

11  knowing these downsides that would accompany the acquisition, the Company purchased

12  Integrity anyway—for a price that would later be characterized by industry insiders as "many

13  multiples too high"—to maintain this growth narrative.  Defendants touted the acquisition's

14  effect on increasing EGM growth without disclosing the disastrous costs that came with it.

15         13.     Given the Company's repeated assurances of record breaking growth, increased

16  sales, and improving RPD, investors and analysts were surprised when, in August 2019,

17  PlayAGS reported a net loss and—for the first time—reported disappointing quarterly revenues

18  and lowered its guidance downward due to challenges in its pivotal Oklahoma market.

19  Defendant Lopez informed investors that over the past year: the Company had placed only 800

20  incremental EGMs into its Oklahoma market, which had lower RPD than investors expected; and

21  the Company's poor financial results were attributable to underperformance in Oklahoma and the

22  placement of these low-RPD units in the Oklahoma market.  On this news, PlayAGS's share

23  price fell nearly 52 percent.

24         14.     However, PlayAGS assured investors that it was "implementing a variety of

25  measures" to correct these issues and the Company's problems were now "very well known."

26  This signaled to investors that this "misstep" would be limited to Oklahoma and would be short

27  lived.  Defendants' larger growth scheme remained concealed.

28

15.     Thus, three months later on November 7, 2019, investors and analysts were again surprised to learn that PlayAGS's domestic RPD decreased and the Company again lowered its guidance.  This time, Defendant Lopez told investors that the Company had come to a "conclusion" regarding its issues in Oklahoma and had "seen the bottom" of its issues there.  PlayAGS again assured investors that it was "addressing [these issues] with specific and targeted countermeasures."  Again, the Company's share price declined as a result, harming investors who suffered financial losses due to the false growth narrative.

16.     It was not until March 4, 2020 that the full impact of PlayAGS's unsupported and unsustainable growth measures, sales manipulation, and problematic Integrity acquisition hit investors.  On this day, the Company announced a pivot in its management of PlayAGS's Oklahoma presence that would now require the elimination of up to 1,000 underperforming units, the sale of which would be reinvested into "higher-performing markets."  This reversal of growth and strategy of abandonment stood in stark contrast to PlayAGS's statements about the strength of the Oklahoma market and earlier assurances that the Company's targeted countermeasures would address PlayAGS's Oklahoma issues.

17.     Revelations concerning the falsity of PlayAGS's growth story, the results of PlayAGS's unsustainable sales manipulation and EGM placement, and the negative impact of the Integrity acquisition took a terrible toll on PlayAGS's investors, who saw the Company's stock price fall from a Class Period high of $32.04 per share on August 27, 2018 to $6.65 per share on March 5, 2020, the day after the Class Period ended.

**C.     Overview of the Securities Act Claims**

18.     Separately, this action asserts purely strict liability and negligence claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") relating to PlayAGS's sale of 10,325,000 shares of common stock, on behalf of the PlayAGS's controlling shareholders, the Apollo Defendants.  Those shares were registered and offered to investors in two secondary public offerings pursuant to a common, false, and misleading Shelf Registration Statement defined herein.  The earlier secondary public offering was commenced on or about August 8, 2018 (the "August 2018 SPO") and saw 6,325,000 shares of Apollo

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

6

1    Defendants' PlayAGS common stock sold to the investing public at the price of $29.25 per

2    share.  The later secondary public offering was commenced on or about March 20, 2019 (the

3    "March 2019 SPO" and, together with the August 2018 SPO, the "SPOs") and saw 4,000,000

4    shares of Apollo Defendants' PlayAGS's common stock sold for $25.50 per share. PlayAGS

5    received none of the proceeds from the SPOs; the proceeds went to the Apollo Defendants,

6    PlayAGS's controlling shareholders, and the Underwriter Defendants.

7         19.    These Securities Act claims are brought on behalf of all persons and entities who

8    purchased or otherwise acquired PlayAGS common stock pursuant and/or traceable to the

9    Company's false and misleading Shelf Registration Statement issued in connection with the

10   SPOs, and who were damaged thereby.

11        20.    Congress passed the Securities Act in the hopes of restoring investor confidence

12   after corporate scandals and the stock market crash of 1929.  It requires that those who sell

13   securities to the investing public do so on the basis of accurate and full disclosures.  The

14   Securities Act creates liability for false, misleading, and incomplete statements made in

15   connection with public securities offerings in order to protect investors and maintain confidence

16   in our public markets.

17        21.    At the time of the SPOs, in an effort to appear to have a strong presence in the

18   EGM market, the Company engaged in unsustainable sales tactics to maintain, and build upon,

19   the purported explosive growth narrative the Company spun leading up to the Company's

20   January 2018 IPO.  These sales tactics preferred a quantity-over-quality approach where

21   PlayAGS was focused on installing as many EGMs on casino floors as possible, even on terms

22   that would negatively impact future financial results.  In contrast, the Shelf Registration

23   Statement used to conduct the SPOs stated that PlayAGS had the ability "to maintain [its] current

24   market position" and that PlayAGS's "Core titles have a proven track record of success and are

25   targeted at maintaining and growing [its] current installed base."

26        22.    PlayAGS's narrative of explosive growth was based on a false story of

27   maintaining the level of sales it had in years prior as well as capturing new EGM business to

28   sustain and even increase its future growth. The Shelf Registration Statement stated that

"[PlayAGS's] installed base represented only approximately 2% of the total addressable market … throughout the United States and Canada …" and that PlayAGS was "highly focused on continuing to expand [its] installed base of leased EGMs in markets that [it] currently serve[s]"—taken together, PlayAGS was "positioned to gain ship share over the next several years."

23.     The Shelf Registration Statement also discussed PlayAGS's growth strategies—a practice of acquiring other companies to instantly increase PlayAGS's installed base while also purportedly increasing the depth of product offerings through diversified content.  The Shelf Registration Statement touted PlayAGS's prior success with its growth strategy, stating that PlayAGS had "a strong track record of acquiring and integrating businesses with limited disruption to [its] core business" and the "[p]roven [a]bility to [s]uccessfully [i]ntegrate [a]cquisitions and [s]cale [its] [p]latform" to "realize both cost and revenue synergies."  The Shelf Registration Statement also claimed that PlayAGS's "strategy of producing diversified content [would] allow [PlayAGS] to maintain and grow [its] market leadership within [its] current Class II base."

24.     However, the Shelf Registration Statement failed to disclose that PlayAGS's track record was not as strong as the Company made it appear, that it was struggling to capture more market share, and that it was losing its grasp on its largest and most important revenue center, Oklahoma.  PlayAGS was worried about hitting earning targets before the August 2018 SPO and PlayAGS employees were pushing product sales in markets that were oversaturated, such as Oklahoma.  By placing more product in oversaturated markets, PlayAGS was subjecting itself to recurring expenses, associated with its fee-sharing and lease arrangements, without the benefit of recurring revenue.

25.     Moreover, the Shelf Registration Statement failed to disclose PlayAGS's flawed growth strategy.  PlayAGS had acquired companies that resulted in placement of unnecessary products in highly competitive and oversaturated markets, including Oklahoma.  As part of those acquisitions, PlayAGS concealed that it received poor quality EGMs that dragged the Company's revenue down and resulted in significant repair and maintenance costs.  Furthermore,

the Shelf Registration Statement did not disclose that certain markets, including Oklahoma, did not prefer product diversification—meaning a strategy of adding diverse product to those locations was believed likely to lead to financial devastation for the Company, yet was undertaken anyway to maintain the false appearance of growth.

26.     The Company would later admit after the SPOs, through which the Apollo Defendants offloaded approximately $254 million worth of PlayAGS common stock, that the Company placed too much diverse product, too quickly, in Oklahoma through product placements the year earlier and through the acquisition of Integrity. Moreover, the Company blamed the poor quality of these games in Oklahoma as a reason for announced decreases in the Company's overall RPD.  Also, the Company told the public, for the first time, that Oklahoma, its largest revenue center, had a historically lower RPD than the Company average (*i.e.*, that its largest revenue center was inefficient).

27.     Simply put, the Shelf Registration Statement failed to disclose (1) PlayAGS's unsustainable sales tactics, (2) that PlayAGS's EGMs in Oklahoma had a lower RPD than the Company's domestic average, and (3) Play AGS's flawed growth and diversification strategy— including its prior record of poorly managed and executed acquisitions—meant to achieve growth at the expense of business fundamentals.  Had these issues been disclosed in the SPOs, investors would have realized that PlayAGS was on a course for a reversal of fortune.

28.     As a result of these undisclosed adverse facts, PlayAGS's stock plummeted, falling from its two secondary offering prices of $29.25 and $25.50 (respectively) to close at $3.58 per share on August 4, 2020, the day these claims were first asserted.

## II.     JURISDICTION AND VENUE

29.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), as well as Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

9

30.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C.§ 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

31.     Venue is proper pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 17 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this District.  Many of the acts charged in this Complaint, including the dissemination of materially false or misleading information, occurred in, or emanated from, this District.  In addition, certain Defendants reside, are headquartered, and/or maintain substantial operations in this District.

32.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

III.    PARTIES

A.      Lead Plaintiff

33.     Court-appointed Lead Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma Police") is a defined benefit pension plan that provides retirement benefits and other specified benefits to the Policemen and women of Oklahoma.  Oklahoma Police was established in 1981 and is based in Oklahoma City, Oklahoma.  Oklahoma Police serves more than 8,500 beneficiaries and is overseen by a 13-member board of trustees, which acts as a fiduciary for the investment of Oklahoma Police's assets.  As set forth in the Certification previously filed with the Court (ECF No. 18-2), Lead Plaintiff purchased a significant amount of PlayAGS common stock during the Class Period, and suffered substantial losses as a result of the violations of the federal securities laws alleged in this action.  In particular, Lead Plaintiff purchased PlayAGS common stock pursuant and traceable to the Shelf Registration Statement, including 11,907 shares purchased in the August 2018 SPO from Deutsche Bank Securities Inc., at the offering price of $29.25 and without commission because of the underwriting discount paid to Deutsche

Bank Securities Inc. as a selling underwriter in connection with this sale, and has been damaged thereby.

**B.    Defendant PlayAGS**

34.    Defendant PlayAGS is incorporated under the laws of Nevada with its principal executive offices located in Las Vegas, Nevada.  PlayAGS's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "AGS."

**C.    The Individual Defendants**

35.    Defendant David Lopez ("Lopez") has served at all relevant times as the Chief Executive Officer ("CEO") and President of PlayAGS and is a Director on PlayAGS's Board of Directors (the "Board").

36.    Defendant Kimo Akiona ("Akiona") has served at all relevant times as the Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO") and Treasurer of the Company.

37.    Defendants Lopez and Akiona may hereafter be referred to at times as the "Executive Defendants," and, together with PlayAGS, the "PlayAGS Defendants."

38.    Defendant David Sambur ("Sambur") was, at all relevant times, a Director on PlayAGS's Board and a Co-Lead Partner at Apollo Global Management LLC.

39.    Defendant Daniel Cohen ("Cohen") was, at all relevant times, a Director on PlayAGS's Board and a Principal at Apollo Global Management LLC.

40.    Defendant Eric Press ("Press") was, at all relevant times, a Director on PlayAGS's Board and a Senior Partner at Apollo Global Management LLC.

41.    Defendant Yvette Landau ("Landau") was, at all relevant times, a Director on PlayAGS's Board.

42.    Defendant Adam Chibib ("Chibib") was, at all relevant times, a Director on PlayAGS's Board.

43.    Defendant Geoff Freeman ("Freeman") was a Director of PlayAGS at the time of the March 2019 SPO.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

11

44.     Defendants Sambur, Cohen, Press, Landau, Chibib, and Freeman may hereafter be referred to at times as the "Director Defendants" and, together with the Executive Defendants, the "Individual Defendants."

### D.     The Apollo Defendants

45.     Defendant Apollo Global Management, LLC ("Apollo Global"), together with its subsidiaries, is a global investment firm that manages multiple alternative asset classes to generate investment returns for its fund investors.  The Shelf Registration Statement identifies Apollo Global, and its subsidiaries, as the "Sponsor" of the SPOs.  Defendant Apollo Global, through its affiliates: Apollo Gaming Holdings, L.P. ("Apollo Gaming"), Apollo Investment Fund VIII, L.P. ("Apollo Investment"), and AP Gaming VoteCo, LLC ("VoteCo" and together with Apollo Global, the "Apollo Defendants"), acquired PlayAGS in 2013.  The purpose of the SPOs was for the Apollo Defendants to exit their investment in PlayAGS by selling its shares to the investing public.  The Apollo Defendants controlled 51.9 percent of the Company's common stock prior to the August 2018 SPO and 33.1 percent prior to the March 2019 SPO.  After the March 2019 SPO, the Apollo Defendants controlled 22.8 percent of the Company's common stock.  As a result, the Apollo Defendants controlled and had significant influence over the outcomes of votes on all matters requiring approval of our stockholders, including entering into significant corporate transactions.  Further, the Apollo Defendants exerted additional control and significant influence over the Company through its representatives, Defendants Sambur, Cohen, and Press, on the Board.

### E.     The Underwriter Defendants

46.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Credit Suisse is a Delaware limited liability company with principal executive offices located at 11 Madison Avenue, 24th Floor, New York, New York.  Credit Suisse was allocated 1,155,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

47.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Deutsche Bank is a Delaware corporation with principal executive offices located at 60 Wall Street, New York, New York.  Deutsche Bank was allocated 1,550,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

48.     Defendant Jefferies LLC ("Jefferies") is a financial services company that acted as an underwriter for the August 2018 SPO and the March 2019 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Jefferies is a Delaware limited liability company with principal executive offices located at 520 Madison Avenue, 11th Floor, New York, New York.  Jefferies was allocated 660,000 shares in the August 2018 SPO, before the exercise of the overallotment, and 2,000,000 shares in the March 2019 SPO.

49.     Defendant Macquarie Capital (USA) Inc. ("Macquarie") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Macquarie is a Delaware corporation with principal executive offices located at 125 West 55th Street, Level 22, New York, New York.  Macquarie was allocated 660,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

50.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Merrill Lynch is a Delaware corporation with principal executive offices located at One Bryant Park, New York, New York.  Merrill Lynch was allocated 385,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

13

51.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Citigroup is a New York corporation with principal executive offices located at 388 Greenwich Street, Tower Building, New York, New York.  Citigroup was allocated 275,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

52.     Defendant Stifel, Nicolaus & Company Inc. ("Stifel") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Stifel is a Missouri corporation with principal executive offices located at 501 North Broadway, St. Louis, Missouri.  Stifel was allocated 275,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

53.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  SunTrust is a Tennessee corporation with principal executive offices located at 3333 Peachtree Road, N.E., Atlanta Financial Center, South Tower, 9, Atlanta, Georgia. SunTrust was allocated 275,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

54.     Defendant Nomura Securities International, Inc. ("Nomura") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Nomura is a New York corporation with principal executive offices located at Worldwide Plaza, 309 West 49th Street, New York, New York.  Nomura was allocated 110,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

14

55.     Defendant Roth Capital Partners, LLC ("Roth Capital") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Roth Capital is a California limited liability company with principal executive offices located at 888 San Clemente, Suite 400, Newport Beach, California.  Roth Capital was allocated 110,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

56.     Defendant Union Gaming Securities LLC ("Union Gaming") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Union Gaming is a Nevada limited liability company with principal executive offices located at 3930 Howard Hughes Parkway, Suite 230, Las Vegas, Nevada.  Union Gaming was allocated 110,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

57.     Defendant The Williams Capital Group, L.P. ("Williams") is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Williams is a Delaware limited partnership with principal executive offices located at 650 Fifth Avenue, 9th Floor, New York, New York.  Williams was allocated 55,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

58.     Defendant Apollo Global Securities, LLC ("Apollo Global Securities"), an affiliate of the Apollo Defendants, is a financial services company that acted as an underwriter for the August 2018 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Apollo Global Securities is a Delaware limited liability company with principal executive offices located at 9 West 57th Street, 48th Floor, New York, New York.  Apollo Global Securities was allocated

275,000 shares in the August 2018 SPO to sell to the investing public before the exercise of the overallotment.

59.      Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a financial services company that acted as an underwriter for the March 2019 SPO, helping to draft and disseminate the Shelf Registration Statement and solicit investors to purchase the PlayAGS stock issued pursuant thereto.  Morgan Stanley a Delaware limited liability company with principal executive offices located at 1585 Broadway, New York, New York.  Morgan Stanley was allocated 2,000,000 shares in the March 2019 SPO to sell to the investing public.

60.      Defendants Credit Suisse, Deutsche Bank, Jefferies, Macquarie, Merrill Lynch, Citigroup, Stifel, SunTrust, Nomura, Roth Capital, Union Gaming, Williams, and Apollo Global Securities may herein be referred to at times as the "August 2018 SPO Underwriter Defendants."

61.      Defendants Jefferies and Morgan Stanley may herein be referred to at times as the "March 2019 SPO Underwriter Defendants" and, together with the August 2018 SPO Underwriter Defendants, the "Underwriter Defendants."

62.      Defendant PlayAGS, the Individual Defendants, the Apollo Defendants, and the Underwriter Defendants may herein be referred to at times as the "Defendants."

## IV.      ADDITIONAL BACKGROUND FOR PLAYAGS AND ITS BUSINESS

63.      PlayAGS describes itself as the leading designer and supplier of EGMs and other products and services for the gaming industry.

64.      Founded in 2005, PlayAGS historically focused on supplying EGMs, including slot machines, video bingo machines, and other electronic gaming devices, to the Native American gaming market.

65.      PlayAGS operates primarily in the North American gaming market, which includes U.S. commercial casinos, Native American casinos, Canadian casinos, video lottery terminals ("VLT") and Mexican casinos.  In the United States, Native American casinos represent a significant portion of the EGM market, with over 360,000 Class II and Class III EGMs, and has historically been a focus for the Company.  The Company generates a significant

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

16

1   amount of its revenues from EGMs that are placed in Native American casinos located in

2   Oklahoma.

3       66.    Native American gaming is regulated under the Indian Gaming Regulatory Act of

4   1988 ("IGRA"), which classifies legalized gaming into three categories: Class I, Class II, and

5   Class III.

6       67.    Class I gaming includes: (i) traditional Native American gaming which may be

7   part of Native American tribal ceremonies and celebrations (*e.g.* contests and games of skill);

8   and (ii) social gaming for minimal prizes.  Regulatory authority over Class I gaming is vested

9   exclusively in Native American tribal governments and is not subject to IGRA requirements.

10  PlayAGS does not compete in the Class I industry.

11      68.    Class II gaming includes EGMs that utilize bingo, electronic aids to bingo, and, if

12  played at the same location where bingo is offered, pull-tabs and other games similar to bingo.

13  Class II gaming excludes: (i) slot machines; and (ii) electronic facsimiles of Class III games.

14  Class II gaming machines can be operated in states that permit bingo-style gaming without any

15  agreement with the state and without any revenue sharing with the state, whereas Class III

16  gaming requires Native American tribes to enter into a compact with the state in which their

17  casino is located, which typically includes revenue sharing with the state.  Revenue from gaming

18  operations is concentrated in the Class II gaming and casino industry and is located primarily in

19  Oklahoma.

20      69.    According to the Company, Class II games are an attractive option for Native

21  American tribes because: (i) revenue generated from Class II gaming is not subject to revenue

22  sharing or taxes; (ii) there are no limits on the number of Class II gaming machines that may be

23  operated in any one facility; and (iii) a strong Class II alternative improves a tribe's leverage

24  when negotiating its Class III compact with the state.  PlayAGS describes the Class II market as

25  "highly relationship based."

26      70.    Class III gaming includes all forms of gaming that do not fit into Class I or Class

27  II markets.  For example, games commonly played at casinos, including but not limited to slot

28  machines, blackjack, craps, roulette, wagering games and electronic facsimiles of any game of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

17

chance.  Class III machines can be found in commercial casinos and in Native American casinos that have entered into a state compact that permits a specified number of Class III machines.

71.     Since 2014, the Company has expanded its product line-up and now operates its business in three distinct segments: EGMs, Table Products ("Table Products") and Interactive Social Casino Games ("Interactive").  Each segment's activities include the design, development, acquisition, manufacturing, marketing, distribution, installation, and servicing of a distinct product line.

72.     ***Electronic Gaming Machines*** is the Company's largest segment, representing 95% of the Company's revenue for 2019, and comes predominantly from Class II sources.  EGMs include but are not limited to slot machines, Class II machines, video poker and video lottery machines.

73.     As of December 31, 2019, PlayAGS's total EGM footprint comprised of 26,865 units (18,368 domestic and 8,497 international).  The Company is licensed in 31 U.S. states and two foreign countries (253 total licenses).

74.     In the Company's EGM Segment, customers are given the option of leasing or purchasing their EGMs and associated gaming systems.  PlayAGS provides its customers with EGMs, table products, ancillary table product equipment, systems software, computer hardware, signage and other equipment for operation within their gaming facilities.  In return, PlayAGS receives either cash for sold items, or a share of the revenue generated by these products and systems, either as a flat monthly fee or a daily fee.  The determination of whether the Company's agreement results in a revenue share, monthly fee, or daily fee arrangement is generally governed by local gaming jurisdictions.

75.     The Company derives substantially all of its EGM revenues from EGMs installed under revenue sharing or fee-per-day lease agreements, also known as "participation" agreements, and referred to by the Company as its "participation model."

76.     As of December 31, 2019, PlayAGS had a library of over 423 proprietary game titles on its EGM cabinets, including: (i) *Orion Portrait*; (ii) *Orion Slant*, (iii) *Orion Upright*; (iv) *ICON*; and (v) *Big Red*.  The Company's *Orion* line of games is engineered for multiple

1    configurations and is available for Class II and Class III markets.  PlayAGS frequently touted its

2    *Orion* platform as a "key driver of [its] equipment sales business," as well as a driver of

3    momentum in Class II, Class III, and newly addressable markets.

4          77.    ***Table Products*** is the Company's second segment, which consists of over 40

5    unique table product offerings, including live felt table games, side bet offerings, progressives,

6    signage and other ancillary table game equipment.  PlayAGS's premium table products include

7    *Criss Cross Poker*, *Chase The Flush*, *Jackpot Hold'em*, and *3 Card Blitz*.

8          78.    As of December 31, 2019, PlayAGS had placed 3,766 table products domestically

9    and internationally.  The Company characterizes itself as a leading supplier of table products to

10    the gaming industry based on number of products placed.

11          79.    Revenue derived from PlayAGS's Table Products segment is primarily focused

12    on royalties and high margin recurring revenue generated by leases.

13          80.    ***Interactive Social Casino Games*** is the Company's third segment, in which it

14    traditionally offered business-to-consumer ("B2C") social gaming interactive casino products

15    and, following the June 2018 acquisition of Gameiom Technologies Limited ("Gameiom," and

16    currently known as "AGS iGaming"), now also offers a business-to-business ("B2B") platform

17    for content aggregation used by real-money gaming ("RMG") and sports-betting partners.

18          81.    Although free to play, the Company's Interactive segment generates revenues

19    from: (1) B2C social products where consumers purchase virtual coins used to play social casino

20    games; (2) B2B social products where PlayAGS obtains a percentage of monthly revenue

21    generated by the white label casino apps that it builds and operates for its customers; and (3)

22    RMG revenues, which are earned primarily based on a percentage of the revenue produced by

23    the games on its platform as well as monthly platform fees and initial integration fees.

24          82.    As of December 31, 2018, PlayAGS's combined B2C offerings reached

25    approximately 38,000 daily active users ("DAU").

26          83.    On January 30, 2018, in an effort to raise capital, PlayAGS completed its initial

27    public offering ("IPO") of 10,250,000 shares of common stock, at a public offering price of

28    $16.00 per share.  The Company received $153.3 million from the IPO.

## V.    EXCHANGE ACT ALLEGATIONS

### A.    Oklahoma Was a Key Focus for the Company

84.    PlayAGS characterizes its Oklahoma market as "established" and the Executive Defendants referred to Oklahoma as a "key market" and a "very strong jurisdiction."  In fact, Oklahoma contains the most PlayAGS units out of any state.  According to the offering materials for PlayAGS's IPO, PlayAGS had 6,545 units in Oklahoma.  The Company's next largest presence in a singular state was 2,642 units in Alabama.  Further, the Company's primary EGM production facility is located in and managed out of Oklahoma.

85.    Oklahoma is the largest tribal market in the U.S. with approximately 40,000 Class II and 30,000 Class III EGMs as of September 30, 2017.

86.    For the twelve month period ending December 31, 2019, PlayAGS derived approximately 24% of its total revenue from gaming operations in Oklahoma.  Approximately 9% of the Company's total revenue was from one Native American gaming tribe—the Chickasaw Nation—in Oklahoma.  PlayAGS has several agreements with the Chickasaw Nation from which the Company derives revenue in Oklahoma.

87.    On November 8, 2018, when Defendant Lopez was asked on PlayAGS's 3Q18 earnings call about the renewal of PlayAGS's Oklahoma contract with the Chickasaw Nation— the Company's largest customer—Defendant Lopez explained that the PlayAGS Defendants were "very confident"  in the prospect of renewal and that the Company has a "great relationship" with the Chickasaw Nation.  In fact, the PlayAGS Defendants acknowledged that the renewal of this Oklahoma contract with its "biggest partner" was important to and "a focus for our investors."  Defendant Lopez reiterated this focus, stating in relevant part:

> As far as like our -- I guess, our biggest partner and all, Chickasaw, we've been working diligently to deal with that. It's -- as we said, it expires sort of at the end of the year of 2019. We've had plenty of time. But we've gotten focused on it because we know that it's a focus for our investors. And at this point, we've got a contract. Terms and conditions are locked and loaded. Everything as agreed to. We have paper. Everyone's got paper in front of them, and we're just waiting for a very high-ranking official to come back into the country from, I think, the U.K. And as soon as that's ready, we lock

1

2

and load and we sign. And so that will be happening in the near future here …

3       88.     When Defendant Lopez informed investors that the Company had in fact renewed

4

5

its contract with the Chickasaw Nation on the Company's May 8, 2019 earnings call, he

explained this contract provided for 3,200 recurring revenue games across their 22 casinos in

Oklahoma.

6

7       89.     In fact, the Company repeatedly spoke of the size and importance of its Oklahoma

8

9

market throughout the Class Period.  For example, Defendant Lopez stated that Oklahoma

"continues to be a healthy market" for the Company.

10      90.     Also during the Class Period, as explained by Defendant Lopez on the Company's

11

12

November 7, 2019 earnings call to discuss their third quarter 2019 results, the Company and its

executives "monitor[ ] the market very closely, looking at it obviously week to week, month to

13

month…."

14      91.     Accordingly, investors were repeatedly assured that, based on the knowledge the

15

16

Company and the Executive Defendants derived from their frequent monitoring, the Company

was heavily focused on the success and growth of Oklahoma, its most important market.

17      **B.      Prior to and During the Class Period, PlayAGS Touted its Pursuit of Acquisitions as a Competitive Strength**

18      92.     PlayAGS's M&A history includes several acquisitions prior to and during the

19

20

21

22

23

Class Period, including Rocket Gaming Systems ("Rocket"), In Bet Gaming, Gamingo Limited, Cadillac Jack, Casino War Blackjack, Inc., C2 Gaming, LLC, and intellectual property acquisitions. According to the Company's offering materials for its IPO, the Company's track record of acquisitions was one of its competitive strengths, expanding product lines and developing new content and gaming products to meet the needs of its customers.

24      93.     According to PlayAGS, the Company pursues acquisitions to enhance its content,

25

26

titles, and overall installed base.  The Company frequently touted its ability to successfully integrate acquisitions with limited disruption to its core business.

27      94.     For example, on May 29, 2015, PlayAGS acquired Cadillac Jack, a provider of

28

Class II gaming machines for the North American tribal gaming market.  The Company

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE          21
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

1   described this acquisition as creating growth opportunities in Class II and Class III jurisdictions

2   and as expanding the Company's geographic footprint in jurisdictions like Alabama, Mexico,

3   and Wisconsin.

4         95.     During the quarter ended June 30, 2018, PlayAGS acquired Gameiom, currently

5   known as "AGS iGaming," a licensed gaming aggregator and content provider to online gaming

6   operators for real money gaming ("RMG") and sports betting partners.  The total consideration

7   for this acquisition was $5 million.  According to Defendant Lopez, the acquisition of Gameiom

8   supported the Company's strategy to expand its distribution channels for its game content and

9   enabled PlayAGS to participate in RMG in the online space.

10         96.     On February 8, 2019, PlayAGS acquired Integrity, a regional slot route operator

11   with over 2,500 gaming machines in operation across over 33 casinos in Oklahoma and Texas.

12   The total consideration for this acquisition was $52.6 million.  The acquisition of Integrity added

13   2,600 recurring revenue units to PlayAGS's installed base.  On the Company's 4Q18 earnings

14   call, Defendant Lopez described the acquisition as a "great example of [PlayAGS's] commitment

15   to strategically grow our EGM installed base."

      **C.**      **Defendants' Fraudulent Scheme to Inflate Growth Leading Up to and After**

16                 **Its IPO**

17         97.     The Class Period begins on January 26, 2018, the day PlayAGS filed with the

18   SEC a prospectus on Form 424B4 (the "IPO Prospectus"), which forms part of the registration

19   statement used to conduct its initial public offering of 10,250,000 shares at an offering price of

20   $16.00 per share (the "IPO").  This offering price was the product of a fraudulent scheme to

21   inflate the market's view of the Company's financial condition, future revenue, and business

22   prospects, detailed below.

23         **1.**      **The Company's IPO Prospectus Connected the Subjects of its**

24                 **Fraudulent Scheme to its Offering Price**

25         98.     In its IPO Prospectus, PlayAGS touted many of the Company's purported

26   strengths, including its revenue growth, successful completion and integration of acquisitions,

27   and optimization of its existing footprint.  For example, PlayAGS stated the following about its

28   competitive strengths:

---

> We have grown our revenue, adjusted EBITDA and installed base by consistently adding unique and differentiated products to offer to our players and casino operators while maintaining a consistent focus on customer service. In addition, we have a track record of completing and integrating acquisitions, expanding our product lines, and developing new content and gaming products to meet the needs of our customers. We believe that this track record differentiates us from our competition and, along with the following competitive strengths, has enabled us to become a leading designer and supplier of gaming equipment and services.

99.     Among these competitive strengths is PlayAGS's purportedly "proven ability" to successfully integrate its acquisitions.  The IPO Prospectus states in pertinent part:

> ***Proven Ability to Successfully Integrate Acquisitions and Scale Our Platform***
>
> We have a strong track record of acquiring and integrating businesses with limited disruption to our core business. Over the past three years, we have effectively integrated over 20 acquisitions. The acquisition of Cadillac Jack demonstrated our ability to realize both cost and revenue synergies and, as a result of efficiently integrating two complementary businesses, to deliver strong financial results in 2016. We believe that our proven track record is the result of our ability to successfully identify businesses with products and cultures that are complementary to AGS.

100.     The Company further told investors that it benefitted from recurring revenue sources and a stable source of income.  The IPO Prospectus stated:

> ***High-Margin , Recurring Revenue Model with Attractive Payback Periods on Newly Deployed Capital***
>
> Approximately 83% of our revenue in the LTM period was derived from products that we leased to our customers and recurring revenue from our Interactive gaming operations. This strong base of recurring, contracted, high-margin revenue generated a 56% EGM adjusted EBITDA margin, which reflects the strong performance and longevity of our game titles and long-term relationships with our key customers. The cash flow generated from our recurring revenue sources has provided us with a stable source of capital to grow our footprint both domestically and internationally. Given the high-margin, recurring-revenue nature of our new EGMs, we benefit from payback periods on our leased units of only approximately 12 months for our core units and approximately 8 months for our premium units.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

23

101.     PlayAGS also touted its optimization strategy and the resultant increase in profitability generated by its already-existing footprint, stating in part:

> ***Optimize Yield Across our Existing Footprint***
>
> We believe there is a significant opportunity to optimize the older EGMs in our existing installed base with newer, more profitable cabinets. By improving the performance of our installed base, we will generate incremental EGM adjusted EBITDA since our participation model enables us to share in the profitability of the EGMs that we place in our customers' gaming facilities. We currently have an installed base of approximately 3,100 older cabinets that we believe, over time, can be upgraded with our newer cabinets to generate higher win per day. The typical refresh cycle for EGMs is approximately three years, which creates a natural, continuous driver of equipment sales and provides us with the ability to optimize our installed base by constantly refreshing it with newer cabinets.

### 2.     The Company and Executive Defendants Engaged in a Fraudulent Scheme to Inflate its IPO Price

102.     However, a confidential witness confirms that in the months leading up to the IPO, PlayAGS executives engaged in a fraudulent scheme that misrepresented the Company's growth to successfully raise money and backing by investment banks for its first public offering. CW-12 worked at PlayAGS in Las Vegas, NV as Director of Gaming Operations from November 2013 until February 2019.  CW-12's responsibilities were managing large projects and acquisitions.  CW-12 then worked in Sales in Florida as an Account Executive until August 2019.  CW-12 reported to Senior Vice President of Slot Products Andrew Burke, who reported to Defendant Lopez.

103.     CW-12 explained that he was present at a meeting with Senior Vice President Burke, Defendant Lopez, Defendant Akiona, Chief Marketing Officer Julia Boguslawski, Senior Vice President of Table Products John Hemberger, and other members of the "C-suite" in mid-2017, six to eight months prior to PlayAGS going public in January 2018.  According to CW-12, several consultants from McKinsey & Company ("McKinsey") were also present.  CW-12

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

24

1  explained that PlayAGS had paid McKinsey to conduct an analysis of the Company and help the

2  Company raise money for the January 2018 IPO.

3      104.  CW-12 stated that the McKinsey consultants had asked the PlayAGS team to

4  provide them with an analysis of the Company's projected growth, and CW-12 was instructed to

5  perform that analysis.  CW-12 recounted that he contacted the sales teams and used their

6  numbers to conduct a "bottom-up" analysis of PlayAGS's revenue.[2]

7      105.  CW-12 further recalled that the meeting attendees reconvened two weeks later for

8  CW-12 to present his findings.  At the meeting, CW-12 stated that PlayAGS could expect to, at

9  best, double its revenues in the next year and double revenue again the following year.  CW-12

10  explained that when he presented this data, Defendant Lopez cut him off and said, "that's not

11  enough."  CW-12 further stated that Defendant Lopez asked the McKinsey consultants to leave

12  the room and then reiterated that CW-12's growth projections were not high enough and that the

13  numbers needed to be revised higher.  CW-12 stated that Burke then echoed Defendant Lopez's

14  instructions to revise the Company's growth projections upwards.  CW-12 stated that Burke then

15  changed his mind and instructed CW-12 to send his analysis to Burke.

16      106.  According to CW-12, approximately two or three months later, CW-12 saw the

17  "package" that McKinsey used to raise money from investment banks, including Merrill Lynch

18  and Jefferies.  CW-12 stated that the growth analysis included in the package was the exact

19  analysis he put together, except that Burke had replaced CW-12's name with McKinsey's, added

20  McKinsey's color scheme, and multiplied all of the numbers by four.

21      107.  CW-12 recalled that he confronted Burke and asked why the analysis contained

22  inaccurate findings.  According to CW-12, Burke replied that Defendant Sambur—Co-Lead

23

24  [2]      In finance, a "bottom-up" analysis is one based on internal, on-the-ground company data
25  to develop measurements and forecasts based on company fundamentals.  *See*
   https://corporatefinanceinstitute.com/resources/knowledge/modeling/bottom-up-forecasting/
26  ("Bottom-up forecasting is a method of estimating a company's future performance by starting
   with low-level company data and working 'up' to revenue. This approach starts with detailed
27  customer or product information and then broadens up to revenue.").  It contrasts with "top-
   down" analyses that instead use industry-wide or other factors external to the company to come
28  up with measurements and forecasts.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

25

Partner of Apollo Global Management, PlayAGS's largest shareholder—said "we needed more." CW-12 responded that the package was a total lie, but CW-12 explained his protest fell on deaf ears.  According to CW-12, Burke said "This is no longer your concern," and "Don't mention this to anyone."  According to CW-12, PlayAGS misconstrued the growth of the company.

108.    By arbitrarily inflating the Company's expected future growth to an extent far beyond that supported by the Company's own internal analysis, and further by providing these inflated measures to the investment banks that would underwrite the IPO, the PlayAGS Defendants employed a fraudulent scheme to inflate the Company's share price from January 26, 2018 that lasted until the true state of its financial condition and growth prospects became known to investors on March 4, 2020.

**D.    PlayAGS Purportedly Employed Optimization Strategy to Compete Amongst Dominant Industry Players**

109.    Throughout the Class Period, PlayAGS attributed much of its success to its optimization capabilities, which it described as consisting of installing newer and more competitive game content on PlayAGS's older EGMs.  For example, on May 3, 2018, Defendant Lopez explained that the Company's increase in revenue was attributable to this strategy, which purportedly allowed the Company to grow its recurring revenue and support its long-term customers by providing them with newer, more profitable products.

110.    PlayAGS games *Orion Portrait* and *ICON* were pivotal parts of the Company's optimization story.  According to the Company, these games built the Company's recurring revenue by "serving profit-enhancing upgrades to some of [its] legacy units in the field." In fact, on March 14, 2018 during the Company's first earnings call as a public company, Defendant Lopez attributed PlayAGS's "record" sales and recurring revenue in part to the "continued performance of our core *ICON* cabinet, [and] the tremendous growth of our premium *Orion Portrait* cabinet."

111.    Contrary to this representation that PlayAGS had the ability to optimize existing units, and unbeknownst to investors, the Company's growth strategy was instead based on flooding the Oklahoma market with EGMs in an undisclosed and unsustainable fashion that did

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

26

not involve more profitable products.  As eventually admitted by Defendant Lopez, throughout 2018 and 2019, the Company was placing additional units into the Oklahoma market, and went "too hard and fast" into that market.  Multiple CWs confirm that PlayAGS utilized manipulative and unsustainable sales practices to do so, and this practice resulted in an oversaturation of the Oklahoma market and the need to swap, relocate, or even sell off 1,000 units and redirect capital to higher-performing markets.

### E.   Unbeknownst to Investors, PlayAGS Placed Immense Pressure on Oklahoma Sales Team to Maintain Post-IPO Momentum

112.   By 2018, as the Company prepared to conduct its string of public offerings, PlayAGS needed to report financial results that confirmed rather than undermined its growth narrative.  To effectively compete in the Oklahoma market—where PlayAGS's business was heavily concentrated—PlayAGS had to demonstrate that it could increase sales and EGM placement numbers in Oklahoma.

113.   The Company seemingly delivered on this goal.  On May 3, 2018, the Company touted the "continued growth of [its] EGMs," continually revising guidance upward based on what it described as "greater visibility" into its products.  In PlayAGS's 1Q18 earnings release on May 3, 2018, the Company told investors it "achieved records in every key category" and reported the "most EGM sales revenue in [the] Company's history."  PlayAGS assured investors it showed "no signs of slowing down."

114.   Again, Defendants attributed much of the Company's growing success to PlayAGS's optimization strategy and the strength of its customer relationships.  In fact, on the May 3, 2018 earnings call, Defendant Lopez assured investors the Company was "continu[ing] to execute [its] yield optimization strategy," which "serves to grow [the Company's] recurring revenue" and "support [PlayAGS's] loyal long-term customers by providing them with newer, more profitable products."  On this same call, Defendant Akiona explained the increase in revenue was "fueled primarily by a substantial increase in EGM equipment sales, an increase in [ ] EGM installed base as well as an increase in our domestic revenue per day."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

27

115.    Contrary to Defendants' statements about the Company's growth and record sales, former PlayAGS employees confirmed that this growth was a product of manipulative and unsustainable sales practices throughout 2018.  For example, CW-1, a former Vice President of Game Development in Atlanta from June 2015 through January 2018, confirmed that PlayAGS was determined to increase its ship share from seven to at least ten percent.[3]  CW-1 explained that ship share must meet or exceed ten percent in order for a casino game manufacturer to be considered a dominant industry player.  CW-1 also explained that PlayAGS was struggling to sell its products in Oklahoma, as well as all over the country.  According to CW-1, after the Company's IPO in January 2018, there was "a lot of pressure" to keep the momentum going.

116.    Other confidential witnesses also confirmed that PlayAGS placed mounting sales pressure on its Oklahoma sales team to place as many games as possible.  CW-2, a former Director of Slot Products in Nevada from September 2015 until February 2017, was responsible for product management, placing units, and forecasting earnings.  CW-2 advised that according to his former colleague, a former Director of Sales, PlayAGS forecasted unrealistic growth and there was "a lot of sales pressure" to keep earnings high going into PlayAGS's initial public offering in January 2018.

117.    CW-11, a former senior employee in sales, employed from before the Class Period until shortly before the August 2019 Secondary Offering.[4]  CW-11 oversaw a team of salesman for a large percent of PlayAGS's sales revenue and reported to a senior vice president who reported to Senior Vice President of Slot Products Andrew Burke, who reported to Defendant Lopez.  CW-11 explained that Burke was pressured to increase the 2018 sales performance in 2019, and that Burke attempted to accomplish this by increasing the RPD projections for all of the leased games in Oklahoma. CW-11 explained that Burke made the

---

[3]    Ship share refers to the share of all slots sold in a specified period.

[4]    At CW-11's request, due to potential retaliatory concerns expressed by CW-11, Lead Plaintiff has removed some identifying details about CW-11's employment at PlayAGS during the relevant time frame. Lead Plaintiff believes that the details of the responsibilities of CW-11 contained herein are sufficient to satisfy the requirements of the PSLRA. However, Lead Plaintiff can provide additional specificity, including CW-11's exact title, to the Court through an *in camera* submission.

1   decision to increase the 2019 RPD budget for every PlayAGS game by 15 to 25 percent despite

2   having no basis for believing RPD would increase. CW-11 was informed of this increase in the

3   annual sales budget at a meeting run by Burke in December 2018.

4        118.    CW-11 went on to say that leased games comprise "probably 99 percent" of

5   AGS's presence in Oklahoma. CW-11 likened this strategy to expecting "a Coke machine" that

6   had been earning the same amount of revenue for years to "magically start making 25 percent

7   more money." CW-11 elaborated that, while it might have been possible to upgrade a few games

8   and increase their RPD, it is unreasonable to assume that every game will increase RPD.

9        119.    PlayAGS was not simply pressuring its salesforce, but more specifically,

10  pressuring them to sell underperforming games to create inflated sales results using manipulative

11  tactics that its officers knew were unsustainable—to give the appearance of growth and further

12  its growth narrative—without disclosing that the growth was generated in part from lower-RPD

13  or otherwise underperforming products, even while touting "optimization" as part of its business.

14  CW-3, a former information systems manager who worked at PlayAGS prior to the Class Period,

15  explained that PlayAGS pressured salespeople—particularly in Oklahoma—to place as many

16  games as possible, even if those games were underperforming.  CW-3 noted this practice began

17  in late 2017 and early 2018 in an effort to inflate PlayAGS's sales numbers.  CW-3 recalled that

18  numerous salespeople "pushed back" against the practice of aggressively selling

19  underperforming games, and those people were terminated.  The more underperforming products

20  the Company sold in this manner, the worse its average RPD and future financial results would

21  inevitably be.

22       120.    CW-4, a former employee of PlayAGS in Georgia, previously worked at Cadillac

23  Jack until Cadillac Jack was purchased by PlayAGS in 2015, where he continued to work until

24  August 2018.  During the Class Period, CW-4 was in the reporting line that reported to Chief

25  Technology Officer ("CTO") Sigmund Lee, who reported to Defendant Lopez.  CW-4

26  participated in a number of meetings with his reporting line throughout the 2017 to 2018 time

27  period where the Oklahoma market was discussed.  According to CW-4, there were several

28  meetings focused on poorly-performing games in Oklahoma and the Company was having a

1    "tough time" with Class II EGMs in Oklahoma.  CW-4 recalled that, at these meetings,

2    PlayAGS's failure to move Class II cabinets in Oklahoma was discussed by CTO Lee.

3         121.    Despite these manipulative and unsustainable sales practices, the Company's false

4    narrative of record-breaking success persisted.  The next quarter, on August 2, 2018, the

5    Company revised its guidance upward again, citing "greater visibility" and touting the

6    Company's "continued growth of [its] EGMs."  PlayAGS touted its 45% increase in revenue as

7    another "company record" and, on the related earnings call, Defendant Lopez attributed

8    PlayAGS's strong results to "record highs in [its] EGM and Table Products revenue, average

9    selling prices, revenue per day, and recurring revenue."

10        122.    CW-5, a former Senior Financial Analyst in Nevada from April 2016 until June

11   2019, explained that there was pressure placed on the PlayAGS sales team to maintain robust

12   sales.  CW-5 added that PlayAGS posted "record sales" in 2018, but sales declined in 2019

13   across all segments of PlayAGS's business and revenue was "lower than normal."  CW-5

14   explained that revenue declined because PlayAGS "pushed hard for 2018 to be a good year"

15   leading up to its IPO by pressuring customers to place heavy orders and leases for 2018.  Thus,

16   the results of PlayAGS's sales strategies and inflated results were unsustainable.

17   **F.    During the Class Period, the PlayAGS Defendants Repeatedly Revised
18          Guidance Upward Based on a Forced Increase in EGM Placement and Sales
            Manipulation**

19        123.    During the Class Period, PlayAGS repeatedly revised its guidance upward, in

20   effect, telling investors to expect financial results above previous expectations announced by the

21   Company.  Unbeknownst to investors, these guidance revisions were based on inorganic success

22   from the manipulative and unsustainable sales practices detailed above.  As the mounting sales

23   of underperforming products began to catch up to the Company and revenues declined, PlayAGS

24   was consistently manipulating sales to hit earnings targets just before quarter-end.

25        124.    PlayAGS's declining sales throughout 2018 was confirmed by CW-6, a former

26   member of the Finance team during the Class period who was responsible for business analytics,

27   forecasting, and budgeting.  CW-6 explained there were "definitely" issues with the revenue

28   center in Oklahoma and the Company was experiencing declining revenues in Oklahoma.  CW-6

1   added that going into the Company's secondary offerings in 2018, PlayAGS's management was

2   concerned because starting in early 2018, the Company was not achieving their earnings targets.

3       125.   CW-6 explained that on several occasions, PlayAGS asked customers to sign

4   purchase documents in different periods in order to spread sales numbers into different quarters.

5   For example, CW-6 described a scenario during the fourth quarter of 2018 where PlayAGS

6   asked one of its customers to sign for half of an EGM order in December 2018 and half in

7   January 2019 to create the illusion of two sales of EGMs to the casino, despite having only one

8   sale.  CW-6 stated this same practice occurred on other occasions as well and tended to occur at

9   the end of the quarter in an effort to meet earnings goals.  According to CW-6, this practice

10  persisted throughout 2018 and 2019.

11      126.   PlayAGS's sales pressure and manipulation were also confirmed by CW-11, who

12  stated the sales team was breaking records in 2018 due in part to PlayAGS's aggressive sales

13  personnel. CW-11 explained that, to further bolster sales numbers, PlayAGS management took

14  the sale of 400 units for various customers scheduled for the first quarter of 2019 and instead

15  recorded that sale for the fourth quarter of 2018. CW-11 stated that he believes Defendant Lopez

16  is the one who made the decision to move those 2019 orders to 2018.

17      127.   CW-2 also confirmed that sales management was "fudging the numbers" by

18  recording sales in incorrect time periods to misrepresent sales.  CW-2 heard Vice President of

19  Slot Products Andrew Burke discuss this practice "off the cuff" on a number of occasions.

20      128.   In addition to manipulating the recording and timing of sales, PlayAGS often

21  forced sales at the eleventh hour to hit earnings targets.  CW-6 explained that PlayAGS would

22  often sell pieces of Integrity, which it acquired in early 2019, to Oklahoma route operators on the

23  last day of the quarter to hit earnings targets.  CW-6 observed this practice during the second half

24  of 2019 and the first quarter of 2020.

25      129.   CW-12 also confirmed that beginning in or around 2016, PlayAGS was "routinely

26  short on sales" at the end of each quarter.  CW-12 recalled that he was on a sales call held at the

27  end of each quarter by Burke and Senior Vice President of Sales Robert Perry where they

28

1   consistently asked salespeople to move sales to the previous quarter in order to make up the

2   shortfall.  CW-12 stated that this occurred since PlayAGS regularly inflated their projected sales.

3        130.   This sales manipulation—and the need to cut costs in light of worsening sales and

4   an over-investment in the Oklahoma market—was well known by Defendants.  CW-5 was

5   present in meetings where PlayAGS's practice of misrepresenting sales to create an impression

6   that sales were stronger in certain quarters was discussed.  CW-5 confirmed that PlayAGS would

7   ask customers to place orders earlier or later than planned so the order would be recognized in a

8   different quarter to meet sales goals.  According to CW-5, this practice was regularly discussed

9   in Defendants Lopez's and Akiona's presence at forecasting and financial review meetings at the

10   end of each month and then more specifically at quarterly meetings.  CW-5 stated that both the

11   finance team and executive leadership, including Defendants Akiona and Lopez, were "definitely

12   present" at these meetings.

13        131.   Further, during May and June of 2019, CW-5 was present at weekly cost-cutting

14   meetings with Defendant Akiona and sometimes Defendant Lopez.  According to CW-5, the

15   focus of these meetings was that the Company had to cut costs because business was declining.

16   CW-5 explained this slowdown was caused by investing too heavily throughout 2018.

17        132.   CW-11 stated he knew in January 2019 that PlayAGS would not meet their

18   projections for the first quarter and the year overall and pointed that out to his superiors, including to

19   Senior Vice President of Sales Robert Perry. CW-11 explained that PlayAGS's poor performance

20   was caused by Burke's unrealistic budget and unreasonable earnings goals. According to CW-11,

21   PlayAGS's earnings goals were also hurt by the manipulation of sales in the fourth quarter of 2018,

22   by the Integrity purchase, and by disappointing *Orion Portrait* sales.

23        133.   As problems in Oklahoma persisted, the Company was due to renew its contract

24   with the Chickasaw Nation, PlayAGS's largest customer nationwide.  The Chickasaw Nation

25   accounted for approximately 11% of the Company's total revenue for the twelve months ended

26   June 30, 2018.  Indeed, the Company was very focused on the renewal of this Oklahoma contract

27   with PlayAGS's "biggest partner."

28

134.    Because of the Company's focus on its Oklahoma market and its loyal, long-term customers, investors too were focused on this contract renewal.  In fact, Defendant Lopez assured investors it was "working diligently to deal with" its contract before it announced on May 3, 2019 that the contract was renewed during the first quarter of 2019, several months before the contract was set to expire at year end.  Just one quarter later, on August 7, 2019, the Company would begin to tell investors about its mounting challenges in Oklahoma.  CW-7, a former Manager of Gaming Operations in Nevada from May 2016 until October 2019, stated PlayAGS re-signed their contract early so that the Chickasaw Nation would not use PlayAGS's challenges in Oklahoma to negotiate better contractual terms.

### G.    The PlayAGS Defendants Continued to Tout the Company's M&A Strategy Amid Problematic Acquisitions

135.    The PlayAGS Defendants spoke highly of its M&A Strategy and cited it as a purported company strength.  In fact, Defendant Lopez characterized the Company's M&A strategy as "prudent," assuring investors the Company would "really focus on the returns" when they evaluate an M&A opportunity.

136.    While true that the Company engaged in many acquisitions prior to and during the Class Period, the quantity and quality of these acquisitions were not commensurate.  PlayAGS's acquisitions often brought undisclosed but mounting issues of their own to the Company, such as Cadillac Jack's undisclosed sales inflation practices and Integrity's significantly low-RPD EGMs—hindering the Company's success.

137.    For example, CW-3 stated that PlayAGS's financial woes began when they purchased competitor Cadillac Jack in 2015.  CW-3 was responsible for merging data and "creating synergy" between the two companies, so he soon discovered that Cadillac Jack's numbers were inflated.  CW-3 stated that Cadillac Jack's practice was to place games "on low terms that were not generating revenue" to inflate the number of EGMs placed in the field.  CW-3 explained that PlayAGS adopted Cadillac Jack's practice of inflating EGM-placement numbers.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

33

138.     The negative impact of the Cadillac Jack acquisition was not the end of the Company's M&A woes.  The Integrity acquisition—which occurred during the Class Period—had a disastrous impact on the Company's Oklahoma RPD.

139.     CW-7 was sent to Oklahoma in October 2018 to conduct market research as to whether PlayAGS should purchase Integrity.  CW-7 discovered that Integrity had "too many units" with an RPD under ten dollars and concluded that purchasing Integrity would negatively impact PlayAGS's RPD as the poorly-performing Integrity games lowered the average RPD for the Company.  CW-7 further explained that the purchase of Integrity would result in the oversaturation of PlayAGS's products in Oklahoma and that PlayAGS did not have the "product depth or software library to support the influx" of new games.

140.     CW-7 relayed his recommendation against the purchase of Integrity to the Former Director of Gaming Operations Alex Hu and Senior Vice President of Slot Products Andrew Burke, who then relayed this recommendation to Defendant Lopez.  CW-7 recounted that PlayAGS decided to purchase Integrity anyway.

141.     CW-7 explained that PlayAGS purchased Integrity to demonstrate an increase in revenue-generating units to "mislead the market" and inflate PlayAGS's share price.  When CW-7 discovered PlayAGS was selling off games in Oklahoma in the fourth quarter of 2019 because the Company could no longer support all of the cabinets, CW-7 recalled that executives "knew this was coming at least two quarters prior."

142.     PlayAGS's problematic acquisition of Integrity was a shock to those inside the Oklahoma gaming industry.  While Defendant Lopez touted this acquisition as "bolster[ing] PlayAGS's] recurring revenue footprint and provide[ing] long-term optimization strategies," industry insiders thought the Company overpaid for Integrity.

143.     CW-8 was a former Account Manager for a major slot manufacturer in Oklahoma during the Class Period.  CW-8 was responsible for customer accounts in Northeastern Oklahoma.  CW-8 explained that PlayAGS was too ambitious with its acquisitions of Integrity and Cadillac Jack, noting that their revenue-per-unit and profit-per-unit numbers were not high

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

34

1   enough to cover these costly acquisitions.  CW-8 stated that, according to his estimation, the cost

2   of the Integrity acquisition was "many multiples too high."

3       144.    CW-9, a former employee at a PlayAGS competitor in Oklahoma for over 10

4   years and during the Class Period, confirmed that PlayAGS overpaid for its acquisition of

5   Integrity.  CW-9 explained that, based on conversations with account executives in Oklahoma,

6   "everybody was surprised" by the price PlayAGS paid for Integrity, as Integrity was valued far

7   less than the $50 million purchase price.  CW-9 characterized the transaction as a "bad deal."

8       145.    According to CW-11, PlayAGS's purchase of Integrity in February 2019 was a

9   disaster. CW-11 explained PlayAGS overpaid for Integrity, and the problem was made worse

10  when other game manufacturers refused to sell PlayAGS games to fill their new Integrity

11  footprint, since PlayAGS was their competitor. CW-11 explained that PlayAGS executives,

12  including Defendants Lopez and Akiona and Andrew Burke knew that PlayAGS could have

13  trouble purchasing replacement games from competitors, given that this had been an issue in the

14  past.  CW-11 stated that prior to the Integrity acquisition, competitor IGT had refused to sell or

15  service their games to PlayAGS, and that PlayAGS had to ask casino customers to purchase the

16  games, parts, or software for the Company, and PlayAGS would then reimburse the casinos.

17      146.    CW-11 explained PlayAGS had to either populate their Integrity footprint with

18  PlayAGS games—which were already widely used in Oklahoma—or sell off their Integrity

19  cabinets. CW-11 recalled attending a meeting with Burke in early 2019 where CW-11 tried to

20  "save the Integrity footprint" but CW-11 described the Integrity acquisition as "dead on arrival."

21  In fact, CW-11 recounted that the Integrity deal was off the table for two months, but the

22  acquisition went through once Integrity reduced its asking price by $10 million.

23      147.    CW-12 stated that, in 2018, Burke then assigned CW-12 to investigate whether

24  PlayAGS should purchase Integrity.  CW-12 stated that he sent the Manager of Gaming

25  Operations to Oklahoma to research Integrity's performance.  CW-12 explained the Manager of

26  Gaming Operations spent three weeks in Oklahoma and visited 80 casinos to assess the Integrity

27  footprint.  CW-12 reported that the Manager of Gaming Operations found that Integrity's

28  footprint overlapped with PlayAGS's in almost 100 percent of the cases.  CW-12 further

reported that the Manager of Gaming Operations also found that almost 80 percent of the casinos wanted to remove the Integrity games since they were quite old.  According to CW-12, the Manager of Gaming Operations told him that PlayAGS should "run from this deal."

148.    CW-12 stated that the analysis he performed valued Integrity at under $15 million, but Integrity was asking $60 million.  CW-12 went on to say that he reported his findings and the Manager of Gaming Operation's findings to Burke and Defendant Lopez. According to CW-12, PlayAGS grossly overspent for Integrity to add to their footprint and "show Wall Street they were growing" going into the secondary public offerings.  CW-12 stated that the ethos at AGS was "growth at all costs—even if the growth was cancerous."

149.    Yet, the Company concealed these adverse facts about its acquisition of Integrity, instead assuring investors that it took a "very measured" approach as part of PlayAGS's optimization efforts.  On the Company's March 5, 2019 earnings call to discuss its 4Q18 and FY 2018 results, Defendant Lopez explained that Senior Vice President of Slot Products Andrew Burke and his team would "watch very closely what's going on with the Integrity units, the installs" so that the Company doesn't "just run out there and start optimizing things sort of willy-nilly.  Defendant Lopez assured investors that the Company's finance team would be analyzing the Integrity project so the Company can "optimize appropriately and judiciously throughout the year and make sure we don't jump out there and do anything too soon."

150.    It would be only five months later when Defendant Akiona told investors that PlayAGS's decrease in domestic EGM revenue per day was attributed to the Company's placement of 800 incremental units into Oklahoma—units with a lower RPD than the Company's domestic average—and going "too hard and fast into the market with certain products." As confirmed by confidential witnesses, the Integrity acquisition only exacerbated the Company's oversaturation in Oklahoma and rendered the decrease in domestic EGM RPD inevitable—a decrease which caused investor losses, as detailed below.

**H.    PlayAGS Assures Investors its Oklahoma "Misstep" is Short-Lived**

151.    On August 7, 2019, PlayAGS finally began to publicly acknowledge its supposedly "record breaking" but in fact unsustainable growth had created problems for the

Company in Oklahoma.  The Company reported a net loss of $7.6 million, disappointing quarterly revenues that fell short of its prior guidance, and—for the first time during the Class Period—*lowered* its guidance forecast.  PlayAGS primarily attributed the weak financial results to product underperformance at three Oklahoma properties and problems with its placement of 800 incremental EGMs into the Oklahoma market over the past year.  Defendant Lopez admitted the Company went "too hard and fast into the market with certain products" and "too deep into [its] portfolio of titles," rather than focusing on the Company's "most successful game themes."

152.    What is more, the Company's acquisition of Integrity and its low RPD EGMs only exacerbated the unsustainability of PlayAGS's practices.  CW-2 explained that PlayAGS pursued its purchase of Integrity so that the Company could say it had "X number of cabinets" and misrepresent the state of the Oklahoma market.  CW-2 stated that PlayAGS knew they would eventually need to sell off the EGMs given that the market could not support the volume of new EGMs in Oklahoma, but PlayAGS had pursued that strategy in order to inflate their share price.  CW-11 also confirmed that RPD was down in 2019 because PlayAGS had oversaturated three Chickasaw casinos.  Thus, as the Company had engaged in an at least year-long effort to flood the Oklahoma market with EGMs, PlayAGS knew its sales manipulation and chaotic acquisition strategy would eventually come to a head.

153.    Despite this news, the Company assured investors that it was efficiently remedying the situation.  Defendant Lopez explained the Company was "implementing a variety of measures to help correct this and improve performance in Oklahoma going into the second half of the year."  Defendant Lopez was asked explicitly whether the issues were driven by a change in the business or demand of PlayAGS products, to which he responded that the Company's addition of new units, plus its optimization strategy resulted in the Company "[going] deeper into [its] title portfolio than [it] should have."  Defendant Lopez also told investors that the Company now had "clarity" with respect to PlayAGS's problems in Oklahoma and "know[s] how to fix it," assuring investors the problems would not persist.

154.    On this news, the Company's share price fell $8.99, or nearly 52 percent, to close at $8.31 per share on August 8, 2019, on unusually heavy trading volume.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

37

155.    Only three months later, the Company reported a further decrease in domestic EGM revenue per day and a further decrease in Oklahoma RPD driven in part by the "continued product performance previously identified."

156.    Again, Defendant Lopez assured investors that the Company had only now come to a "conclusion" that its issues in Oklahoma were two-fold and that PlayAGS would begin to address its "lower performing units" in Oklahoma—units that existed in the Oklahoma market due to sales pressure to place underperforming units to hit earlier earnings targets—by making title changes, cabinet swaps, or floor relocations.  Defendant Lopez again assured investors the Company had a grasp on the problems in Oklahoma explaining, "[w]ith great certainty we do understand the challenges we face in Oklahoma market and we are addressing them with specific and targeted countermeasures."  Defendant Lopez went so far to say the Company had "seen the bottom" of its Oklahoma issues, signaling to investors that the Company's pivotal Oklahoma business would improve.

157.    On this news, PlayAGS's stock price fell 6.71% to close at $11.82 per share on November 8, 2019.

**I.      Investors Finally Learn That the Build in EGM Placement Was Not Sustainable and That PlayAGS Could Not Afford to Maintain its Footprint**

158.    It was only a matter of time before the Company's decision to inflate sales numbers by unsustainably placing underperforming products in its EGM market had the inevitable negative effects on the Company's business.  The extent of the serious and long-term decline in the Company's business was finally revealed on March 4, 2020, when PlayAGS again reported a decrease in domestic EGM revenue per day "driven by incremental units in Oklahoma that yield lower RPD than our domestic average."

159.    After months of stringing investors along, the Company finally acknowledged its inability to sustain the growth forced onto its Oklahoma footprint by telling investors it would be selling underperforming units to generate cash that would instead be either reinvested in other higher-performing markets or used to improve RPD in Oklahoma.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

38

160.    To do this, PlayAGS announced that rather than make title changes and swaps to already-existing EGMs, it would now have to sell or "prune" these underperforming units, which would negatively impact the Company's Oklahoma footprint by up to 1,000 units in 2020.  This plan stood in stark contrast to earlier assurances that PlayAGS would address its challenges in Oklahoma by year end 2019 and would "be prudent in 2020." Essentially, the Company was promising to unravel its record EGM placement and recurring revenue achieved through unsustainable, low-quality growth.

161.    Thus, the Company's Class Period efforts to flood the Oklahoma market with EGMs to manipulate and inflate Company sales finally came to a head—resulting in the removal of these units to free up Company capital at the expense of PlayAGS investors.

162.    On this news, PlayAGS's stock price fell 18.7% to close at $6.65 per share on March 5, 2020.

J.    **Additional Allegations of Scienter**

163.    As alleged herein, the PlayAGS Defendants acted with scienter in that they: (i) knew, or were deliberately reckless in not knowing, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew, or were deliberately reckless in not knowing, that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly (or with deliberate recklessness) and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, the PlayAGS Defendants, by virtue of their receipt of information reflecting the true facts regarding PlayAGS, their control over, receipt, and modification of PlayAGS's allegedly materially misleading statements and their associations with the Company that made them privy to confidential proprietary information concerning PlayAGS, participated in the fraudulent scheme alleged herein.

164.    The Executive Defendants permitted PlayAGS to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.  As set forth herein, the Executive

1    Defendants, by virtue of their receipt of information reflecting the true facts regarding PlayAGS,

2    their control over, receipt, and modification of the Company's allegedly materially misleading

3    statements and omissions, and their positions with the Company that made them privy to

4    confidential information concerning PlayAGS, participated in the fraudulent scheme in violation

5    of the Exchange Act as alleged herein.  Further, the acts taken in furtherance of the fraudulent

6    scheme, and the making of false and/or misleading statements, were done knowingly (or with

7    deliberate recklessness) by officers and/or directors in their official capacities with authority to

8    bind their respective corporations.

9          165.   The Executive Defendants are liable as participants in a fraudulent scheme and

10   course of conduct that operated as a fraud or deceit on those who purchased PlayAGS common

11   stock by disseminating materially false and misleading statements and/or concealing material

12   adverse facts.  The scheme deceived the investing public regarding PlayAGS's business,

13   operations, and management and the intrinsic value of PlayAGS common stock and caused Lead

14   Plaintiff and members of the Class to purchase PlayAGS common stock at artificially inflated

15   prices.

16         166.   Numerous additional facts give rise to the strong inference of scienter that,

17   throughout the Class Period, Defendants Lopez and Akiona knew or were severely reckless in

18   disregarding that (i) PlayAGS used baseless and arbitrary growth projections to conduct its IPO

19   and forecasted unrealistic growth; (ii) PlayAGS's immense sales pressure on employees to flood

20   the Oklahoma market with EGMs was unsustainable; (iii) PlayAGS's declining business could

21   not continue to be propped up by manipulating sales at quarter-end; and (iv) the Company's

22   2019 acquisition of Integrity saddled the Company with low-RPD EGMs and negatively

23   impacted the Company's pivotal Oklahoma market.

24         167.   First, confidential witnesses confirm that PlayAGS's largest shareholder, Apollo,

25   placed pressure on the Company to continue its fallacious growth momentum.  CW-11 stated

26   that PlayAGS was under a lot of pressure from Apollo to make a large, sweeping change to show

27   that PlayAGS was working to fix their revenue problems.  CW-11 recounted how Defendant Lopez

28   blamed the Company's poor performance on the weather and "pushing too hard and too fast"

into Oklahoma on the 2019 earnings calls. CW-11 described these explanations as "misinformation" and a "smokescreen" to hide the real reasons for the poor performance.  In fact, as confirmed by CW-12, when CW-12 became aware that PlayAGS's growth analysis contained inaccurate findings, Andrew Burke replied that Defendant Sambur—Co-Lead Partner of Apollo Global Management, AGS's largest shareholder—said "we needed more." CW-12 responded that the package was a total lie, but CW-12 explained his protest fell on deaf ears. According to CW-12, Burke said "This is no longer your concern," and "Don't mention this to anyone." According to CW-12, PlayAGS misconstrued the growth of the Company.

168.    Further, CW-12 stated that in late 2018, Defendant Sambur told Burke that he needed to increase RPD in Oklahoma, and Burke assigned this project to CW-12. CW-12 explained that the only way to increase RPD in Oklahoma was to replace underperforming games. CW-12 stated that he calculated that PlayAGS needed to spend $20 million to $30 million to increase RPD in Oklahoma, which was oversaturated with old games. CW-12 explained that Burke sent him to Oklahoma for three months to optimize the PlayAGS games there. CW-12 stated that PlayAGS only approved two to three million dollars for the optimization project, which was only enough to replace "the worst of the worst."

169.    Second, confidential witnesses confirm that PlayAGS and its executives were placing sales pressure on the Oklahoma sales team to unsustainably flood its Oklahoma market with EGMs.  CW-5 explained that there was pressure placed on the PlayAGS sales team to maintain robust sales.  CW-5 added that PlayAGS posted "record sales" in 2018, but sales declined in 2019 across all segments of PlayAGS's business and revenue was "lower than normal."  CW-5 explained that revenue declined because PlayAGS "pushed hard for 2018 to be a good year" leading up to its IPO by pressuring customers to place heavy orders and leases for 2018.  Because the impetus for these manipulative and unsustainable sales practices came from PlayAGS management itself, Defendants cannot claim ignorance of these activities.

170.    CW-3, a former information systems manager who worked at PlayAGS prior to the Class Period, explained that PlayAGS pressured salespeople—particularly in Oklahoma—to place as many games as possible, even if those games were underperforming.  CW-3 noted this

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

41

practice began in late 2017 and early 2018 in an effort to inflate PlayAGS's sales numbers.  CW-3 recalled that numerous salespeople "pushed back" against the practice of aggressively selling underperforming games, and those people were terminated.

171.    Third, confidential witnesses confirm that Defendants Lopez and Akiona were present at forecasting, financial and cost-cutting meetings where sales manipulation practices were discussed.  CW-5 was present in meetings where PlayAGS's practice of misrepresenting sales to create an impression that sales were stronger in certain quarters was discussed.  CW-5 confirmed that PlayAGS would ask customers to place orders earlier or later than planned so the order would be recognized in a different quarter to meet sales goals.  According to CW-5, this practice was regularly discussed in Defendants Lopez and Akiona's presence at forecasting and financial review meetings at the end of each month and then more specifically at quarterly meetings.  CW-5 stated that both the finance team and executive leadership, including Defendants Akiona and Lopez, were "definitely present" at these meetings.  CW-4 participated in a number of meetings with his reporting line throughout the 2017 to 2018 time period where the Oklahoma market was discussed.  According to CW-4, there were several meetings focused on poorly-performing games in Oklahoma and the Company was having a "tough time" with Class II EGMs in Oklahoma.  CW-4 recalled that, at these meetings, PlayAGS's failure to move Class II cabinets in Oklahoma was discussed by CTO Lee.

172.    Further, during May and June of 2019, CW-5 was present at weekly cost-cutting meetings with Defendant Akiona and sometimes Defendant Lopez.  According to CW-5, the focus of these meetings was that the Company had to cut costs because business was declining.  CW-5 explained this slowdown was caused by investing too heavily throughout 2018.

173.    Fourth, Defendant Lopez and his reporting line were made aware of problems with the Company's acquisition of Integrity—including the resultant oversaturation of the Oklahoma market.  CW-7 was sent to Oklahoma in October 2018 to conduct market research as to whether PlayAGS should purchase Integrity.  CW-7 discovered that Integrity had "too many units" with an RPD under ten dollars and concluded that purchasing Integrity would negatively impact PlayAGS's RPD.  CW-7 further explained that the purchase of Integrity would result in

1  the oversaturation of PlayAGS's products in Oklahoma and that PlayAGS did not have the

2  "product depth or software library to support the influx" of new games.  Importantly, CW-7

3  relayed his recommendation against the purchase of Integrity to Former Director of Gaming

4  Operations Alex Hu and Senior Vice President of Slot Products Andrew Burke, who then relayed

5  this recommendation to Defendant Lopez. CW-7 recounted that PlayAGS decided to purchase

6  Integrity anyway.

7          174.    <u>Fifth</u>, given the multitude of statements concerning the Company's grasp on its

8  problems in Oklahoma, the size and importance of the Oklahoma market to the Company's

9  overall revenue, and the Executive Defendants' frequent monitoring of the Oklahoma market, it

10  is reasonable to infer that the Executive Defendants would be aware of the mounting problems

11  with PlayAGS's EGMs in Oklahoma as these facts are critical to PlayAGS's core operations.

12  Indeed, throughout the Class Period, the PlayAGS Defendants discussed PlayAGS's operations

13  in Oklahoma at length.  When the Company began to disclose to investors the problems it faced

14  in Oklahoma, Defendant Lopez explained that the Company was able to look at how its issues in

15  Oklahoma have accumulated over time and get clarity on how to resolve the Company's issues,

16  stating in relevant part:

17          So it just was very clear for us to look at it and how it accumulated
           over time and we're able to understand it . . . now in Q2, it just
18          became much more clear to us, but in that clarity is the solution.
           Right. And in that clarity. We know how to fix it. We know how to
19          go out there and get after the problem and resolve it over time.
20
           175.    Moreover, the PlayAGS Defendants assured investors it was monitoring the

21  Company's Oklahoma operations, understood the problems there, and had "clarity" in their

22  solution.  For these reasons, investors were heavily focused on the Company's Oklahoma

23  market.  On the Company's August 7, 2019 earnings call for example, Defendant Lopez

24  reiterated that the Company's issues in Oklahoma were "very well known" such that the

25  Company "know[s] where we misstep-ped on that.  We know how to get out there and

26  understand how to fix it."  Given the critical important of the Oklahoma region to PlayAGS's

27  overall business and projected growth, including the importance of remedying the Company's

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

43

1   oversaturation in Oklahoma and renewing its contract with the Company's largest customer in its

2   largest market, the problems detailed herein could not have occurred without the Executive

3   Defendants' knowledge and approval.

4   **K.**      **Defendants' Materially False and Misleading Statements and Omissions**

5        176.     Lead Plaintiff alleges that the statements within this section were materially false

6   and misleading because, among other reasons, they omitted to disclose material information of

7   which Defendants were aware or were reckless in not knowing.  As alleged herein, such

8   statements artificially inflated or artificially maintained the price of PlayAGS common stock and

9   operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired

10  those securities during the Class Period.  Because Defendants chose to speak on the issues

11  described below, it was important that they not mislead investors or withhold material

12  information.  As described below, Defendants created an impression of a state of affairs at

13  PlayAGS that differed in a material way from the one that actually existed.

14       177.     The Executive Defendants made, or caused to be made, false statements that

15  artificially inflated the price of PlayAGS common stock during the Class Period.  The Executive

16  Defendants, because of their positions with the Company, possessed the power and authority to

17  control the contents of PlayAGS's quarterly reports, press releases, and presentations to

18  securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

19  They were provided with copies of the Company's reports and press releases alleged herein to be

20  misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent

21  their issuance or to cause them to be corrected.  Because of their positions with the Company and

22  their access to material non-public information available to them but not to the public, the

23  Executive Defendants knew that the adverse facts specified herein had not been disclosed to—

24  and were being concealed from—the public and that the positive representations being made

25  were then materially false and misleading.  PlayAGS and the Executive Defendants are liable for

26  the false and misleading statements pleaded herein.

27

28

1

### 1.   March 14, 2018 – 4Q18 Financial Results

2        178.     On March 14, 2018, PlayAGS announced its fourth quarter and fiscal year 2018

3    results, reporting a 35 percent year-over-year increase in total revenue over the prior year period

4    to $57.7 million.  According to the press release, the Company reported that net loss improved to

5    $8.5 million from $20.2 million for the quarter and $45.1 million from $81.4 million for the year.

6    Moreover, PlayAGS stated it expects to generate total adjusted EBITDA of $124 – 130 million

7    in 2018, representing growth of approximately 16-22 percent compared to the prior year period.

8    The press release stated, in relevant part:[5]

9              2018 Outlook

10
             We expect to generate total adjusted EBITDA of $124 - $130
11            million in 2018, ***representing growth of approximately 16%-22%
             compared to the prior year period.***
12
             AGS expects 2018 capital expenditures to be in the range of $55 -
13            $60 million, compared to $57.5 million in 2017, ***reflecting an
             expectation for a continued increase in our installed base in both
14            existing and new markets as well as our ongoing yield
             optimization initiative.***
15

16        179.     On the same day, PlayAGS held an earnings call with analysts and investors to

17   discuss the Company's fourth quarter and full year 2018 financial results.  On the call, Defendant

18   Lopez attributed the Company's "record" sales revenue in part to the "tremendous growth" of its

19   Orion Portrait Cabinet and "strategic acquisitions," stating in relevant part:

20            Slide 2 shows that Q4 revenue of approximately $57.7 million was
             up 35% year-over-year and adjusted EBITDA grew to
21            approximately $26.4 million, up 20% over last year. ***Although we
             achieved record sales revenue in the fourth quarter, I'm pleased
22            to report that we also achieved record recurring revenue of $45.2
             million which grew 20% year-over-year. These double-digit gains
23            and revenue in EBITDA were underscored by the continued
             performance of our core ICON cabinet, the tremendous growth of
24            our premium Orion Portrait cabinet, and the inclusion of the
             Rocket Gaming and In Bet assets from our strategic acquisitions
25            in the second half of the year.***

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[5]        Bold and italics are used to demonstrate statements alleged to be false or misleading.
28   Bold without italics is used purely for emphasis.  All emphasis is added unless otherwise noted.

180.    Defendant Lopez discussed PlayAGS's growth strategy, explaining "***Our focus has always been to grow this company in a sustainable and responsible way and we continue to execute on our strategic growth initiatives to drive long-term value creation for our new shareholders.***"

181.    Further, in response to an analyst question on which markets will see the most growth through 2018, Defendant Lopez explained PlayAGS was having success "across the board," stating in relevant part:

> Some interesting questions; we've been dissecting our last quarter and our last 6 months and sort of looking at the year ahead and really trying to say to ourselves, what is going to drive business first if we were to like choose a few jurisdictions. And you know, I think that we'll pick the usual suspects, it's going to be California, it's going to be Nevada, it's going to be Florida, it's going to be Texas; jurisdictions like that, we have Ohio opening up. ***We have some -- we have great opportunities but if you look back and even in the prepared remarks, if you look how Q4 shook out, we're pretty diverse in the way we spread across all jurisdictions and casinos***, I think the staff was in Q4 the largest sale we had to anyone customer, largest placement was like 28 units, be off by a couple there.
>
> ***But the fact of the matter is it's really spread across the board and that's reflective -- if you look at sort of our wide space opportunity, we have great opportunities across the United States, Class 3 jurisdictions and we always say conservative growth in Class 2 but we see it, we see continued growth in Class 2, we always speak conservatively about that like it's going to be a very small number but we're comfortable with what we see on horizon there, and so I would hesitate to really pick any jurisdictions but I think it's going to be across the board for us we're having a lot of success, games are working everywhere.***

182.    Also in response to an analyst question regarding PlayAGS's inorganic growth in its M&A environment, Defendant Lopez touted the Company's "mindful" diligence and discipline when it comes to acquisitions, explaining:

> When we -- the way we look at M&A is sort of the way that Apollo [ph] has taught us to look at M&A for the last 4 years which is, if there is something out there in our space or very close to our space, we take a look, ***we do a lot of diligence, we've put a lot of time in. We kissed all the fronts if you will, we're looking for footprints all the time.*** And I think for such great examples of where we've looked

at deals, more than 3x or 4x or 5x and gone back and done the deals on iteration line 6.

*So it's a matter of discipline that we've look at everything. At AGS, we do something I think that I've never done at any other company that I've worked at and we pretty much do tons of diligence, tons of research; it's got to meet the criteria for us, it's got to meet financial criteria, it has to meet the criteria of fit for the company, and then it just can't become a distraction, of course it can become a distraction to our current business and the huge growth opportunities that we have* and of course, we monitor the culture, we look at cultures as we look at companies, as it's something that could sort of damage what is an egg -- it's our fragile egg of culture for the company. *We're very mindful of that when we look at M&A opportunities.*

183.     Defendants' statements contained in ¶¶178–82 were materially false and/or misleading when made because:

(a)     PlayAGS's purportedly record-breaking growth was fueled by the Company's manipulative and unsustainable sales practices on its Oklahoma sales team in at least a year-long effort to inflate its EGM-placement numbers, combat the Company's declining sales numbers, and give investors the false impression that the Company was able to keep its momentum going;

(b)     The Company was not organically achieving its earnings targets and—in an effort to conceal that fact—PlayAGS was manipulating sales and reported revenue and margins by recording one sale as two sales or asking customers to place orders in an earlier or later quarter than planned, and this practice was regularly discussed in monthly forecasting and financial review meetings attended by Defendants Lopez and Akiona;

(c)     This sales manipulation and pressure was saddling the Oklahoma market with more volume of EGMs than it could support—placed on unfavorable terms—such that this practice was not sustainable and PlayAGS would need to sell off these EGMs at the end of the Class Period; and

(d)     As a result of the foregoing, Defendants' public statements were false and misleading at all relevant times.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

47

## 2.      May 3, 2018 – 1Q18 Financial Results

184.     On May 3, 2018, PlayAGS announced its first quarter 2018 financial results, reporting a 36 percent year-over-year increase in total revenue over the prior year period to $64.9 million.  Also according to the earnings release, in the first quarter 2018, PlayAGS sold 838 EGMs, up 85 percent year-over-year.  Finally, the Company reported that net loss improved to $9.5 million from $12.4 million.  Moreover, PlayAGS increased its guidance based on "greater visibility" on its newer products throughout the year.  The press release stated, in relevant part:

First Quarter Financial Highlights

- ***Total revenue increased 36% to $64.9 million, a company record, driven by continued growth of our EGMs in the Class III marketplace***, led by demand for our newer premium Orion Portrait cabinet.

- ***EGM equipment sales increased 107% to $15.2 million, another company record***, due to the sale of 838 units, approximately 60% of which were Orion Portrait cabinet.

* * *

2018 Outlook

Based on our year-to-date progress and due to our current momentum, we now expect our adjusted EBITDA in 2018 to be between $126 and $131 million. ***This is an upward revision to the guidance we previously released and is based on greater visibility that we now have for Orion Portrait and other products throughout the year.*** We maintain our capital expenditures range of $55 to $60 million.

185.     Additionally in the earnings release, Defendant Lopez was quoted touting the expansive growth in PlayAGS's EGM Segment, stating in relevant part:

The first quarter of 2018 was absolutely tremendous for AGS - ***we achieved records in every key category***, ***including revenue, adjusted EBITDA, average selling price, and recurring revenue. We reported the most EGM sales revenue in our company's history with 838 units sold, driven largely by the continued success of the Orion Portrait cabinet***, while our Tables and Interactive segments both reported their strongest EBITDA quarters to date . . . . With industry-leading game performance and the recent introduction of the new Orion Slant, ***AGS shows no signs of slowing down and we are confident that 2018 will be our best year yet***.

186.     The same day, PlayAGS held an earnings call with analysts and investors to discuss the Company's first quarter 2018 financial results.  On the call, Defendant Lopez

discussed the Company's Oklahoma expansion, as well as the successful execution of PlayAGS's legacy EGM optimization strategy, stating in relevant part:

> Turning to our EGM segment on Slide 5. We ended Q1 with a total recurring EGM base of 24,033 units up 13% year-over-year. In addition to the inclusion of the Rocket EGMs, recurring unit growth was bolstered by the 4 wins opening in Q1 where AGS received approximately 14% of the floor. ***Additionally, we benefited from a couple of expansions in Oklahoma. We continue to execute on our yield optimization strategy upgrading 1650 of our legacy machines on a trailing 12 month basis with our latest high-performing products. This mission serves to grow our recurring revenue and protect our base as well as support our loyal long-term customers by providing them with our newer, more profitable products. As of Q1, approximately $5.6 million of our recurring revenue came from our optimization efforts over the past two years.*** We sold 838 EGMs for a total of $15.2 million in sales revenue for the quarter up 107% over the prior year period.

187.    Additionally on the call, Defendant Akiona attributed EGM Segment revenue growth, in part, to the expansion of PlayAGS's Oklahoma business and increases in the Company's EGMs and domestic RPD, stating in relevant part:

> ***For the first quarter of 2018, total revenues were up 36% to $64.9 million of which $61.3 million were from EGMs, $1.7 million from table products and $1.9 million from interactive. The increase in revenues were fueled primarily by a substantial increase in EGM equipment sales, an increase in our EGM installed base as well as an increase in our domestic revenue per day, or RPD.*** Revenue for the first quarter also included approximately $4.1 million of EGM recurring revenue from our recent Rocket Gaming asset acquisition that was completed in December.
>
> ***Turning to our EGM segment, gaming operations revenue increased 22% in the first quarter to a record $46 million. The year-over-year increase primarily reflects a larger domestic install base that grew by over 2500 units or 18%.*** Approximately, 1500 of the unit increase was from the Rocket Gaming asset acquisition and the remaining organic increase was led by increases in Texas, Nevada, Florida and California. ***Also in the first quarter, we saw the install base grow in Indiana and Oklahoma by nearly 500 units from new casino openings and expansions*** notably the 4 wins property in Indiana where we installed nearly 250 units in the quarter. ***Domestic RPD for the first quarter also increased by 3% to $26.72 compared to the first quarter of 2017, driven primarily by our optimization initiative as well as the rollout of our newer premium Orion Portrait cabinet.***

188.    Defendant Akiona touted the Company's increase in gross margin, primarily attributable to the Company's increase in RPD, stating in relevant part:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

49

> ***Gross margin for gaming operations increased to 82.9% in the first quarter, compared to 82.3% in the prior year period, primarily due to the increase in RPD.*** Equipment sales gross margin also increased to 51.4% to 47.5% due to the proportionally high amount of our premium Orion Portrait cabinet sales in the quarter.

189.    Defendants' statements contained in ¶¶184–88 were materially false and/or misleading when made because:

(a)    PlayAGS's purportedly record-breaking growth was fueled by the Company's immense and manipulative and unsustainable sales practices utilized by its sales team in at least a year-long effort to inflate its EGM-placement numbers, combat the Company's declining sales numbers, and keep its momentum going;

(b)    The Company was not organically achieving its earnings targets and—in an effort to conceal that fact—PlayAGS was manipulating sales and reported revenue and margins by recording one sale as two sales or asking customers to place orders in an earlier or later quarter than planned, and this practice was regularly discussed in monthly forecasting and financial review meetings attended by Defendants Lopez and Akiona;

(c)    This sales manipulation and pressure was saddling the Oklahoma market with more volume of EGMs than it could support—placed on unfavorable terms—such that this practice was not sustainable and PlayAGS would need to sell off these EGMs at the end of the Class Period; and

(d)    As a result of the foregoing, Defendants' public statements were false and misleading at all relevant times.

### 3.    August 2, 2018 – 2Q18 Financial Results

190.    On August 2, 2018, PlayAGS announced its second quarter 2018 financial results, reporting a 45 percent increase in total revenue over the prior year period to $72.8 million.  The press release also reported a 144 percent increase in EGM sales, based on quarterly sales of 1,058 units.  Again, PlayAGS increased its guidance based on the Company's "greater visibility" into the performance of its products.  The press release stated, in relevant part:

Second Quarter Financial Highlights

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

50

- **Total revenue increased 45% to $72.8 million, a company record, driven by continued growth of our EGMs in the Class III marketplace**, led by demand for our premium Orion Portrait cabinet.

- **Recurring revenue grew to $52.6 million or 26% year-over-year.** In addition to the contribution from the EGMs purchased from Rocket Gaming and Table Products purchased from In Bet in the Fall of 2017, **the increase was driven by our strong Domestic revenue per day ("RPD") of $27.79, up $1.90 year-over-year**.

- **EGM equipment sales increased 144% to $20.2 million, another Company record, due to the sale of 1,058 units,** of which approximately 60% and 12% were Orion Portrait and Orion Slant cabinets, respectively.

- **Net loss improved to $5.3 million from $20.1 million in the prior year, primarily due to increased revenue described above.**

\* \* \*

2018 Outlook

Based on our year-to-date progress and due to our current momentum, we now expect our total Adjusted EBITDA in 2018 to be between $132.0 and $136.0 million. **This is an upward revision to the guidance we previously released and is based on greater visibility that we now have for the installation and performance of Orion Portrait, Orion Slant, STAX, and other products for the remainder of the year, in addition to accelerated efforts to increase our footprint in sizable new markets**, such as Canada. We maintain our capital expenditures range of $55.0 to $60.0 million.

191.   In the earnings release, Defendant Lopez was quoted touting the Company's record results, including in the EGM Segment, and attributed the increased guidance to opportunities in the EGM Segment, stating in relevant part:

> **AGS grew both the top and bottom line by more than 40% in the second quarter, marking the most successful quarter in our company's history. Our strong results reflect record highs in our EGM and Tables Products revenue, average selling prices, revenue per day, and recurring revenue**. We continue to reap the benefits of our Orion and Bonus Spin product launches, our steady ramp into key markets like Nevada, California and New Jersey, and strong performance from both our optimized and new product footprint.
>
> In addition to a strong pipeline of new product launches and our initial entry into markets such as Canada to accelerate our growth, our recent acquisition of content-aggregator Gameiom creates a new channel to exploit our industry-leading game content in online real-money gaming markets. **Because of the potential upside from these**

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No.: 2:20-cv-01209-JCM-NJK

51

> ***exciting opportunities in our EGM business and our strong first
> half of the year, we are raising our Adjusted EBITDA guidance to
> reflect a new range of $132 million to $136 million***.

192.    That same day, PlayAGS held an earnings call with analysts and investors to

discuss the Company's second quarter 2018 financial results.  On the earnings call, Defendant

Lopez touted that PlayAGS was successfully executing its legacy EGM optimization strategy,

stating in relevant part:

> Coming off a record-breaking first quarter, I was extremely proud
> of the team for continuing to deliver such solid results. ***Q2 was a
> quarter highlighted by ongoing momentum in our EGM segment***,
> driven by the Orion Portrait Cabinet and bolstered by the successful
> launch of the new Orion Slant Cabinet.
>
> *   *   *
>
> We've made good progress with our yield optimization strategy,
> upgrading nearly 1,500 of our legacy machines on a trailing 12-
> month basis with our latest high-performing products. We are now
> starting to see real RPD improvement as the base of upgraded units
> continues to grow. ***As of Q2, approximately $8.3 million of trailing
> 12-month recurring revenue came from our optimization efforts
> in both the U.S. and Mexico.***
>
> ***As a result of optimization, growing the recurring footprint with
> new, high-performing product, and the overall health of our poor
> tribal markets, domestic RPD grew to its highest level in years,
> averaging $27.79 in Q2. This grew $1.90 from the prior-year
> period, and $1.07 sequentially.***

193.    Also on the call, Defendant Akiona attributed the Company's increased domestic

RPD to the Company's new product offerings, as well as the execution of its legacy EGM

optimization growth strategy, and specifically noted "strong performance" in Oklahoma, stating

in relevant part:

> ***For the second quarter, total revenues were up 45% to $72.8
> million, of which $69.3 million was from EGMs, $1.8 million from
> table products, and $1.7 million from interactive. The increase in
> revenues were fueled primarily by a substantial increase in EGM
> equipment sales, and improved performance in our EGM gaming
> operations business, which was driven by a larger EGM install
> base as well as a notable increase in our domestic revenue per day,
> or RPD.***
>
> *   *   *
>
> ***Total RPD for the current quarter also increased by 8.9%, to
> $21.77 cents compared to the second quarter of 2017, driven***

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

52

> *primarily by our new product offerings and through the*
> *optimization of our install base with our industry-leading EGMs.*
> *Notable was strong performance in certain key markets like*
> *Oklahoma*, Texas, Florida, and California, just to name a few.

194.    Defendants' statements contained in ¶¶190–93 were materially false and/or misleading when made because:

(a)    PlayAGS's purportedly record-breaking growth was fueled by the Company's immense and manipulative and unsustainable sales practices utilized by its sales team in at least a year-long effort to inflate its EGM-placement numbers, combat the Company's declining sales numbers, and keep its momentum going;

(b)    The Company was not organically achieving its earnings targets and—in an effort to conceal that fact—PlayAGS was manipulating sales and reported revenue and margins by recording one sale as two sales or asking customers to place orders in an earlier or later quarter than planned, and this practice was regularly discussed in monthly forecasting and financial review meetings attended by Defendants Lopez and Akiona;

(c)    This sales manipulation and pressure was saddling the Oklahoma market with more volume of EGMs than it could support—placed on unfavorable terms—such that this practice was not sustainable and PlayAGS would need to sell off these EGMs at the end of the Class Period; and

(d)    As a result of the foregoing, Defendants' public statements were false and misleading at all relevant times.

### 4.    November 8, 2018 – 3Q18 Financial Results

195.    On November 8, 2018, PlayAGS announced its third quarter 2018 financial results, reporting that total revenue had increased 34 percent over the prior year to $75.5 million. The earnings release reported that EGM equipment sales had again increased, this time by 82 percent year-over-year, based on quarterly sales of 1,332 units.  Yet again, the Company increased its guidance based on the Company's purported progress executing its growth initiatives and "improved visibility" for the remainder of 2018. The press release stated, in relevant part:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
Case No.: 2:20-cv-01209-JCM-NJK

53

Third Quarter Financial Highlights

- ***Total revenue increased 34% to $75.5 million, a Company record, driven by continued growth of our EGMs in the Class III marketplace***, including entry into Alberta, Canada as well as a large sale to a long-standing tribal customer.

- ***Recurring revenue grew to $50.7 million, or 18% year-over-year.*** In addition to the contribution from the EGMs purchased from Rocket Gaming, the increase was driven by our strong domestic revenue per day ("RPD") of $27.14, up $1.70 year-over-year as well as increases in Table Products revenue driven by an increase in Table Product units.

- ***EGM equipment sales increased 82% to $24.7 million, another Company record, due to the sale of 1,332 units***, of which approximately 24% were sold in Canada and 276 units were sold to a long-standing tribal customer.

- ***Net income improved to $4.3 million from a net loss of $4.1 million in the prior year period, primarily due to the increased revenue described above***.

\* \* \*

2018 Outlook

Based on our year-to-date progress and due to our current momentum, we now expect our total Adjusted EBITDA in 2018 to be between $134.0 and $136.0 million. ***This is an upward revision to the guidance we previously released and is based on our progress executing against our many growth initiatives in the first half of the year and due to our improved visibility for the remainder of the year.***

196. That same day, PlayAGS held an earnings call with analysts and investors to discuss the Company's third quarter 2018 financial results. On the call, Defendant Lopez informed the market that PlayAGS was making "good progress" regarding the Company's legacy EGM optimization strategy within its recurring install base, stating in relevant part:

> ***When thinking about the recurring install base, it's important to think about the quality of our base in addition to its size. So while we will be up slightly in the recurring units over 2017, it's with a better mix of units positively impacting our RPD. This is part of our ongoing optimization strategy, and we will always look for the highest return on invested capital for our equipment.***

> ***We continue to make good progress with this strategy, upgrading more than 880 of our legacy machines year-to-date. As a result of optimization, growing the recurring footprint with new high-performing product and the overall health of our core tribal markets, domestic RPD grew by $1.70 year-over-year, to $27.14.***

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

54

197.     Defendant Akiona attributed the Company's increase in revenue to "record EGM equipment sales," stating in relevant part:

> *For the third quarter, total revenues were up 34%, to $75.5 million, of which $71.8 million was from EGMs*, $2.1 million from Table Products and $1.7 million from Interactive. *The increase in revenues were driven by record EGM equipment sales, primarily in early entry markets such as Canada and Nevada, as well as improved performance in our gaming operations business with a notable increase in our domestic RPD*.

> David mentioned the growth in our recurring revenue year-over-year, which was driven by several factors. First, the contribution of EGMs purchased from Rocket Gaming. Second, an increase in Orion Portrait cabinets on lease year-over-year. We ended the third quarter with almost 1,700 Orion Portrait cabinets on lease, up from 500 in the prior year period. *Third, strong RPD performance from our domestic and international EGM gaming operation businesses.* And fourth, an increased install base of Table Product units on lease, up 715 units year-over-year, driven by the in-bet assets, new openings and the continued success of our progressives and side bets.

198.     Defendant Lopez further stated that PlayAGS had continued to penetrate the "healthy" Oklahoma market and remains committed to its optimization efforts to raise the Company's RPD, stating in relevant part:

> And of course, as you know, and we talk about on every call, and we talked about in the prepared remarks again today, *optimization is a big part of getting that RPD lift. We continue to stay committed to that.*

> *So it's all about going out there and getting to the jurisdictions. You know what they are, mostly. But we stay focused. And we look at Oklahoma, and you look at our penetration in Oklahoma, but we continue to add units in Oklahoma. It continues to be a healthy market for us.* We're having units in every corner of the U.S., Canada and Mexico, wherever we know that it's a strong lease jurisdiction. So we just stay focused on that. It's going to be a huge focus obviously in Q4 and beyond and exactly something that when we look at 2019 that we're going to stay focused on.

199.     Additionally on the November 8, 2018, earnings call, Defendant Akiona touted that PlayAGS's domestic RPD had increased $1.70 year-over-year to $27.14, due to new EGM offerings and the optimization of existing EGMs within the Company's install base, including in the Oklahoma market, stating in relevant part:

> *Domestic RPD for the current quarter increased by $1.70, to $27.14, compared to the third quarter of 2017, driven primarily by*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

55

*our new product offerings and through the ongoing optimization of our install base with our industry-leading EGMs. Notable increases were seen in certain markets like Oklahoma,* Texas, Florida, California and Washington, to name a few. International RPD for the current quarter also increased, by $0.19, to $8.52, compared to the third quarter of 2017, driven by the optimization of our install base.

200.   In response to analyst questions regarding expansion in the Oklahoma market, Defendant Lopez further attested to the health of, and upcoming expansion in, the Company's Oklahoma market, stating in relevant part:

*So as far as the risk goes, we don't see anything just yet,* and I think it'd be very early in the game to talk about how Arkansas casinos could risk anything up in Oklahoma. I don't think that we will see the Oklahoma customer going to Arkansas. And I'd also say that Oklahoma sort of has some of the finest operators out there in the country, and they're going to, in the words of our president, secure their borders, if you will. They're going to: a) make sure that their players stay in the state and; b) they're going to continue to draw players from other states because they do what they do and they do it very well.

So I think that – and as far as upside goes, nothing specific, *but we always say modest growth in those jurisdictions, modest growth in Class II and modest growth in Oklahoma.* Now they do have some projects that are coming online. We haven't sort of published numbers on what we're going to do in those arenas yet, but they do have some expansions and some new projects that are coming online. And we'll obviously continue to get our fair share, if you will, of the Chickasaw market as they expand and as every other tribe in Oklahoma expands, as well.

201.   Defendants' statements contained in ¶¶195–200 were materially false and/or misleading when made because:

(a)   PlayAGS's purportedly record-breaking growth was fueled by the Company's immense and manipulative and unsustainable sales practices utilized by its sales team in at least a year-long effort to inflate its EGM-placement numbers, combat the Company's declining sales numbers, and keep its momentum going;

(b)   The Company was not organically achieving its earnings targets and—in an effort to conceal that fact—PlayAGS was manipulating sales and reported revenue and margins by recording one sale as two sales or asking customers to place orders in an earlier or

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

56

1  later quarter than planned, and this practice was regularly discussed in monthly forecasting and

2  financial review meetings attended by Defendants Lopez and Akiona;

3       (c)   This sales manipulation and pressure was saddling the Oklahoma market

4  with more volume of EGMs than it could support—placed on unfavorable terms—such that this

5  practice was not sustainable and PlayAGS would need to sell off these EGMs at the end of the

6  Class Period; and

7       (d)   As a result of the foregoing, Defendants' public statements were false and

8  misleading at all relevant times.

9       **5.    March 5, 2019 – 4Q18 and FY2018 Financial Results**

10      202.   On March 5, 2019, PlayAGS announced its fourth quarter and full year 2018

11  financial results, reporting that total revenue had increased 25 percent over the prior year to

12  $72.1 million.  The earnings release reported that EGM equipment sales had again increased, this

13  time by 86 percent, based on quarterly sales of 1,159 units.  The Company also gave adjusted

14  EBITDA guidance for 2019 in the range of $160.0 to $164.0 million.  The press release stated, in

15  relevant part:

16       Fourth Quarter 2018 Financial Highlights

17   • **Total revenue increased 25% to $72.1 million, driven by
18     continued growth in our EGM segment in the Class III
       marketplace**, primarily in early-entry markets such as Ontario,
19     Mississippi and Nevada as well as continued penetration into
       ramping markets such as California and Florida.

20   • **EGM equipment sales increased 86% to $23.2 million, due to
21     the sale of 1,159 units, of which nearly 60% were sold into
       early-entry markets**.

22   • **Gaming operations revenue, or recurring revenue, grew to
23     $48.9 million, or 8% year-over-year**, driven by EGMs
       purchased from Rocket Gaming, increased domestic revenue per
24     day ("RPD") of $26.41, growth and performance of our
       international installed base, and an increase in Table Products
25     revenue.

                              * * *

26       2019 Outlook

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

57

We expect to generate total Adjusted EBITDA(4) of $160.0 - $164.0 million in 2019, representing growth of approximately 17% - 20% compared to 2018.

We further expect 2019 capital expenditures to be in the range of $65.0 - $69.0 million, compared to $66.2 million in 2018, *reflecting an expectation for a continued increase in our installed base in both existing and new markets as well as our ongoing yield optimization initiative, which includes units recently purchased from Integrity.*

203.    Additionally in the earnings release, Defendant Lopez was quoted touting the Company's rapid growth in its first year as a public company, specifically highlighting growth in the EGM Segment, stating in relevant part:

We ended our first year as a public company with a solid fourth quarter and 35% growth in annual revenue," said Chief Executive Officer David Lopez. "*Our continued top line growth, increased operating cash, and free cash flow generation reflects the industry-leading performance of our products and AGS' unique position given how underrepresented we are in the market. These two factors contributed to our phenomenal growth in electronic gaming machines ("EGMs"), ending the year with more than 4,300 sold units, a 71% increase from fiscal 2017. We kicked off 2019 with the close of our acquisition of Integrity Gaming Corp., which bolsters our recurring revenue footprint and provides long-term optimization opportunities*. With new product and content launches, further penetration of both new and early-entry markets, and international expansion, *AGS is positioned for another high-growth year in 2019.*

204.    That same day, PlayAGS filed its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"), affirming the previously reported financial results, which was signed by Defendants Lopez and Akiona.

205.    On March 5, 2019, PlayAGS held an earnings call with analysts and investors to discuss the Company's fourth quarter 2018 financial results.  On the call, Defendant Akiona touted that the Company's legacy EGM optimization strategy was driving domestic RPD growth, stating in relevant part: "*Domestic RPD for the current quarter increased by $0.53 to $26.41 compared to the fourth quarter of 2017, driven primarily by our new product offerings through the ongoing optimization of our installed base with our leading EGMs.*"

206.    Defendant Lopez also touted the Company's EGM segment growth for the quarter, stating in pertinent part:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

58

With that, I'll now provide an update on our segment performance for the quarter. Turning to our EGM segment on Slide 6, *we sold 1,159 units in the fourth quarter, up 66% year-over-year, resulting in placements at nearly 100 casinos across 30 states in Canadian provinces*. We achieved approximately 5% ship share in the fourth quarter based on the estimation of total slot units in the latest EILERS-FANTINI Quarterly Slot Survey, which is in line with our normal ship share range.

207.    Additionally on the call, Defendant Lopez informed investors that the Company's "*total EGM recurring base of 24,647 units, up roughly 4% year-over-year and more than 460 units higher than Q3 2018*" were "*all organic growth.*"

208.    In response to an analyst question regarding PlayAGS's optimization efforts in light of the Company's acquisition of Integrity, Defendant Lopez explained PlayAGS's strategy was to be "very measured," stating in relevant part:

Yes. So I think the entire Integrity acquisition and that project comes in phases. We'll start with low-hanging fruit early, which is sort of like some bad -- some public costs and some corporate public costs. *We want to sort of monitor here -- early on here. Andrew and the team will watch very closely what's going on with the Integrity units, the installs.* We really need to get to other customers. *We want to make sure we don't just run out there and start optimizing things sort of willy-nilly. We want to be very measured.* This will go into our bucket of everything else that gets optimized. It's not like we're specifically going to target Integrity units. We're going to put it into the hopper. *As we like to say, turn it over to our team of nerds, on Andrew's team and then finance, they'll analyze things, and then we'll optimize appropriately and judiciously throughout the year and make sure we don't jump out there and do anything too soon.* But I think that that's the way we look at it. We -- as far as growth goes in the Integrity acquisition, we talked about somewhere around on the upper end of what we're looking for organic growth like around that 15% mark. And we expect to be able to execute on that. If you sort of take 2018 EBITDA for them and you pro forma it for the partial year and then you add back some growths, that's essentially what we've gotten the number for us this year.

209.    Finally, in response to analyst questions regarding the Company's ability to further grow its recurring revenues, Defendant Lopez specifically called out Oklahoma as a "strong jurisdiction" to generate recurring revenues in 2019, stating in relevant part:

Yes. So I think that when you look at recurring -- our recurring footprint, and I'll speak to that number sort of globally. When we're expanding in 2019, obviously, it's going to be sort of like equal opportunity sort of like placements for leases. *But again, we're*

*going to be right back in our very strong jurisdictions like Oklahoma*. We're going to see real growth in Mexico again. We're obviously going to see going to see some international or what I'd say is true international growth because I sort of look at Mexico as almost domestic, but we'll see some true international growth with leased units in the Philippines. *So when you put those altogether, we've got real opportunities for recurring revenue growth in 2019 that, I think, that will shape up very nicely versus what we did even in 2018. But I think it's the usual suspect that can -- when you look at the domestic opportunities being led again -- once again by the state of Oklahoma.*

210.    Defendants' statements contained in ¶¶202–03, 205–09 were materially false and/or misleading when made because:

(a)    PlayAGS's purportedly record-breaking growth was fueled by the Company's immense and manipulative and unsustainable sales practices utilized by its sales team in at least a year-long effort to inflate its EGM-placement numbers, combat the Company's declining sales numbers, and keep its momentum going;

(b)    The Company was not organically achieving its earnings targets and—in an effort to conceal that fact—PlayAGS was manipulating sales and reported revenue and margins by recording one sale as two sales or asking customers to place orders in an earlier or later quarter than planned, and this practice was regularly discussed in monthly forecasting and financial review meetings attended by Defendants Lopez and Akiona;

(c)    This sales manipulation and pressure was saddling the Oklahoma market with more volume of EGMs than it could support—placed on unfavorable terms—such that this practice was not sustainable and PlayAGS would need to sell off these EGMs at the end of the Class Period;

(d)    The reported sale of 1,159 quarterly and 4,300 yearly EGM units were attributable in part to a decision by PlayAGS management, including Defendant Lopez, to manipulate sales by recording 400 units for various customers scheduled for the first quarter of 2019 in the fourth quarter of 2018;

(e)    The 2019 acquisition of Integrity saddled the Company with low RPD units that negatively impacted PlayAGS's domestic average RPD so much so that the Company would have to offload these units and reinvest its capital elsewhere; and

(f)     As a result of the foregoing, Defendants' public statements were false and misleading at all relevant times.

### 6.     May 8, 2019 – 1Q19 Financial Results

211.    On May 8, 2019, PlayAGS announced its first quarter 2019 financial results, reporting quarterly revenues of $73.0 million, up 13 percent year-over-year.  The earnings release reported that EGM equipment sales had again increased by 33 percent, based on quarterly sales of 1,024 units.  Finally, the Company reiterated its previous 2019 guidance.  The press release stated, in relevant part:

First Quarter 2019 Financial Highlights

- ***Total revenue increased 13% to $73.0 million, driven by continued growth in our EGM segment***, primarily sold units in early-entry markets such as Michigan, Saskatchewan, Pennsylvania and Massachusetts, as well as continued penetration into ramping markets such as Florida and California in addition to the contribution of leased EGMs acquired from Integrity Gaming Corp. ("Integrity") in February 2019.

* * *

2019 Outlook

Based on our year to date progress, we continue to expect to generate total adjusted EBITDA of $160 - $164 million in 2019, representing growth of approximately 17% - 20% compared to the prior year period. We also continue to expect 2019 capital expenditures to be in the range of $64 - $69 million, compared to $66.6 million in 2018, ***reflecting an expectation for a continued increase in our installed base in both existing and new markets as well as our ongoing yield optimization initiative, including units recently purchased from Integrity***.

212.    Additionally in the earnings release, Defendant Lopez was quoted touting the Company's EGM growth, stating in relevant part:

***I'm pleased to report another solid quarter of growth for AGS, with total revenue of $73 million up 13% year-over-year, driven by double-digit gains in EGMs and Tables***," said Chief Executive Officer David Lopez. "Sold EGM units grew 22% year-over-year and our Tables Products segment reported its strongest quarter to date, driven by our award-winning progressive platforms. ***Our EGM recurring revenue installed base grew 14% year-over-year to 27,308 units, driven by the inclusion of 2,500 EGMs from the Integrity acquisition which we closed in February of this year. With numerous levers to build momentum - including strategic investments in R&D to continue building a strong, diversified and***

1

2

***expanded product portfolio, as well as many new and underpenetrated domestic and international markets - AGS is well-positioned for continued long-term, meaningful growth***.

3      213.   The same day, PlayAGS held an earnings call with analysts and investors to

4   discuss the Company's first quarter 2019 financial results.  On the call, Defendant Akiona touted

5   PlayAGS's "ongoing success" in its EGM segment, stating in relevant part:

6

7

8

> ***Turning to our EGM segment, first quarter EGM sales increased 33% year-over-year to $20.2 million, due to the sale of 1,024 units as compared to 838 in the prior year period.*** The current quarter included approximately 100 sold units to new and expansionary properties. ***Our ICON and Orion family of cabinets continued to drive our ongoing success in penetrating the Class III market***.

9

10

11

12

13

14

15

> ***In our domestic EGM gaming operations business, our installed base grew by over 2,245 units year-over-year, and over 2,500 units sequentially, driven primarily by the purchase of approximately 2,500 EGMs from Integrity, which closed in February of this year.*** We recorded approximately $2 million in recurring revenue from the Integrity EGMs in the first quarter. We also increased placements of Orion Portrait, Orion Slant, and ICON cabinets on lease. Year-over-year increases in the domestic installed base also included the voluntary removal of 500 machines from a single customer in Texas in the prior year, as well as an end of lease buyout by a customer who purchased 420 VLT machines in 2018, and another 130 VLT machines in the first quarter of this year.

16      214.   Defendants' statements contained in ¶¶211–13 were materially false and/or

17   misleading when made because:

18      (a)      PlayAGS's purportedly record-breaking growth was fueled by the

19   Company's immense and manipulative and unsustainable sales practices utilized by its sales

20   team in at least a year-long effort to inflate its EGM-placement numbers, combat the Company's

21   declining sales numbers, and keep its momentum going;

22      (b)      The Company was not organically achieving its earnings targets and—in

23   an effort to conceal that fact—PlayAGS was manipulating sales and reported revenue and

24   margins by recording one sale as two sales or asking customers to place orders in an earlier or

25   later quarter than planned, and this practice was regularly discussed in monthly forecasting and

26   financial review meetings attended by Defendants Lopez and Akiona;

27      (c)      This sales manipulation and pressure was saddling the Oklahoma market

28   with more volume of EGMs than it could support—placed on unfavorable terms—such that this

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

62

1    practice was not sustainable and PlayAGS would need to sell off these EGMs at the end of the

2    Class Period;

3           (d)    The 2019 acquisition of Integrity saddled the Company with low RPD

4    units that negatively impacted PlayAGS's domestic average RPD so much so that the Company

5    would have to offload these units and reinvest its capital elsewhere; and

6           (e)    As a result of the foregoing, Defendants' public statements were false and

7    misleading at all relevant times.

8    **L.    The Fraud Begins to Cause Investor Losses, but Defendants Continue to
            Mislead the Market**

9

10          **1.    August 7, 2019 – 2Q19 Financial Results (First Partial Losses Caused
                   by the Fraud)**

11          215.   After the market closed on August 7, 2019, when the Company reported its

12   second quarter 2019 results, PlayAGS shocked the market by reporting a net loss of $7.6 million,

13   or negative $0.21 earnings per share (versus expectations of positive $0.14 per share).  The

14   Company additionally reported disappointing quarterly revenues of $74.5 million (or growth of 2

15   percent year-over-year), and adjusted EBITDA of $35.7 million (down 2 percent year-over-

16   year).  PlayAGS also lowered its full-year 2019 adjusted EBITDA guidance to a range of $145

17   million to $150 million (or growth of 6 to 10 percent year-over-year), down from its previous

18   guidance for a range of $160 million to $164 million.

19          216.   PlayAGS primarily attributed these negative financial results to product

20   underperformance at three Oklahoma properties and problems with its placement of 800

21   incremental EGMs into the Oklahoma market over the past year.

22          217.   That same day, on an earnings call with analysts and investors, Defendant Lopez

23   informed investors that "over the past year," PlayAGS has grown its Oklahoma footprint by 800

24   incremental units and attributed PlayAGS's underperformance to "going too hard and fast into

25   the market with certain products" and "too deep into [the Company's] portfolio of titles:

26          *[W]e are experiencing some challenges in Oklahoma, where we
            have our largest base of recurring revenue, EGM.*

27

28          *We mentioned several factors for decreased [revenue per day]
            earlier and one of the issues we are actively working to fix is*

*product underperformance.* I'll give you some color on what's driving this. Over the past year, we've grown our Oklahoma footprint with 800 incremental units and separately optimized numerous existing units. Some of the underperformance is a result of going too hard and fast into the market with certain products. We also went too deep into our portfolio of titles, where we should have focused on our most successful game themes.

218. Defendant Akiona attributed the decrease in domestic EGM revenue per day to the placement of these 800 incremental low-RPD units into Oklahoma over the past year:

> *This decrease is due to a number of factors in Oklahoma, including, one, product underperformance at 3 Oklahoma properties, which largely accounts for the decrease in RPD. Two, the placement of approximately 800 incremental units into Oklahoma over the past year, which has a market yield, a lower RPD than our domestic average.* And finally, flooding, which resulted in the closure of several casinos.

219. Defendant Lopez, however, assured investors that the Company was implementing measures to correct this problem and explained PlayAGS's Oklahoma issues were not attributable to the Oklahoma market itself, explaining "*[w]e are implementing a variety of measures to help correct this and improve performance in Oklahoma going into the second half of the year.* What's important to note that this is not attributable to the market itself. Oklahoma has been and continues to be a healthy market."

220. In response to an analyst question regarding whether these issues were driven by a change in the business or demand of PlayAGS products, Defendant Lopez responded that PlayAGS "went a little too hard, too fast with some products and with some titles" and "went much deeper into [the Company's] title portfolio that [it] should have," stating:

> [W]e broke it down for you in the remarks, where we said, we've added about 800 new units in the market over the last 12 months. *On top of that, we've been optimizing.* And so it really came down to it looks like -- we didn't go hard enough with something like Portrait and as we said, again we said, we went a little too hard, too fast with some products and with some titles. We went much deeper into our title portfolio than we should have. We have proven products, they show up on the EILERS report, they show up very consistently and we went much deeper into the portfolio, which did not yield the performance.

221. When asked whether the Company's problems were a result of "the 800 units added not ramping up to your expectations or was it a little bit of those titles deeper in the library

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

64

that you pulled out for those that just didn't maybe faded a little quicker than you thought," Defendant Lopez acknowledged the Company saw problems in Oklahoma as early as the first quarter of 2019, yet continued to conceal the full truth. Specifically, Defendant Lopez told investors that the Company now had "clarity" with respect to PlayAGS's problems in Oklahoma and "know[s] how to fix it." Defendant Lopez stated in pertinent part as follows:

> We did have weather in Oklahoma, but it wasn't to the magnitude that we saw in Q1. So it just was very clear for us to look at it and how it accumulated over time and we're able to understand it. We could actually look back at Q1 and say, with some of what we saw in Q1, like I referred, was it little bit of a head fake and it very well could have been. ***But now in Q2, it just became much more clear to us, but in that clarity is the solution. Right. And in that clarity. We know how to fix it. We know how to go out there and get after the problem and resolve it over time.***

222.    Defendant Lopez also assured investors that PlayAGS understands how to fix the Company's Oklahoma-specific problems:

> So those are the kind of things that we went in, we analyzed and understood them. And we said, hey, where does this exist, well, it comes down to ***Oklahoma, it comes down to certain decisions we made there and it even comes down largely in that space to just a handful of accounts. So it's very well known. We know what we need to do. We know where we misstep-ped on that. We know how to get out there and understand how to fix it.***

223.    In reaction to these disclosures, analysts expressed their concerns and immediately downgraded PlayAGS stock. The news was such a surprise to Bank of America Merrill Lynch that it downgraded its rating on PlayAGS stock by two levels (from "Buy" to "Underperform") and slashed its PlayAGS price target from $30 to $14 on concerns of faltering growth.

224.    On this news, the Company's share price fell $8.99, or nearly 52 percent, to close at $8.31 per share on August 8, 2019, on unusually heavy trading volume. The price of PlayAGS stock, however, remained artificially inflated.

225.    Defendants' statements contained in ¶¶217–22 were materially false and/or misleading when made because:

(a)    PlayAGS's purportedly record-breaking growth was fueled by the Company's immense and manipulative and unsustainable sales practices utilized by its sales

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

65

team in at least a year-long effort to inflate its EGM-placement numbers, combat the Company's declining sales numbers, and keep its momentum going;

(b)     The Company was not organically achieving its earnings targets and—in an effort to conceal that fact—PlayAGS was manipulating sales and reported revenue and margins by recording one sale as two sales or asking customers to place orders in an earlier or later quarter than planned, and this practice was regularly discussed in monthly forecasting and financial review meetings attended by Defendants Lopez and Akiona;

(c)     This sales manipulation and pressure was saddling the Oklahoma market with more volume of EGMs than it could support—placed on unfavorable terms—such that this practice was not sustainable and PlayAGS would need to sell off these EGMs at the end of the Class Period;

(d)     The 2019 acquisition of Integrity saddled the Company with low RPD units that negatively impacted PlayAGS's domestic average RPD so much so that the Company would have to offload these units and reinvest its capital elsewhere;

(e)     The Company's explanation that its poor performance was due to weather and "pushing too hard and too fast" in Oklahoma was misinformation and a "smokescreen" to hide the real reasons for its poor performance, as confirmed by CW-11; and

(f)     As a result of the foregoing, Defendants' public statements were false and misleading at all relevant times.

**2.     November 7, 2019 – 3Q19 Financial Results (Second Partial Losses Caused by the Fraud)**

226.     After the market closed on November 7, 2019, PlayAGS issued a press release reporting their third quarter 2019 results. Total revenue increase 5% due to the Company's sale of nearly 1,400 EGMs, "the most in [the] [C]ompany's history."  Domestic EGM revenue per day decreased 8% to $25.08 compared to $27.14 in the prior year driven by incremental units in markets that yield lower RPD than the Company's domestic average. Oklahoma RPD decreased 17% to $18.13 compared to $21.72 in the prior year driven in part by the "continued product performance previously identified."

227.     On an earnings call after the market closed the same day to discuss these results, Defendant Lopez explained the Company's "conclusion" is that issues in Oklahoma were "clearly twofold" and that the Company began targeting changes to their "lower performing units" in Oklahoma:

> Since the close of Q2 and throughout Q3, we have continued to analyze our footprint, the market and the competition which has led to our conclusion that the issues are clearly twofold.
>
> First, as we indicated on our Q2 call, we did have some product rollout game performance in analytics issues that negatively impacted our RPD performance in the state. Second is that it's clear that the influx of premium competitive product that entered this space in 2018 has continued to perform well and has taken Oklahoma 2 premium products share levels that rival some of the highest in the nation.
>
> * * *
>
> To date we have touched more than 900 units in Oklahoma. Touches include any change we make to a unit, including game title changes, cabinet swaps or on floor relocations. ***Most of our actions thus far have been title changes on specifically targeted lower performing units which requires de minimis CapEx and has helped stabilize performance on those optimized units.*** Although we are moving quickly on these changes, it will take some time before there is a material impact on both the Oklahoma numbers and our overall domestic RPD. ***Our objective is to address nearly 1,500 units by year-end*** and to be prudent in 2020 with our utilization of new higher earning premium products such as Orion Rise and Orion 49C.

228.     Defendant Lopez assured investors the Company had a grasp on the problems in Oklahoma explaining, "***[w]ith great certainty we do understand the challenges we face in Oklahoma market and we are addressing them with specific and targeted countermeasures***."

229.     Defendant Akiona confirmed that the Company's decrease in domestic RPD was due to underperformance in Oklahoma and acknowledged that PlayAGS's Oklahoma units yield on average an RPD that is lower than the Company's domestic average:

> Domestic EGM revenue per day or RPD decreased by 8% to $25.08 compared to $27.14 in the prior year period. When normalized for the impact of EGMs purchased from Integrity, we estimate that domestic RPD was $26.55, down approximately 2%. The decrease is primarily due to product underperformance in Oklahoma, which David just discussed.
>
> Slide 10 breaks out Oklahoma RPD and bifurcate Integrity performance from our legacy base. We grew recurring revenue by

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

67

> 11% year-over-year due to the Integrity acquisition along with growth of more than 1,200 AGS incremental units. Because our Oklahoma units yield on average an RPD that is lower than our domestic average RPD, these organic placements have the effect of pulling down our overall domestic RPD while still increasing both revenue and EBITDA.

230.    Yet, in response to an analyst question regarding an update on the Company's Oklahoma operations, Defendant Lopez misrepresented to investors that PlayAGS's problems were "level[ing] off" and that the Company had "***seen the bottom***" of its issues there:

> We've been monitoring the market very closely, looking at it obviously week to week, month to month and from our perspective looking at revenue in the state and looking at RPD, we can sort of see that leveling off for that inflection point. In order to bounce off back and to really see growth into the future, that's where our comes [sic] into some of the things we've talked about in the past and of course at G2E which is releasing some of our premium cabinets into the market. So first, it will be the Rise cabinet. Second, that will come in -- very likely be the curve or our 49C and then of course Starwall in for the remainder of the year. So that's where I think that we can see and we can feel our confidence. We've understood the problem very clearly. You heard what we said in our prepared remarks there. ***We're seeing it level off, we're often asked that we've seen the bottom. We feel like we've seen it now and going forward, we see that our optimization has been effective and that the new products, especially premium products to compete in that market is a true requirement and that's what we're rolling out.***

231.    On this news, PlayAGS's stock price fell 6.71% to close at $11.82 per share on November 8, 2019. The price of PlayAGS stock, however, remained artificially inflated.

232.    Analysts remained cautious of the Company's position in the Oklahoma market. Jeffries stated that "[o]ur impression is that the competitive pressure on product in OK remains a key challenge," noting "a conservative stance on 4Q19 is warranted." Deutsche Bank stated that "we expect the headwinds in Oklahoma and a broader participation malaise in the domestic participation landscape to continue to curb gaming ops performance" and that "the EGM sales component will face tougher comparisons in 2020."

233.    Defendants' statements contained in ¶¶227–228, 230 were materially false and/or misleading when made because:

(a)    PlayAGS's purportedly record-breaking growth was fueled by the Company's unsustainable sales practices utilized by its sales team in at least a year-long effort to

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

68

1  inflate its EGM-placement numbers, combat the Company's declining sales numbers, and keep
2  its momentum going;

3     (b)   The Company was not organically achieving its earnings targets and—in
4  an effort to conceal that fact—PlayAGS was manipulating sales and reported revenue and
5  margins by recording one sale as two sales or asking customers to place orders in an earlier or
6  later quarter than planned, and this practice was regularly discussed in monthly forecasting and
7  financial review meetings attended by Defendants Lopez and Akiona;

8     (c)   This sales manipulation and pressure was saddling the Oklahoma market
9  with more volume than it could support—placed on unfavorable terms—such that this practice
10  was not sustainable and PlayAGS would need to sell off these EGMs at the end of the Class
11  Period;

12     (d)   The 2019 acquisition of Integrity saddled the Company with low RPD
13  units that negatively impacted PlayAGS's domestic average RPD so much so that the Company
14  would have to offload these units and reinvest its capital elsewhere;

15     (e)   Despite assurances that the Company achieved "clarity" in its solution to
16  address its self-inflicted oversaturation in the Oklahoma market and that they had "seen the
17  bottom" of this problem, PlayAGS was forced to sell anywhere from 500 to 1,000 units,
18  decreasing the Company's Oklahoma footprint it had so heavily touted as pivotal to the
19  Company's growth; and

20     (f)   As a result of the foregoing, Defendants' public statements were false and
21  misleading at all relevant times.

22  **M.    PlayAGS's Fraud Continues to Cause Investor Losses**

23     234.   Further consequences of the Company's fraudulent scheme and materially false
24  and misleading statements occurred on March 4, 2020, when the Company issued a press release
25  after the market closed reporting its fourth quarter and full year 2019 results.  While domestic
26  gaming operations increased 5% for the year due to the acquisition of Integrity Gaming Corp.,
27  the press release revealed that domestic EGM revenue per day decreased 5% to $24.97 compared
28  to $26.41 in the prior year period "driven by incremental units in Oklahoma that yield lower

RPD than our domestic average." Further, Oklahoma RPD decreased 12% to $18.15 compared to $20.70 in the prior year driven by a decrease in product performance.

235. PlayAGS also reported a 13% increase in sales revenue, "driven by increased EGM unit sales as well as **the sale of 327 previously leased, lower-yielding Oklahoma units to a distributor as part of our ongoing strategic management of our installed base**."

236. On an earnings call the same day to discuss these results after the market closed, Defendant Lopez discussed a pivot in the Company's efforts to manage its Oklahoma footprint, which now includes selling its underperforming units and re-investing the proceeds in "higher-performing markets," as opposed to swapping titles or relocating machines:

> EGM sales revenue also included the sale of approximately 300 lower RPD Class III units from the Integrity installed base. That said, we did not count these units in our sold number KPI of 1,283 units. As we have talked about on our last 2 earnings calls, we have been working to better manage our footprint in Oklahoma. After evaluating our capital strategy and analyzing the current operating environment in Oklahoma, **we believe the prudent thing to do is to sell some of our underperforming units to generate cash that can be invested in other higher-performing markets, or we can choose to allocate some of those dollars to improve revenue per day in Oklahoma.**
>
> Moving to RPD. Year-over-year domestic yields of $24.97 were down 5%. Outside of Oklahoma, our domestic RPD grew 7% year-over-year to $35.63 driven by a strong performance from our Orion family of cabinets.

237. Defendant Lopez also indicated PlayAGS had come up with "targeted countermeasures" to combat the weak RPD in Oklahoma, explaining in relevant part:

> Slide 11 breaks out Oklahoma RPD specifically and separates Integrity performance from our legacy base. Although Q4 Oklahoma RPD was down year-over-year, we are experiencing less degradation than we saw in Q2 and Q3 of 2019. **Q4 Oklahoma RPD remained relatively flat from Q3, signifying stabilization as a result of some of our targeted countermeasures. Those efforts have included game title changes, cabinet swaps, on floor relocations and selling of underperforming units.**

238. Defendant Akiona expanded on this strategy, noting that the Company's strategic sale of underperforming units would decrease PlayAGS's presence in Oklahoma by up to 1,000 units:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

70

> We look at our domestic installed base in 2 ways: Our Oklahoma footprint and our non-Oklahoma footprint. In non-Oklahoma, we believe opportunities exist to grow our market share in the Class III premium space, which David will touch upon in his closing comments.
>
> In Oklahoma, we believe that opportunities to improve our business come via a variety of measures. First, let's talk about the composition of our installed base. With approximately 10,200 units in Oklahoma, some of which are older-generation machines as well as some third-party units, we will continue to optimize units that we believe will generate the best returns, using new game titles on existing cabinets as well as new hardware, such as the new Orion Rise, Orion Curve and Starwall, to help drive gains in RPD and improve overall yield.
>
> As we consider the current operating environment in Oklahoma, we have begun to strategically sell or prune some underperforming parts of our footprint this year in locations where we do not believe the capital outlay would generate the best returns for us. This could impact the Oklahoma installed base by about 500 to 1,000 units in 2020. By executing on these initiatives, we believe we will exit 2020 with a more optimal footprint, greater stabilization in the base and better cash returns moving forward.

239. Defendant Lopez explained another PlayAGS initiative that sought to address the Company's weak RPD in Oklahoma, stating in relevant part:

> The final initiative focuses on generating the best returns on our cash by investing in new product categories as well as focusing our efforts to improve revenue per day in Oklahoma. We believe the best uses of our cash are twofold: first, launching new premium products into the Class III and Class II premium lease-only market, which represents ample white space for us; and second, selectively optimize our cash returns in markets like Oklahoma and Mexico to drive gains in RPD and improve overall yields and cash flow.

240. In response to an analyst question regarding the number of units touched[6] in Oklahoma, Defendant Lopez referred to the touched units beyond the 1,200 units earlier disclosed by PlayAGS as a "moving target":

> **Brad J. Boyer** - Stifel, Nicolaus & Company, Incorporated, Research Division - Analyst
>
> Okay. Very helpful. And then second, you guys did provide a lot of color around Oklahoma. One thing I noticed just in the slides, it looks like to date, you've touched over 1,500 units. I know it's kind

---

[6]   As explained on the Company's November 7, 2019 earnings call, touches include "any change [ made] to a unit, including game title changes, cabinet swaps or on floor relocations."

of a moving target, but is a little bit higher than kind of what we had talked about previously kind of 1,200. I guess, just curious where we stand there in the -- as far as realigning games, putting capital into sort of optimizing Oklahoma. I mean is it your expectation that we're going to continue to see a significant number of units beyond the 1,500 level touched as we move into 2020? Or do you think we're kind of in the latter innings of sort of that revitalization of the base process in Oklahoma?

**David B. Lopez** - PlayAGS, Inc. - CEO, President & Director

I think -- good question. **I think, as you said, it's a moving target.** As far as we're concerned, we look at those changes as both being game conversions and cabinet swaps. We're trying to be as judicious as we can with cabinet swaps because that's where the capital sits. As far as game theme conversions, we've actually had very good results with those. We look at those numbers weekly and monthly. The returns on that, obviously, are very good. The cost is de minimis. And the returns on that -- on the cost is really just labor getting out there, and we can make that money back very quickly. But we can see a demonstrable return on those changes. Those will continue. **As far as how we're going to go out and touch the base, we've got about 10,000 -- roughly 10,000 units out there or so in Oklahoma, so we've touched 15% of it. I think there's still plenty more to get to, but those touches will include simple game conversions.**

241.     Defendant Akiona explained this strategy of selling underperforming units would continue into 2020, explaining **"[w]e are open to selling certain portions of our footprint on a, call it, specific analysis basis. And so you'll see some of that in probably the first half of the year."**

242.     On this news, PlayAGS's stock price fell 18.7% to close at $6.65 per share on March 5, 2020.  Over the next several days, PlayAGS's stock price fell an additional 15% to close at $5.64 per share on March 9, 2020.

**N.     Loss Causation**

243.     During the Class Period, as detailed herein, the PlayAGS Defendants engaged in a scheme to deceive the market and wrongful course of conduct that artificially inflated and/or artificially maintained the price of PlayAGS's common stock by making false and misleading statements, and omitting material information, about the Company's operations, financial results, and business prospects.  These material false statements and omissions concealed numerous material facts from investors, including but not limited to the fact that (i) PlayAGS's record-

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

72

breaking sales and EGM placement were achieved by unsustainably flooding the Oklahoma market with more volume of EGMs than it could support and manipulating sales and reported revenue and margins by recording one sale as two sales or asking customers to place orders in an earlier or later quarter than planned, and (ii) PlayAGS's acquisition of Integrity saddled the Company with low RPD units that negatively impacted PlayAGS's domestic average RPD so much so that the Company would have to offload these units and reinvest its capital elsewhere. As a result of Defendants' fraudulent scheme and material misstatements and omissions, the price of PlayAGS securities was artificially inflated during the Class Period.

244.    As alleged herein, the artificial inflation in the price of PlayAGS common stock dissipated on August 8, 2019, November 8, 2019 and March 5, 2020, as the true nature of PlayAGS's business became known, the effects of Defendants' scheme played out, Defendants' false and misleading statements and omissions became apparent to the market, and the price of PlayAGS common stock fell. As a result of their acquisitions of PlayAGS common stock at artificially inflated prices during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss.

245.    The declines in the price of PlayAGS stock pled herein were a direct and proximate result of the nature, extent and impact of the PlayAGS Defendants' prior false and misleading statements and omissions being revealed to investors. The timing and magnitude of the price declines of PlayAGS common stock negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

246.    The economic loss suffered by Lead Plaintiff and other members of the Class was a direct and proximate result of the PlayAGS Defendants' wrongful conduct and fraudulent scheme, which inflated the prices of PlayAGS common stock and resulted in the subsequent decline in the value of PlayAGS common stock when the true financial condition of PlayAGS was revealed and the impact of its unsustainable growth story materialized.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

73

247.    It was entirely foreseeable to the PlayAGS Defendants that their scheme and materially false and misleading statements and omissions would artificially inflate and/or maintain the price of PlayAGS's common stock.  It was also foreseeable to the PlayAGS Defendants that the revelation of the truth alleged herein would cause the price of PlayAGS's common stock to fall as the artificial inflation caused by the PlayAGS Defendants' misstatements and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by the PlayAGS Defendants' scheme and materially false and misleading statements and omissions.

## O.    Presumption of Reliance

248.    At all relevant times, the market for PlayAGS's publicly traded common stock was efficient for the following reasons, among others:

(a)     PlayAGS's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, PlayAGS filed periodic public reports with the SEC and the NYSE;

(c)     According to the Company's Form 10-Q filed for the year ended September 30, 2020 filed on November 5, 2020, the Company had approximately 35,765,771 million shares outstanding as of the date of the filing, demonstrating a very active and broad market for PlayAGS common stock;

(d)     PlayAGS regularly and publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     PlayAGS was followed by several securities analysts employed by major brokerage firms and research service providers, including Buysellsignals Research, Corporate Watchdog Reports, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Jefferies, Roth Capital Partners, LLC, Sadif Analytics, SunTrust Robinson Humphrey Capital

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

74

1    Markets, Telsey Advisory Group, ValuEngine, Inc., and Wright Investors Service, who wrote

2    reports which were distributed to the brokerage firms' sales force and certain customers of

3    brokerage firms or research service providers.  Each of these reports was publicly available and

4    entered the public marketplace; and

5              (f)    Unexpected material news about PlayAGS was rapidly reflected in and

6    incorporated into the Company's stock price during the Class Period.

7          249.    As a result of the foregoing, the market for PlayAGS's common stock promptly

8    digested current information regarding PlayAGS from publicly available sources and reflected

9    such information in PlayAGS's common stock price.  Under these circumstances, all persons and

10   entities who purchased or otherwise acquired PlayAGS's common stock during the Class Period

11   suffered similar injury through their purchase of PlayAGS at artificially inflated prices, and the

12   presumption of reliance applies.

13         250.    A Class-wide presumption of reliance is also appropriate in this action under the

14   Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972),

15   because the Class's claims are grounded on Defendants' material omissions.  Because this action

16   involves Defendants' failure to disclose material adverse information regarding (i) PlayAGS

17   unsustainably flooding the Oklahoma market with more volume of EGMs than it could support

18   and manipulating sales and reported revenue and margins, and (ii) PlayAGS's acquisition of

19   Integrity which saddled the Company with low RPD units that negatively impacted PlayAGS's

20   domestic average RPD—information that the PlayAGS Defendants were obligated to disclose—

21   proof of positive reliance is not a prerequisite to discovery.  All that is necessary is that the facts

22   withheld be material in the sense that a reasonable investor might have considered them

23   important in making investment decisions.  Given the importance of the Oklahoma market and

24   PlayAGS's EGMs, sales, revenues, margins, and acquisitions, as set forth above, that

25   requirement is satisfied here.

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

75

**P.      Inapplicability of the Statutory Safe Harbor**

251.      The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

252.      The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

253.      To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

254.      In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the PlayAGS Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the statement was authorized or approved by an executive officer of PlayAGS who knew that the statement was false when made, and/or the statement omitted material adverse information whose disclosure was necessary to render the statement not misleading.

255.      None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the PlayAGS Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## VI.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

**FIRST CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against PlayAGS and the Executive Defendants**

256.     Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶1–17 and ¶¶29–255 as if fully set forth herein.

257.     This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Lead Plaintiff and the Class, against PlayAGS and the Executive Defendants.

258.     During the Class Period, Defendants PlayAGS, Lopez, and Akiona carried out a plan, scheme, and course of conduct that was intended to and throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (b) artificially manipulate the price of PlayAGS common stock; and (c) cause economic harm to Lead Plaintiff and other members of the Class.

259.     Defendants PlayAGS, Lopez, and Akiona (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and/or (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of PlayAGS common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

260.     During the Class Period, Defendants PlayAGS, Lopez, and Akiona, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information about the Company's financial well-being, operations, and prospects, as alleged herein.

261.     During the Class Period, Defendants PlayAGS, Lopez, and Akiona made false statement specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

77

1   to make the statements made, in light of the circumstances under which they were made, not

2   misleading.

3          262.    Defendants PlayAGS's, Lopez's, and Akiona's liability arises from the fact that

4   they developed and engaged in a scheme to manipulate the price of PlayAGS common stock and

5   were aware of the dissemination of information to the investing public that they knew or

6   recklessly disregarded was materially false and misleading.  Defendants Lopez and Akiona, as

7   senior officers of the Company, are liable as direct participants in the wrongs complained of

8   herein.  Through their high-raking positions of control and authority as the most senior executive

9   officers of PlayAGS, each of these Defendants were able to control, and did directly control, the

10  content of the public statements disseminated by PlayAGS.  Defendants Lopez and Akiona had

11  direct involvement in the daily business of the Company and participated in the preparation and

12  dissemination of PlayAGS's materially false and misleading statements set forth above.

13         263.    Defendants PlayAGS, Lopez, and Akiona had actual knowledge of the

14  misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless

15  disregard of the true facts that were available to them.  Defendants PlayAGS's, Lopez's, and

16  Akiona's acts were done for the purpose and effect of concealing the scheme alleged herein from

17  the investing public, and to artificially manipulate the market price of PlayAGS common stock.

18         264.    The scheme: (i) deceived the investing public regarding PlayAGS's operations

19  and the true value of PlayAGS's common stock, and (ii) caused Lead Plaintiff and other

20  members of the Class to purchase or otherwise acquire PlayAGS's common stock at artificially

21  inflated prices, which fell as the true condition of PlayAGS's business was revealed.

22         265.    The Executive Defendants are liable as participants in a fraudulent scheme and

23  course of conduct that operated as a fraud or deceit on the Class members by disseminating

24  materially false and misleading statements and/or concealing material information.  Each of the

25  Executive Defendants were culpable for this deceit insofar as they acted, or omitted to act, in

26  furtherance of the scheme with scienter.

27         266.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the

28  integrity of the market, they purchased PlayAGS common stock and were harmed when the truth

about PlayAGS negatively impacted the price of those securities.  Lead Plaintiff and the Class would not have purchased PlayAGS stock at the prices they paid, or at all, had they been aware of the truth about PlayAGS.

267.     As a direct and proximate result of Defendants PlayAGS's, Lopez's, and Akiona's wrongful conduct, Lead Plaintiff and other members of the Class suffered harm in connection with their respective purchases of the Company's common stock during the class period.

268.     By virtue of the foregoing, Defendants PlayAGS, Lopez, and Akiona have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## SECOND CLAIM FOR RELIEF
### Violation of Section 20(a) of the Exchange Act
### Against the Executive Defendants and the Apollo Defendants

269.     Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶1–17 and ¶¶29–268 as if fully set forth herein.

270.     This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Lead Plaintiff and the Class, against each of the Executive Defendants and each of the Apollo Defendants.

271.     As alleged above, PlayAGS violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by undertaking a fraudulent scheme, making materially false and misleading statements, and omitting material information in connection with the purchase of PlayAGS's stock.

272.     This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Executive Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, PlayAGS is primarily liable under Section 10(b) of the Exchange Act.

273.     As set forth above, each of the Executive Defendants and each of the Apollo Defendants were each controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of each Defendant's voting power, ownership, rights as against

PlayAGS, and/or specific acts, the Executive Defendants and the Apollo Defendants had the power to control PlayAGS's operations and its decision-making processes.

274.    Specifically, (i) Apollo maintained a controlling interest in both PlayAGS's common stock and in its voting securities; (ii) Apollo had the power to appoint, and did appoint, a significant number of the Board's directors; and (iii) Apollo had the power to cause, and did cause, PlayAGS to register and offer securities for sale to the public.

275.    By reason of such conduct, Apollo is liable pursuant to Section 20(a) of the Exchange Act.

276.    The Executive Defendants also acted as controlling persons of PlayAGS within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above, the Executive Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading.  The Executive Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

277.    In particular, the Executive Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about PlayAGS and the actions of PlayAGS and its employees.

278.    By reason of such wrongful conduct, the Apollo Defendants and Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

80

## VII.  SECURITIES ACT ALLEGATIONS

### A.  PlayAGS Could Not Maintain the Financial Condition of its EGM Business at the Time of the SPOs Because of its Undisclosed and Unsustainable Sales Tactics

#### 1.  PlayAGS's IPO Prospectus Tells A Growth Narrative Prior to the SPOs

279.   Based on information PlayAGS presented in its IPO Prospectus, PlayAGS appeared to be doing well in the EGM market going into 2018.  In the IPO Prospectus, PlayAGS touted its 20% year-over-year growth in revenue, its expansive product footprint, and "Major Events" in 2017, which included "the most successful product launch in AGS history," "record revenue," and "2x the number of EGM sold in all of 2016" in the first half of 2017.  PlayAGS's IPO Prospectus contained the following graphic:



AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

81

280.    PlayAGS also touted its growth opportunities in its EGM market, describing the "untapped potential" in the market in the form of the following graph in the IPO Prospectus:



281.    PlayAGS also represented its growth in EGM sales since 2013, with explosive growth between 2016 and 2017, as depicted in the following chart in the IPO Prospectus:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

82





282.     According to PlayAGS, at the time of the IPO, PlayAGS's growth in a large range of metrics was on a steady increase from 2013 to 2017, and the majority of that growth was derived from recurring revenue associated with lease arrangements with casino operators.  The following graph was also included in the IPO Prospectus:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

83

283.    PlayAGS also touted that it had a higher-than-industry-average RPD in both casino-owned games (*i.e.*, where the casino operators purchased the machines from PlayAGS) and in the premium leased game market:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

84



284.    In the IPO Prospectus, with respect to the Class II market, the Company discussed the potential for growth over the next few years, stating:

> As of September 30, 2017, the Native American Class II market consisted of approximately 60,000 EGMs, with AGS products representing over 16% of that market with approximately 10,000 recurring Class II EGMs placed in approximately 150 gaming facilities across 18 states. According to Eilers & Krejcik, the Class II market is expected to grow its installed base by approximately 2% over the next three years in the United States.

285.    With respect to the Class III market, the Company also discussed the market's growth and the Company's opportunity for growth in the Class III market:

> Currently, there are approximately 1,000 casinos throughout the U.S. and Canada with approximately 980,000 total EGMs. Excluding approximately 135,000 EGMs under route operations and approximately 60,000 Class II EGMs, there are 785,000 Class III EGMs throughout the U.S. and Canada, of which approximately 415,000 are in commercial casinos and approximately 370,000 are

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

85

in tribal casinos. Eilers & Krejcik predict that the installed base of Class III/commercial game EGMs in the U.S. and Canada will grow by approximately 2%, or 16,000 units, over the next three years. In 2016, revenue increased in 18 of the 24 states with legalized commercial gaming. While the specific drivers of this growth differ from market-to-market, the nationwide growth trend can be attributed to stronger consumer confidence, lower levels of unemployment and more available disposable income. As of September 30, 2017, we had placed only 4,000 recurring Class III units (1,200 of which were video lottery terminals) in over 300 casinos, which represents less than 1% of the total number of EGMs placed in the U.S. and Canadian Class III and commercial gaming markets. Given our very low penetration in Class III Native American and commercial casinos, these markets present a significant growth opportunity.

286. Overall, the Company stated in its IPO Prospectus that it was positioned for growth:

We have increased our installed base of EGMs every year from 2005 through the LTM period, and as of September 30, 2017, our total EGM footprint comprised 22,015 units (14,544 domestic and 7,471 international). We remain highly focused on continuing to expand our installed base of leased EGMs in markets that we currently serve as well as new jurisdictions where we do not presently have any EGMs installed. Since our founding, we have made significant progress in expanding the number of markets where we are licensed to sell or lease our EGMs. In 2005, we were licensed in three states (5 total licenses). Currently, we are licensed in 31 U.S. states and two foreign countries (253 total licenses). As of September 30, 2017, our installed base represented only approximately 2% of the total addressable market of approximately 980,000 EGMs installed throughout the United States and Canada. According to Eilers & Krejcik, U.S. casino operators expect to allocate approximately 5.5% of their 2018 EGM purchases to AGS products, which would result in ship share more than three times higher than our ship share in 2016. We believe we are positioned to gain significant ship share over the next several years.

287. Thus, at the start of 2018, investors had no reason to believe that PlayAGS's growth was achieved through unsustainable means. However, according to former employees of PlayAGS, PlayAGS's growth was unsustainable and would soon face significant setbacks.

288. After the Company's IPO, there was a lot of pressure to keep its momentum from previous financial performance going. Beginning in late 2017 and early 2018, Defendants pressured salespeople to place as many games as possible, even if those games were underperforming in ways that would be expected to cause negative impacts on the Company's future financial performance.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

86

289.     Indeed, the unsustainable, undisclosed sales tactics—discussed herein through confidential witnesses and Defendants' own admissions after the SPOs—would be timed in such a way that they would support growth over the short term but result in sales and revenue declines after the Apollo Defendants offloaded more than $254 million worth of PlayAGS common stock to the investing public in the SPOs.

290.     Former employees have described how PlayAGS's growth was based on undisclosed, unsustainable sales practices caused by extraordinary pressure from PlayAGS's management going into the Company's SPOs because starting in early 2018, the Company was not achieving its earnings targets organically.  CW-5, a former Senior Financial Analyst in Nevada from April 2016 until June 2019, explained that revenue declined because PlayAGS "pushed hard for 2018 to be a good year" leading up to its IPO by pressuring customers to place heavy orders and leases for 2018.  CW-6 explained that on several occasions throughout 2018 and 2019, PlayAGS asked customers to sign purchase documents in different periods in order to spread sales numbers into different quarters and create the illusion of multiple EGM sales where only one sale had occurred.  PlayAGS's sales pressure and manipulation were also confirmed by CW-11, who explained how PlayAGS management took the sale of 400 units for various customers scheduled for the first quarter of 2019 and instead recorded that sale for the fourth quarter of 2018.  CW-11 stated that he believes Lopez is the one who made the decision to move those 2019 orders to 2018.  CW-2 also confirmed that sales management was "fudging the numbers" by recording sales in incorrect time periods to misrepresent sales.

291.     Simply put, PlayAGS could not maintain its robust sales generated by its undisclosed sales practices, before and during the SPOs.  As discussed below, these facts should have been disclosed in the Shelf Registration Statement's discussion of that which touted PlayAGS's strengths in the market and ability to maintain its positions within the market.

292.     Thus, at the time of the SPOs, PlayAGS was struggling to maintain the positive financial performance it had prior to its IPO in January 2018, particularly in Oklahoma, its largest and most important market.  Throughout the relevant time period, Company personnel and market analysts referred to this prior financial performance as "momentum."  Indeed prior to

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

87

1    the SPOs, PlayAGS was struggling to sell its products in Oklahoma, as well as all over the

2    country.

3        **B.    PlayAGS's Growth Strategy was Unsustainable Prior to and During the
             SPOs**

4

5        293.    As noted above, PlayAGS growth strategy was based, in part, upon acquiring

6    companies to increase product footprint (*i.e.*, more EGMs on the ground) and increase

     intellectual property or content (*i.e.*, product diversity).  However, PlayAGS's growth strategy

7    was unsustainable, especially in the Oklahoma market—its largest and most important revenue

8    generator.

9

10       **1.    Undisclosed Problems with PlayAGS's Acquisition of Cadillac Jack
             Undermined PlayAGS's Growth Narrative Leading Up to the SPOs**

11       294.    As early as 2015, PlayAGS acquired Cadillac Jack to gain a strong foothold in the

12   Native American casino market, including in Oklahoma. In a press release announcing the

13   acquisition, Defendant Lopez stated in pertinent part:

14                   Adding Cadillac Jack to the AGS family creates a bigger, broader,
                 and more powerful gaming solutions provider. This is a significant
15               milestone for our company and … further solidifies AGS as a
                 serious player in the gaming space. Each organization's respective
16               strengths create excellent growth opportunities in the Class II and
                 Class III markets, as well as an increased geographic footprint.
17

18       295.    However, PlayAGS's acquisition of Cadillac Jack did not have its intended effect

19   on the Oklahoma market because Cadillac Jack had problems of its own that were not disclosed

20   to investors.  As detailed below, Cadillac Jack's own financial performance was inflated.

     Further, Cadillac Jack's practice was to place games on unfavorable terms that were not

21   generating revenue but gave the appearance of growth.  While the standard practice in the Class

22   II market is for gaming companies to lease their games to casinos in exchange for 20 percent of

23   each game's revenues, Cadillac Jack offered casino lease rates at 5 to 10 percent of revenue.  In

24   some cases, Cadillac Jack leased games to casinos at a 0 percent revenue share for the first six

25   months.  Cadillac Jack adopted this practice in every market they operated, including Oklahoma,

26   Alabama, and Mexico.  Thus, the part of PlayAGS's growth narrative based in significant part on

27

28

1    contributions from its Cadillac Jack acquisition would be incapable of sustaining growth long-

2    term.

3          296.    CW-10, a former Cadillac Jack employee who joined PlayAGS and worked in an

4    engineering capacity and left in October 2019, recounted that the merger between Cadillac Jack

5    and PlayAGS in 2015 went poorly.

6          297.    According to CW-10, Cadillac Jack produced a lot of Class II games and had a

7    strong presence in Oklahoma.  CW-10 explained that Class II games operated on a leasing

8    model, where casinos rent the EGMs, rather than purchasing them outright from the

9    manufacturer, and then remit a portion of the earnings to the manufacturer.  CW-10 stated that

10   Class II games are popular with casinos that do not have the capital to purchase games outright.

11   CW-10 stated that PlayAGS was interested in purchasing Cadillac Jack because of the Class II

12   revenue model and its Oklahoma-region footprint was appealing as well.  CW-10 further stated

13   PlayAGS wanted to swap out Cadillac Jack's older Class II EGM models for newer models, but

14   that this effort was not very successful as casinos wanted to retain their older EGMs.

15         298.    CW-10 stated that the games in the field in Oklahoma were three to four years old

16   and regularly "tanked" and required maintenance and upkeep.  PlayAGS spent a lot of time and

17   resources fixing older games and putting them back in the field.  CW-10 said that many of these

18   games required "recertification" multiple times and that each recertification costs between forty

19   and sixty thousand dollars.  CW-10 personally worked on three of these re-certifications. CW-10

20   stated that the technical issues in Oklahoma "started creeping in" in 2016 or 2017 and persisted

21   until CW-10 departed PlayAGS in October 2019.

22              **2.      PlayAGS Continued Its Unsustainable Acquisition Strategy and False
                          Growth Narrative by Acquiring Integrity Leading Up to the SPOs**
23

24         299.    Despite these undisclosed issues of PlayAGS's own creation, in early to mid-

25   2018, PlayAGS sought to thrust more product, regardless of its predictable drain on ultimate

26   financial performance, into the Oklahoma market. To do this, PlayAGS acquired Integrity to

27   increase recurring revenues and yield optimization in Oklahoma.  In fact, when PlayAGS

28   announced that it was acquiring Integrity, it touted Integrity's installed base of more than 2,700

1   Class III and Class II games in Oklahoma and Texas, including slot machines manufactured by

2   various slot suppliers, including PlayAGS, in approximately 30 tribal casinos. In December

3   2018, when the market first learned that PlayAGS was going to acquire Integrity, the Company

4   stated that its "roots are in Oklahoma, and [it was] excited to invest further in a market [it was]

5   passionate about and where [it] already [had] strong sales and customer support networks."

6   However, the Integrity acquisition was a disaster.

7        300.    CW-7 was a former employee at PlayAGS from May 2016 to October 2019.

8   CW- 7 was sent to Oklahoma in October 2018 to conduct market research as to whether

9   PlayAGS should purchase Integrity.  CW-7 discovered that Integrity had "too many units" with a

10  RPD under ten dollars and concluded that purchasing Integrity would negatively impact

11  PlayAGS's RPD.  CW-7 further explained that the purchase of Integrity would result in the

12  oversaturation of PlayAGS's products in Oklahoma and that PlayAGS did not have the "product

13  depth or software library to support the influx" of new games. Yet,PlayAGS decided to purchase

14  Integrity anyway.

15       301.    CW-7 stated that the Integrity purchase did decrease overall RPD as the poorly-

16  performing Integrity games lowered the average RPD for the Company.

17       302.    The problems with PlayAGS's acquisition of Integrity were well-known, even to

18  industry insiders at PlayAGS's competitors with specialized, inside knowledge of the EGM

19  market and insight into Oklahoma, who believed PlayAGS's growth strategy in Oklahoma,

20  through acquisitions, was unsustainable.

21       303.    CW-8 was a former Account Manager for a major slot manufacturer in

22  Oklahoma.  CW-8 was responsible for customer accounts in Northeastern Oklahoma. CW-8

23  explained that PlayAGS was too ambitious with its acquisitions of Integrity and Cadillac Jack,

24  noting that their revenue-per-unit and profit-per-unit numbers were not high enough to cover

25  these costly acquisitions.  Moreover, CW-8 explained that the games PlayAGS purchased from

26  Integrity were too old to perform well.  CW-8 stated that, according to his estimation, the cost of

27  the Integrity acquisition was "many multiples too high."

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

90

304.    CW-9, a former employee at a PlayAGS competitor in Oklahoma, confirmed that PlayAGS overpaid for its acquisition of Integrity. CW-9 explained that "everybody was surprised" by the price PlayAGS paid for Integrity, as Integrity was valued far less than the $50 million purchase price.  CW-9 characterized the transaction as a "bad deal."

305.    PlayAGS's business was already declining in Oklahoma in early 2018—in part because of failed acquisition of Cadillac Jack—and the acquisition of Integrity compounded those problems.  PlayAGS's excessive product placement in Oklahoma, through its acquisitions and unsustainable sales practices, exacerbated the already-existing substantial financial problems and poor projections for PlayAGS at the time of the SPOs.  As described below, PlayAGS's unsustainable growth strategy, its problems in the Oklahoma market, and its contemporaneous integration issues with its acquisitions should have been disclosed in its Shelf Registration Statement, rendering it false and misleading.

C.    **The SPOs**

306.    On or about August 6, 2018, PlayAGS filed a shelf registration statement on Form S-3 with the SEC (together with the Prospectus Supplements defined herein, the "Shelf Registration Statement"). Pursuant to the Shelf Registration Statement, the Company registered for sale, on behalf of the Apollo Defendants, 18,970,161 shares of common stock, for a total offering price of up to $1 billion, which shares were permitted to be sold on a rolling basis (the "August 2018 SPO").

307.    The Shelf Registration Statement was declared effective by the SEC on August 8, 2018, and the Company then commenced the August 2018 SPO.

308.    On August 10, 2018, the Company filed a prospectus supplement with the SEC on Form 424B1 (the "August 2018 SPO Prospectus Supplement"), which is part of the Shelf Registration Statement, for the August 2018 SPO.  In the August 2018 SPO, PlayAGS, on behalf of the Apollo Defendants, registered for sale and issued 6,325,000 shares of its common stock, including the underwriter overallotment of 825,000 shares, at the public offering price of $29.25 per share.  Net of underwriting discounts and commissions, the August 2018 SPO was valued at $154,037,812.50.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

91

309.    The proceeds of the August 2018 SPO went to the Apollo Defendants, not the Company.

310.    The Underwriter Defendants, excluding Defendant Morgan Stanley, were the underwriters for the August 2018 SPO.

311.    On March 20, 2019, the Company, on behalf of the Apollo Defendants, registered for sale and issued 4,000,000 shares of its common stock at the public offering price of $25.50 per share (the "March 2019 SPO"). For the March 2019 SPO, using a shelf registration process, the Company filed a prospectus supplement with the SEC on Form 424B1 (the "March 2019 SPO Prospectus Supplement," which forms part of the Shelf Registration Statement together with the August 2018 SPO Prospectus Supplement, the "Prospectus Supplements").  Net of underwriting discounts and commissions, the March 2019 SPO was valued at $100,000,000.

312.    The proceeds of the March 2019 SPO went to the Apollo Defendants, not the Company.

313.    Jefferies and Morgan Stanley were the only Underwriter Defendants for the March 2019 SPO.

314.    Each of the Individual Defendants participated in the preparation of the Shelf Registration Statement and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein.  The Individual Defendants signed the Shelf Registration Statement and/or was a director of PlayAGS at the time the filing of the part of the registration with respect to which their liability is being asserted, participated in the SPOs, and solicited the purchase of PlayAGS's common shares, to serve their financial interest and those of PlayAGS and the Apollo Defendants. The Individual Defendants, in their capacity as senior executives and/or directors of PlayAGS, reviewed, edited, and approved the Shelf Registration Statement.

315.    The Underwriter Defendants are investment banks which specialize, *inter alia*, in underwriting public offerings of securities.  The Underwriter Defendants served as underwriters of the SPOs and received millions of dollars in fees paid to the underwriter syndicate.  The August 2018 SPO Underwriter Defendants received $6.8 million in fees for the August 2018

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

92

SPO.  The March 2019 SPO Underwriter Defendants received $2 million in fees for the March 2019 SPO.

316.    The Underwriter Defendants determined that in return for their share of proceeds from the SPOs, they were willing to merchandise PlayAGS's common stock in the SPOs.

317.    The Underwriter Defendants also demanded and obtained an agreement from PlayAGS that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  The Underwriter Defendants also made certain that PlayAGS had purchased millions of dollars in directors' and officers' liability insurance.

318.    Representatives of the Underwriter Defendants assisted the Company, the Individual Defendants, and the Apollo Defendants in planning the SPOs, and purportedly conducted an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's operations and financial prospects.

319.    In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with PlayAGS's and the Apollo Defendants' management and top executives (including the Individual Defendants), and engaged in "drafting sessions" regarding the Shelf Registration Statement in advance of its filing.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the SPOs; (ii) the terms of the SPOs, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Shelf Registration Statement; (iv) what disclosures about the Company would be made in the Shelf Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Shelf Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants were negligent in not knowing of the Company's undisclosed existing

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

93

problems and plans, and the materially untrue statements and omissions contained in the Shelf Registration Statement as detailed herein.

320.     The Underwriter Defendants caused the Shelf Registration Statement to be filed with the SEC and to be declared effective in connection with offers and sales thereof, including to Lead Plaintiff and the Class.

### D.     Defendants' False and Misleading Shelf Registration Statement

321.     The Shelf Registration Statement was negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation.  Specifically, the Shelf Registration Statement was materially false and misleading in that it omitted to state: (i) PlayAGS's declining market strength, including in its largest revenue center, Oklahoma; (ii) the Company's growth strategies were unsustainable; (iii) the Company suffered from an inability to grow and was experiencing major execution issues in Oklahoma; (iv) thus, the Company's touted competitive strengths (*i.e.*, current market share, ability to grow, and opportunity for growth) were not reasonably likely to lead to increased revenue or sustained financial performance; and (v) as a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

322.     Sections 11 and 12(a)(2) of the Securities Act create liability against each of the Defendants for each (1) misstatement, (2) omission in contravention of an affirmative legal disclosure obligation, and (3) omission of information that is necessary to prevent existing disclosures from being misleading, in the Shelf Registration Statement.

323.     Pursuant to SEC Regulation C, the Shelf Registration Statement was required to disclose material information necessary to ensure that representations in the Shelf Registration Statement were not misleading.  Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

324.    Further, Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303.  Specifically, Item 303 and the SEC's related interpretive releases thereto, requires issuers to disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause the issuer's financial information not to be indicative of future operating results.

325.    Moreover, Defendants were also required to comply with Item 105 (formerly 503) of Regulation S-K, 17 C.F.R. § 229.105.  Specifically, Item 105 requires that the Shelf Registration Statement furnish, among other things, a discussion of the most significant factors that make the SPOs speculative or risky.

### E.    The Shelf Registration Statement Falsely Portrayed PlayAGS's Competitive Strengths

326.    The Shelf Registration Statement misleadingly touted the success PlayAGS had in the EGM market, including in its largest and most important market—Oklahoma.  In reality, PlayAGS was struggling to further grow and maintain its market share after the IPO.  In Oklahoma, PlayAGS was on a decline in 2018 and 2019 and this is significant because Oklahoma represents a substantial portion of PlayAGS's revenue base.  As PlayAGS explained:

> Oklahoma is our largest market and our EGMs in the state accounted for approximately 22% of our total revenue for the last twelve months ended June 30, 2018.  Our largest customer is the Chickasaw Nation, a Native American gaming operator in Oklahoma, which accounted for approximately 11% of our total revenue for the last twelve months ended June 30, 2018.

327.    As a result of the undisclosed true state of affairs at the Company, the Shelf Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained in the Shelf Registration Statement not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

328.    For example, the Shelf Registration Statement, in its August 2018 SPO Prospectus Supplement, falsely touted the Company's strengths in the EGM market, stating that PlayAGS was a "leading" supplier of EGMs and drew investor affection to a "strong base of recurring, contracted, high-margin revenue," which was attributed to "strong performance and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No.: 2:20-cv-01209-JCM-NJK

95

1  longevity of [PlayAGS's] game titles and long-term relationships with [the Company's] key

2  customers."  The Shelf Registration Statement stated in pertinent part, as follows:

3  ***We are a leading designer and supplier of electronic gaming***
4  ***machines ("EGMs") and other products and services for the***
   ***gaming industry.***

5                          ***

6  ***High-Margin, Recurring Revenue Model with Attractive Payback***
7  ***Periods on Newly Deployed Capital***

8  Approximately 76% of our revenue in the LTM period was derived
   from products that we leased to our customers and recurring revenue
9  from our Interactive gaming operations.  ***This strong base of***
   ***recurring, contracted, high-margin revenue generated a 53%***
10 ***EGM adjusted EBITDA margin during the LTM period, which***
   ***reflects the strong performance and longevity of our game titles***
11 ***and long-term relationships with our key customers.  The cash***
   ***flow generated from our recurring revenue sources has provided***
12 ***us with a stable source of capital to grow our footprint both***
   ***domestically and internationally.  Given the high-margin,***
13 ***recurring-revenue nature of our new EGMs, we benefit from***
   ***payback periods on our leased units of only approximately 12***
14 ***months for our core units and approximately 8 months for our***
   ***premium units.***

15      329.    The statements in ¶328 were each false and misleading statements of material fact

16 when made because they failed to disclose and misrepresented the following material adverse

17 facts, known material adverse trends or material uncertainties, and significant risks that existed at

18 the time of the SPOs:

19      (a)    Contrary to the Shelf Registration Statement, at the time of the SPOs,

20 PlayAGS was not a "leading designer and supplier" of EGMs—rather, the Company was

21 struggling to meet sales targets and had to engage in unsustainable practices to do so, including

22 saturating its markets and sacrificing quality with underperforming units, to such an extent that it

23 would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-

24 performing markets;

25      (b)    PlayAGS was not achieving earnings targets and was placing significant

26 pressure on its Oklahoma sales teams to use unsustainable practices to continue momentum after

27 its massive pre-IPO sales push—something that PlayAGS was failing to accomplish—resulting

28 in an oversaturation in Oklahoma, PlayAGS's largest and most important market;

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS          96
CASE NO.: 2:20-CV-01209-JCM-NJK

(c)     At the time of the SPOs, PlayAGS had saddled itself with poor quality EGMs, that it acquired from Cadillac Jack before the Offering and Integrity during the SPOs, in the oversaturated Oklahoma market, leading to foreseeable losses and declining performance;

(d)     As Defendant Lopez admitted after the SPOs, PlayAGS had been placing poor quality EGMs in Oklahoma "over the past year" (*i.e.*, since 2018) prior to the addition of more poor quality EGMs from Integrity—in other words, PlayAGS was investing too heavily for growth in the oversaturated Oklahoma market at the time of the SPOs;

(e)     PlayAGS was not capturing growth in Oklahoma in 2018 and 2019 but instead was saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets—something that Defendant Lopez and Akiona admitted after the SPOs;

(f)     PlayAGS's games in Oklahoma, PlayAGS's largest revenue center, required significant resources to maintain and optimize because of the poor quality EGMs acquired from Cadillac Jack and Integrity and had lower RPD than the Company average—an adverse fact that Defendant Akiona disclosed to the investing public months after the SPOs; and

(g)     As a result, PlayAGS was the opposite of "a leading designer and supplier of [EGMs] and other products and services for the gaming industry"—it was declining and not positioned to sustain its prior growth.

330.     The Shelf Registration Statement, in its August 2018 Prospectus Supplement, further touted the Company's strength in the market by telling investors that the Company was "***able to maintain [its] market share by partnering with [its] tribal customers to continually develop high-quality Class II titles that optimize the revenue generated at their casinos***."

331.     This statement in ¶330 is a false and misleading statement of material fact when made because it failed to disclose and misrepresented the following material adverse facts, known material adverse trends or material uncertainties, and significant risks that existed at the time of the SPOs:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

97

(a)     PlayAGS was not able to maintain its market share—rather the Company was struggling to meet sales targets and had to engage in unsustainable practices to do so, including saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets;

(b)     PlayAGS's largest and most important market, Oklahoma, was oversaturated with EGMs from PlayAGS and its competitors;

(c)     PlayAGS was not achieving earnings targets and PlayAGS was placing significant pressure on its Oklahoma sales teams to use unsustainable practices to continue momentum after its massive pre-IPO sales push—something that PlayAGS was failing to accomplish;

(d)     At the time of the SPOs, PlayAGS had saddled itself with poor quality EGMs, that it acquired from Cadillac Jack before the Offering and Integrity during the SPOs, in the oversaturated Oklahoma market, leading to foreseeable losses and declining performance;

(e)     As Defendant Lopez admitted after the SPOs, PlayAGS had been placing poor quality EGMs in Oklahoma "over the past year" (*i.e.*, since 2018) prior to the addition of more poor quality EGMs from Integrity—in other words, PlayAGS was investing too heavily for growth in the oversaturated Oklahoma market at the time of the SPOs;

(f)     PlayAGS was not capturing growth in Oklahoma in 2018 and 2019 but instead was saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets—something that Defendant Lopez and Akiona admitted after the SPOs; and

(g)     As a result, PlayAGS could not maintain its current share in the Class II market, including its largest Class II market revenue generator—the Native American gaming market in Oklahoma—because it was forced to swap, relocate, or even sell off its EGMs in order to prevent further substantial losses.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

98

332. The August 2018 SPO Prospectus Supplement, which forms part of the Shelf Registration Statement, focused on the increase of its "installed base" (or amount of units on the ground) as a metric of success and claimed the Company was "positioned to increase [its] ship share." The Shelf Registration stated, in pertinent part, as follows:

> We have increased our installed base of EGMs every year from 2005 through the LTM period, and as of June 30, 2018, our total EGM footprint was 24,523 units (16,647 in the United States and Canada and 7,876 international). *We remain highly focused on continuing to expand our installed base of leased EGMs in markets that we currently serve* as well as new jurisdictions where we do not presently have any EGMs installed. Since our founding, we have made significant progress in expanding the number of markets where we are licensed to sell or lease our EGMs. In 2005, we were licensed in three states (5 total licenses). Currently, we are licensed in 36 U.S. states and five foreign countries (approximately 260 total licenses). As of June 30, 2018, our installed base represented approximately 2% of the total addressable market of approximately 980,000 EGMs installed throughout the United States and Canada. According to Eilers & Krejcik, U.S. casino operators expect to allocate approximately 7% of their 2018 EGM purchases to AGS products, which would result in ship share more than five times higher than our ship share in 2016. We believe we are positioned to increase our ship share over the next several years.

333. Likewise, the March 2019 SPO Prospectus Supplement, which is part of the Shelf Registration Statement, incorporated by reference the following statements:

> We have increased our installed base of EGMs every year from 2005 through the year ended December 31, 2018, and as of December 31, 2018, our total EGM footprint comprised 24,647 units (16,296 domestic and 8,351 international). *We remain highly focused on continuing to expand our installed base of leased EGMs in markets that we currently serve* as well as new jurisdictions where we do not presently have any EGMs installed. Since our founding, we have made significant progress in expanding the number of markets where we are licensed to sell or lease our EGMs. In 2005, we were licensed in three states (5 total licenses) and currently we are licensed in 38 U.S. states and eight foreign countries (approximately 270 total licenses). As of December 31, 2018, our installed base represented only approximately 2.4% of the total domestic market of approximately 990,000 EGMs installed throughout the United States and Canada. According to Eilers & Krejcik, U.S. casino operators expect to allocate approximately 4% of their 2018 EGM purchases to AGS products. We believe we are positioned to gain significant market share over the next several years.

334. These statements in ¶¶332–33 are each false and misleading statements of material fact when made because they failed to disclose and misrepresented the following

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

99

material adverse facts, known material adverse trends or material uncertainties, and significant risks that existed at the time of the SPOs:

(a)     While the EGM installed base increased, that installed base consisted of poor quality games with an RPD lower than the Company average and, as a result, PlayAGS did not include the quality (or lack thereof) of this alleged growth in its disclosures;

(b)     PlayAGS was not able to maintain its market share—rather the Company's growth was unsustainable;

(c)     PlayAGS's largest and most important market, Oklahoma, was oversaturated with EGMs from PlayAGS and its competitors;

(d)     PlayAGS was not achieving earnings targets and PlayAGS was placing significant pressure on its Oklahoma sales teams to use unsustainable practices to continue momentum after its massive pre-IPO sales push—something that PlayAGS was failing to accomplish;

(e)     At the time of the SPOs, PlayAGS had saddled itself with poor quality EGMs, that it acquired from Cadillac Jack before the Offering and Integrity during the SPOs, in the oversaturated Oklahoma market, leading to foreseeable losses and declining performance;

(f)     As Defendant Lopez admitted after the SPOs, PlayAGS had been placing poor quality EGMs in Oklahoma "over the past year" (*i.e.*, since 2018) prior to the addition of more poor quality EGMs from Integrity—in other words, PlayAGS was investing too heavily for growth in the oversaturated Oklahoma market at the time of the SPOs;

(g)     PlayAGS was not capturing growth in Oklahoma in 2018 and 2019 but instead was saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets—something that Defendant Lopez and Akiona admitted after the SPOs;

(h)     PlayAGS's games in Oklahoma, PlayAGS's largest revenue center, required significant resources to maintain and optimize because of the poor quality EGMs

1    acquired from Cadillac Jack and Integrity and had lower RPD than the Company average—facts

2    that Defendants Lopez and Akiona disclosed to the investing public months after the SPOs; and

3                (i)      As a result of these compounding factors, PlayAGS could not realistically

4    increase its ship share or gain significant market share, and any belief to the contrary would not

5    have aligned with these undisclosed, adverse facts in Defendants' possession at the time.

6          335.     The Shelf Registration Statement, in its August 2018 SPO Prospectus

7    Supplement, also touted PlayAGS's "***earning performance of [its] products is the primary***

8    ***driver of customer demand***" but this statement was a false and misleading statement of material

9    fact when made because the Shelf Registration Statement failed to disclose and misrepresented

10    the following material adverse facts, known material adverse trends or material uncertainties, and

11    significant risks that existed at the time of the SPOs:

12                (a)     The statement was misleading in that it failed to tell investors that

13    PlayAGS's customer base in Oklahoma, its allegedly strongest and largest market, was a product

14    of placing games on unfavorable terms where PlayAGS was receiving less RPD than the

15    Company average and was negatively impacting the Oklahoma market to such an extent that it

16    would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-

17    performing markets;

18                (b)     Oklahoma, PlayAGS's largest revenue center, had lower RPD than the

19    Company average—an adverse fact that Defendant Akiona disclosed to the investing public

20    months after the SPOs; and

21                (c)     As a result, earning performance was not the reason for customer

22    demand—being the low-cost provider was, and that tactic was unsustainable for PlayAGS's long

23    term growth as evidenced by PlayAGS's need to scale back the number of EGMs, and upgrade

24    any remaining EGMs, in its largest and, allegedly, most established market.

25          336.     Both in the August 2018 Prospectus Supplement and the March 2019 Prospectus

26    Supplement, the Company touted its quality product offerings and technological innovation and

27    stated that:

28

*[T]he quality and breadth of our customer base is a strong testament to the effectiveness and quality of our product offerings, technological innovation and customer service.*

337. The statement in ¶336 is a false and misleading statement of material fact when made because it failed to disclose and misrepresented the following material adverse facts, known material adverse trends or material uncertainties, and significant risks that existed at the time of the SPOs:

(a) Contrary to the Shelf Registration Statement, at the time of the SPOs, PlayAGS did not have a strong customer base—rather the Company was struggling to meet sales targets and had to engage in unsustainable practices to do so, including saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets;

(b) PlayAGS was not achieving earnings targets and PlayAGS was placing significant pressure on its Oklahoma sales teams to use unsustainable practices to continue momentum after its massive pre-IPO sales push—something that PlayAGS was failing to accomplish;

(c) PlayAGS was at the time of the SPOs maintaining poor quality EGMs, that it acquired from Cadillac Jack before the Offering and Integrity during the SPOs, in the oversaturated Oklahoma market, leading to foreseeable losses and declining performance;

(d) As Defendant Lopez admitted after the SPOs, PlayAGS was placing poor quality EGMs in Oklahoma "over the past year" (*i.e.*, since 2018) prior to the addition of more poor quality EGMs from Integrity—in other words, PlayAGS was investing too heavily for growth in the oversaturated Oklahoma market at the time of the SPOs;

(e) As a result of flooding the oversaturated Oklahoma market with product, PlayAGS was not capturing growth in Oklahoma in 2018 and 2019 but instead was saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets—something that Defendant Lopez and Akiona admitted after the SPOs;

(f)     PlayAGS's games in Oklahoma, PlayAGS's largest revenue center, required significant resources to maintain and optimize its EGMs because of the poor quality and low RPD earning EGMs acquired from Cadillac Jack and Integrity and had lower RPD than the Company average—facts that Defendants Lopez and Akiona disclosed to the investing public months after the SPOs; and

(g)     PlayAGS misleadingly failed to tell investors that PlayAGS's customer base in Oklahoma, its allegedly strongest and largest market, was a product of placing games on unfavorable terms where PlayAGS was receiving less RPD than the Company average.

338.    The August 2018 SPO Prospectus Supplement, which is part of the Shelf Registration Statement and incorporated by reference PlayAGS's 2017 annual report on Form 10-K, filed with the SEC on March 14, 2018 ("2017 Annual Report"), which is part of the Shelf Registration Statement, and the March 2019 SPO Prospectus Supplement, which is part of the Shelf Registration Statement and incorporated by reference the 2018 Annual Report, touted the success of PlayAGS's "Core" title games:

> We categorize our EGM titles into two main groups: "Core" and "Premium and Specialty". ***Our Core titles have a proven track record of success and are targeted at maintaining and growing our current installed base***.

339.    These statements in ¶338 are false and misleading statements of material fact when made because they failed to disclose and misrepresented the following material adverse facts, known material adverse trends or material uncertainties, and significant risks that existed at the time of the SPOs:

(a)     PlayAGS was suffering from technical issues associated with their games in Oklahoma as a product of their acquisition of Cadillac Jack and Integrity;

(b)     Prior to the SPOs, existing games were so old that PlayAGS employees had to perform "recertification" on them, which cost the Company between forty to sixty thousand dollars each time and needed to do so frequently;

(c)     Starting in early 2018, PlayAGS's salespeople were under significant pressure to capture more of the EGM market including in PlayAGS's largest market, leading to unsustainable sales practices;

(d)     PlayAGS was eventually forced to swap, relocate, or even sell off units in its EGM installed base and reinvest capital in higher-performing markets months after the SPOs; and

(e)     As a result, PlayAGS did not have a "proven track record of success" and its EGMs were not designed to maintain and grow customer demand.

## F.     The Shelf Registration Statement Falsely Portrayed PlayAGS's Ability to Grow and Its Success with Its Growth Strategy

340.    The Shelf Registration Statement also misinformed investors about PlayAGS's ability to grow and misrepresented its prior success with its growth strategy, which included acquisitions as means of quickly establishing product footprint and content depth. For example, the Shelf Registration Statement, through statements in the August 2018 SPO Prospectus Supplement, stated, in pertinent part, that:

> We offer a wide variety of content and technology with hundreds of titles, and we aim to be a "one-stop shop" for our customers. We have recently expanded our EGM cabinet offerings to include cutting-edge premium products, such as Orion (introduced in May 2017), and Orion Slant (introduced in March 2018), and unique formats that stand out on the casino floor, such as Big Red (introduced in September 2014).
>
> ***
>
> **We strategically pursue acquisitions and utilize our broad, customer-focused distribution network to enhance our content, titles and overall installed base.**
>
> ***
>
> **Proven Ability to Successfully Integrate Acquisitions and Scale Our Platform**
>
> **We have a strong track record of acquiring and integrating businesses with limited disruption to our core business**. Over the past three years, we have effectively integrated over 20 acquisitions. **The acquisition of Cadillac Jack demonstrated our ability to realize both cost and revenue synergies and, as a result of efficiently integrating two complementary businesses, to deliver strong financial results in 2016 and continue into 2017.** We

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

104

believe that our proven track record is the result of our ability to successfully identify businesses with products and cultures that are complementary to AGS.

341. Likewise, the Prospectus Supplements incorporated by reference the Company's 2017 Annual Report which discusses the purported success PlayAGS had in acquiring companies:

On May 29, 2015, the Company acquired 100% of the equity of Amaya Americas Corporation ("Cadillac Jack"), a leading provider of Class II gaming machines for the North American tribal gaming market, with key regions of operation within Alabama, Mexico, and Wisconsin. ***This acquisition is expected to create growth opportunities in Class II and Class III jurisdictions and expands the Company's geographic footprint with an EGM installed base of approximately 10,500 units. The combined management teams are complementary and possess years of combined experience that is expected to allow us to effectively grow and improve our business.***

342. These statements in ¶¶340–41 are false and misleading statements of material fact when made because they failed to disclose and misrepresented the material adverse facts, known material adverse trends or material uncertainties, and significant risks that existed at the time of the SPOs:

(a) PlayAGS's acquisitions in Oklahoma were not successful or strategically advantageous—acquisitions of Cadillac Jack and Integrity resulted in a flooding of low quality EGMs in an oversaturated market—leaving PlayAGS with little, if any, effective growth, significant expenses, and recurring quarterly net losses;

(b) PlayAGS's acquisition of Cadillac Jack overlooked the Oklahoma market's preference for older EGMs (instead of product diversity)—a fact later admitted by Defendant Lopez months after the SPOs when he stated "[w]e also went too deep into our portfolio of titles, where we should have focused on our most successful game themes";

(c) The acquisition of Cadillac Jack did not result in strong financial performance but rather a commitment of long-term resources and expenses associated with optimizing low quality EGMs;

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

105

(d)     The acquisition of Integrity exacerbated the oversaturation that already existed in the Oklahoma market and PlayAGS's lack of product depth or software library to support the influx of new product;

(e)     The costs associated with the acquisitions of Cadillac Jack and Integrity were not adequately covered by the low RPD EGMs—in fact, those acquisitions further dragged PlayAGS's average RPD;

(f)     The acquisitions of Cadillac Jack and Integrity required significant optimization  because of the oversaturated Oklahoma market such that PlayAGS was eventually forced to swap, relocate, or even sell off units in its EGM installed base and reinvest capital in higher-performing markets—something Defendants and Company admitted months after the SPOs; and

(g)     As a result, PlayAGS did not have a proven track record of success but rather a track record of poorly managed acquisitions based on a quantity-over-quality approach, which resulted in substantial financial losses.

343.    The August 2018 SPO Prospectus Supplement, which forms part of the Shelf Registration Statement, touted to investors "continued" growth of Class II EGM market share and recurring revenue. The Shelf Registration Statement stated in pertinent part, as follows:

> **_Further Expand Our Class II Market Leadership and Continue Growth of our Recurring Revenue Base_**
>
> We believe that our existing core Class II product offering is among the strongest in the industry and _**we are committed to growing our existing Class II installed base**_.  Currently, we believe we are the second largest supplier of Class II games in the United States.  We expect to _**continue gaining market share in our existing Class II jurisdictions as we introduce more games and new hardware, and we also intend to enter new Class II jurisdictions we have acquired 58 new Class II licenses in the past three and a half years.**_  In the first quarter of 2018, there was a sizable Native American casino that opened and our Class II placements represented nearly 15% of the property's floor.  We believe that _**the unique advantages offered by Class II gaming will result in Native American operators continuing to grow the number of Class II units that they have in their casinos.  Given our existing leadership in the Class II market, we feel that we are very well-positioned to capture our share of this continued growth in Class II**_.

344.     These statements in ¶343 are each false and misleading statements of material fact when made because they failed to disclose and misrepresented the following material adverse facts, known material adverse trends or material uncertainties, and significant risks that existed at the time of the SPOs:

(a)     PlayAGS was at the time of the SPOs maintaining poor quality EGMs that it acquired from Cadillac Jack before the Offering and Integrity during the SPOs in the oversaturated Oklahoma market, leading to low RPD EGMs, foreseeable losses and declining performance;

(b)     As Defendant Lopez admitted after the SPOs, PlayAGS was placing poor quality EGMs in Oklahoma "over the past year" (*i.e.*, since 2018) prior to the addition of more poor quality EGMs from Integrity—in other words, PlayAGS was investing too heavily in the oversaturated Oklahoma market at the time of the SPOs;

(c)     PlayAGS was not achieving earnings targets and PlayAGS was placing significant pressure on its Oklahoma sales teams to build continued momentum after its massive pre-IPO sales push—something that PlayAGS was failing to accomplish; and

(d)     As a result of flooding the oversaturated Oklahoma market with product, PlayAGS was not capturing growth in Oklahoma in 2018 and 2019 but instead was saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets—something that Defendant Lopez and Akiona admitted after the SPOs.

345.     The March 2019 SPO Prospectus Supplement, which is part of the Shelf Registration Statement, incorporated by reference the Company's Form 8-K, filed with the SEC on February 11, 2019, and informed investors on the Integrity acquisition as follows:

> PlayAGS … today announced the successful completion of its acquisition of Integrity Gaming Corp.   ("Integrity").   This acquisition increases AGS' recurring revenue footprint by more than 2,700 games and presents yield optimization opportunities.
>
> ***
>
> We are thrilled to have so quickly closed this deal and are ready to provide Integrity's customers with exceptional service and support.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

107

Every Integrity customer is also an AGS customer, ***so this should be a relatively seamless transition and one that gives us an opportunity to work with operators to ensure they are getting the best performance from their Integrity-placed games***.

346.    These statements in ¶345 are each false and misleading statements of material fact when made because they failed to disclose and misrepresented the following material adverse facts, known material adverse trends or material uncertainties, and significant risks that existed at the time of the SPOs:

(a)    The acquisition of Integrity exacerbated the oversaturation that already existed in the Oklahoma market and PlayAGS's lack of product depth or software library to support the influx of new product;

(b)    The costs associated with the acquisition of Integrity were not adequately covered by the low RPD EGMs—in fact, those acquisitions further dragged PlayAGS's average RPD;

(c)    The acquisitions of Cadillac Jack and Integrity required significant optimization and resulted in the foreseeable oversaturation of the Oklahoma market to such an extent that PlayAGS would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets—something that Defendants Lopez, Akiona and PlayAGS admitted months after the SPOs; and

(d)    As a result, the acquisition of Integrity did not ensure that customers were getting the "best performance"; rather, the acquisition was disastrous.

**G.    The Shelf Registration Statement Failed to Disclose and Misrepresented Significant Risks that Made the SPOs More Speculative and Risky**

347.    The August 2018 SPO Prospectus Supplement, which is part of the Shelf Registration Statement and incorporated by reference PlayAGS's 2017 Annual Report, inaccurately described as ***potential***, certain risks associated with PlayAGS's growth strategies, which "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

108

> ***Slow growth in the development of new gaming jurisdictions or the number of new casinos, declines in the rate of replacement of existing electronic gaming machines and ownership changes and consolidation in the casino industry could limit or reduce our future prospects.***

***

> To the extent new gaming jurisdictions are established or expanded, we cannot guarantee we will be successful penetrating such new jurisdictions or expanding our business in line with the growth of existing jurisdictions. As we enter into new markets, we may encounter legal and regulatory challenges that are difficult or impossible to foresee and which could result in an unforeseen adverse impact on planned revenues or costs associated with the new market opportunity. If we are unable to effectively develop and operate within these new markets, then our business, operating results and financial condition would be impaired. Furthermore, as ***we attempt to generate new streams of revenue by placing our participation electronic gaming machines with new customers we may have difficulty implementing an effective placement strategy for jurisdictional specific games. Our failure to successfully implement an effective placement strategy could cause our future operating results to vary materially from what management has forecasted.***

348. Likewise, the March 2019 SPO Prospectus Supplement, which is part of the Shelf Registration Statement and incorporated by reference PlayAGS's 2018 Annual Report, also inaccurately described as ***potential***, certain risks associated with PlayAGS's growth strategies, which "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Slow growth in the development of new gaming jurisdictions or the number of new casinos, declines in the rate of replacement of existing electronic gaming machines and ownership changes and consolidation in the casino industry could limit or reduce our future prospects.***

***

> To the extent new gaming jurisdictions are established or expanded, we cannot guarantee we will be successful penetrating such new jurisdictions or expanding our business in line with the growth of existing jurisdictions. As we enter into new markets, we may encounter legal and regulatory challenges that are difficult or impossible to foresee and which could result in an unforeseen adverse impact on planned revenues or costs associated with the new market opportunity. If we are unable to effectively develop and operate within these new markets, then our business, operating

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

109

results and financial condition would be impaired. Furthermore, as *we attempt to generate new streams of revenue by placing our participation electronic gaming machines with new customers we may have difficulty implementing an effective placement strategy for jurisdictional specific games. Our failure to successfully implement an effective placement strategy could cause our future operating results to vary materially from what management has forecasted.*

349. The statements referenced above in ¶¶347–48 are each inaccurate statements of material fact because while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Shelf Registration Statement failed to disclose and misrepresented the following significant, ***then-existing*** material events and adverse trends or uncertainties that PlayAGS ***had already been*** facing at the time of the SPOs:

(a) Contrary to the Shelf Registration, the risk disclosure is inaccurate because the possibility of "future operating results [] vary[ing] materially from what management has forecasted" was already guaranteed by the inflated nature of management's public forecasts; *i.e.*, multiplying internal analyses arbitrarily by four;

(b) As Defendant Lopez admitted after the SPOs, PlayAGS was placing poor quality EGMs in Oklahoma "over the past year" (*i.e.*, since 2018) prior to the addition of more poor quality EGMs from Integrity—in other words, PlayAGS was investing too heavily in the oversaturated Oklahoma market at the time of the SPOs; and

(c) As a result of flooding the oversaturated Oklahoma market with product, PlayAGS was not capturing growth in Oklahoma in 2018 and 2019 but instead was saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets—something that Defendant Lopez and Akiona admitted after the SPOs.

350. The August 2018 SPO Prospectus Supplement, which is part of the Shelf Registration Statement and incorporated by reference PlayAGS's 2017 Annual Report, inaccurately described as ***potential***, certain risks associated with PlayAGS's strength in the Oklahoma market, which "could" have an adverse effect on its business, financial condition, and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

110

results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***State compacts with our existing Native American tribal customers to allow Class III gaming could reduce demand for our Class II games and our entry into the Class III market may be difficult as we compete against larger companies in the tribal Class III market.***
>
> Most of our Class II Native American tribal customers have entered into compacts with the states in which they operate to permit the operation of Class III games.  While we seek to also provide Class III alternatives in these markets, we believe the number of our Class II game machine placements in those customers' facilities could decline, and our operating results could be materially and adversely affected.  As our Native American tribal customers continue to transition to gaming under compacts with the state, we continue to face significant uncertainty in the market that makes our business in these states difficult to manage and predict and we may be forced to compete with larger companies that specialize in Class III gaming. We believe the establishment of state compacts depends on a number of political, social, and economic factors that are inherently difficult to ascertain.  Accordingly, although we attempt to closely monitor state legislative developments that could affect our business, we may not be able to timely predict if or when a compact could be entered into by one or more of our Native American tribal customers.  ***For example, in Oklahoma, the continued introduction of Class III games since the passage of the tribal gaming compact in 2004 may put pressure on our revenue and unit market share and our revenue share percentages and may result in a shift in the market from revenue share arrangements to a "for sale" model***.

351.    Likewise, the March 2019 SPO Prospectus, which is part of the Shelf Registration Statement and incorporated by reference the Company's 2018 Annual Report, also inaccurately described as ***potential***, certain risks associated with PlayAGS's strength in the Oklahoma market, which "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***State compacts with our existing Native American tribal customers to allow Class III gaming could reduce demand for our Class II games and our entry into the Class III market may be difficult as we compete against larger companies in the tribal Class III market.***
>
> Most of our Class II Native American tribal customers have entered into compacts with the states in which they operate to permit the operation of Class III games.  While we seek to also provide Class III alternatives in these markets, we believe the number of our Class

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

111

II game machine placements in those customers' facilities could decline, and our operating results could be materially and adversely affected.  As our Native American tribal customers continue to transition to gaming under compacts with the state, we continue to face significant uncertainty in the market that makes our business in these states difficult to manage and predict and we may be forced to compete with larger companies that specialize in Class III gaming.  We believe the establishment of state compacts depends on a number of political, social, and economic factors that are inherently difficult to ascertain.  Accordingly, although we attempt to closely monitor state legislative developments that could affect our business, we may not be able to timely predict if or when a compact could be entered into by one or more of our Native American tribal customers.  ***For example, in Oklahoma, the continued introduction of Class III games since the passage of the tribal gaming compact in 2004 may put pressure on our revenue and unit market share and our revenue share percentages and may result in a shift in the market from revenue share arrangements to a "for sale" model***.

352.     Moreover, the August 2018 SPO Prospectus Supplement, which is part of the Shelf Registration Statement and incorporated by reference the Company's  2017 Annual Report, inaccurately described as ***potential***, certain risks associated with PlayAGS's strength in the Oklahoma market, which "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***For the year ended December 31, 2017, two customers were each responsible for approximately 11% of our total revenue and we generated approximately 24% and 11% of our total revenue in the states of Oklahoma and Alabama, respectively.***

> For the year ended December 31, 2017, approximately 24% of our total revenue was derived from gaming operations in Oklahoma, and approximately 11% of our total revenue was from one Native American gaming tribe in that state.  Additionally, for the year ended December 31, 2017, approximately 11% of our total revenue was derived from gaming operations in Alabama, and approximately 11% of our total revenue was from one Native American gaming tribe in that state.  The significant concentration of our revenue in Oklahoma and Alabama means that local economic, regulatory and licensing changes in Oklahoma or Alabama may adversely affect our business disproportionately to changes in national economic conditions, including adverse economic declines or slower economic recovery from prior declines.  ***While we continue to seek to diversify the markets in which we operate, changes to our business, operations, game performance and customer relationships in Oklahoma*** or Alabama, ***due to*** changing gaming regulations or licensing requirements, higher taxes, ***increased competition, declines in market revenue share percentages or otherwise***, ***could have a material and adverse effect on or financial***

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

112

***condition and results of operations.*** In addition, changes in our relationship with our two largest customers, including any disagreements or disputes, a decrease in revenue share, removal of electronic gaming machines or non- renewal of contracts, could have a material and adverse effect on our financial condition and results of operations.

Moreover, neighboring states such as Kansas, Texas and Arkansas have passed or could pass gaming legislation, which could take market share from Oklahoma gaming facilities or otherwise negatively impact the Oklahoma gaming market and, as a result, negatively impact our results of operations.

353. Likewise, the March 2019 SPO Prospectus Supplement, which is part of the Registration Statement and incorporated by reference PlayAGS's 2018 Annual Report, inaccurately described as ***potential***, certain risks associated with PlayAGS's strength in the Oklahoma market, which "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

***We generate a substantial amount of our total revenue from two customers and in two states.***

For the year ended December 31, 2018, approximately 22% of our total revenue was derived from gaming operations in Oklahoma, and approximately 11% of our total revenue was from one Native American gaming tribe in that state. Additionally, for the year ended December 31, 2018, approximately 9% of our total revenue was derived from gaming operations in Alabama, and approximately 9% of our total revenue was from one Native American gaming tribe in that state. The significant concentration of our revenue in Oklahoma and Alabama means that local economic, regulatory and licensing changes in Oklahoma or Alabama may adversely affect our business disproportionately to changes in national economic conditions, including adverse economic declines or slower economic recovery from prior declines. ***While we continue to seek to diversify the markets in which we operate, changes to our business, operations, game performance and customer relationships in Oklahoma*** or Alabama, ***due to*** changing gaming regulations or licensing requirements, higher taxes, ***increased competition, declines in market revenue share percentages or otherwise, could have a material and adverse effect on or financial condition and results of operations.*** In addition, changes in our relationship with our two largest customers, including any disagreements or disputes, a decrease in revenue share, removal of electronic gaming machines or non-renewal of contracts, could have a material and adverse effect on our financial condition and results of operations.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

113

354.    The statements referenced above in ¶¶350–53 were each inaccurate statements of material fact because while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Shelf Registration Statement failed to disclose and misrepresented the following significant, ***then-existing*** material events and adverse trends or uncertainties that PlayAGS ***had already been*** facing at the time of the SPOs:

(a)     PlayAGS was already a company struggling to meet sales targets and had to engage in unsustainable practices to do so, including saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets and those problems were a product of actions PlayAGS took to try to capture growth in a declining market, as opposed to factors outside of its control;

(b)     PlayAGS's largest and most important market, Oklahoma, was oversaturated with EGMs from PlayAGS and its competitors;

(c)     PlayAGS was not achieving earnings targets and PlayAGS was placing significant pressure on its Oklahoma sales teams to use unsustainable practices to continue momentum after its massive pre-IPO sales push—something that PlayAGS was failing to accomplish;

(d)     PlayAGS was at the time of the SPOs maintaining poor quality EGMs, that it acquired from Cadillac Jack before the Offering and Integrity during the SPOs, in the oversaturated Oklahoma market, leading to foreseeable losses and declining performance;

(e)     As Defendant Lopez admitted after the SPOs, PlayAGS was placing poor quality EGMs in Oklahoma "over the past year" (*i.e.*, since 2018) prior to the addition of more poor quality EGMs from Integrity—in other words, PlayAGS was investing too heavily in the oversaturated Oklahoma market at the time of the SPOs;

(f)     As a result of flooding the oversaturated Oklahoma market with product, PlayAGS was not capturing growth in Oklahoma in 2018 and 2019 but instead was saturating its markets and sacrificing quality with underperforming units, to such an extent that it would soon

need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing

markets—something that Defendant Lopez and Akiona admitted after the SPOs;

        (g)     Oklahoma, PlayAGS's largest revenue center, had lower RPD than the

Company average—a fact that Defendant Akiona disclosed to the investing public months after

the SPOs; and

        (h)     PlayAGS's games in Oklahoma, PlayAGS's largest revenue center,

required significant resources to maintain and optimize its EGMs because of the poor quality and

low RPD earning EGMs acquired from Cadillac Jack and Integrity and had lower RPD than the

Company average—facts that Defendants Lopez and Akiona disclosed to the investing public

months after the SPOs.

     355.    Moreover, the August 2018 SPO Prospectus Supplement, which is part of the

Shelf Registration Statement and incorporated by reference PlayAGS's 2017 Annual Report,

inaccurately described as **_potential_**, certain risks associated with PlayAGS's ability to acquire

and integrate businesses, which "could" have an adverse effect on its business, financial

condition, and results of operations, rather than disclosing the actual events and trends or

uncertainties that had already manifested and affirmatively misrepresented its strength in the

market:

> ***Our inability to complete future acquisitions and integrate those businesses successfully could limit our future growth.***
>
> From time to time, we pursue strategic acquisitions in support of our strategic goals. ***In connection with any such acquisitions, we could face significant challenges in managing and integrating our expanded or combined operations, including acquired assets, operations and personnel.*** There can be no assurance that acquisition opportunities will be available on acceptable terms or at all or that we will be able to obtain necessary financing or regulatory approvals to complete potential acquisitions. Our ability to succeed in implementing our strategy will depend to some degree upon the ability of our management to identify, complete and successfully integrate commercially viable acquisitions. ***Acquisition transactions may disrupt our ongoing business and distract management from other responsibilities.***
>
> In addition, there can be no assurance regarding when or the extent to which we will be able to realize any anticipated financial or operational benefits, synergies or cost savings from these acquisitions. ***We may also incur greater costs than estimated to***

AMERICAN CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

115

> ***achieve all of the synergies and other benefits from an acquisition.***
> Integration may also be difficult, unpredictable and subject to delay because of possible company culture conflicts and different opinions on technical decisions and product roadmaps. We may be required to integrate or, in some cases, replace, numerous systems, such as those involving management information, purchasing, accounting and finance, sales, billing, employee benefits, payroll, data privacy and security and regulatory compliance.

356.    Likewise, the March 2019 SPO Prospectus Supplement, which is part of the Shelf Registration Statement and incorporated by reference PlayAGS's 2018 Annual Report, also inaccurately described as ***potential***, certain risks associated with PlayAGS's ability to acquire and integrate businesses, which "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Our inability to complete future acquisitions and integrate those businesses successfully could limit our future growth.***
>
> From time to time, we pursue strategic acquisitions in support of our strategic goals. ***In connection with any such acquisitions, we could face significant challenges in managing and integrating our expanded or combined operations, including acquired assets, operations and personnel.*** There can be no assurance that acquisition opportunities will be available on acceptable terms or at all or that we will be able to obtain necessary financing or regulatory approvals to complete potential acquisitions. Our ability to succeed in implementing our strategy will depend to some degree upon the ability of our management to identify, complete and successfully integrate commercially viable acquisitions. ***Acquisition transactions may disrupt our ongoing business and distract management from other responsibilities.***
>
> In addition, there can be no assurance regarding when or the extent to which we will be able to realize any anticipated financial or operational benefits, synergies or cost savings from these acquisitions. ***We may also incur greater costs than estimated to achieve all of the synergies and other benefits from an acquisition.*** Integration may also be difficult, unpredictable and subject to delay because of possible company culture conflicts and different opinions on technical decisions and product roadmaps. We may be required to integrate or, in some cases, replace, numerous systems, such as those involving management information, purchasing, accounting and finance, sales, billing, employee benefits, payroll, data privacy and security and regulatory compliance.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

116

357.   The statements referenced above in ¶¶355–56 were each inaccurate statements of material fact because while noting only the *potential* negative impacts on its business, financial condition, and results of operations, the Shelf Registration Statement failed to disclose and misrepresented the following significant, *then-existing* material events and adverse trends or uncertainties that PlayAGS *had already been* facing at the time of the SPOs:

(a)   PlayAGS was encountering significant issues related to the acquisitions of Cadillac Jack and Integrity, including the placement of poor quality, low RPD EGMs that required substantial resources to repair, maintain and/or optimize to such an extent that it would soon need to swap, relocate, or even sell off 1,000 units and reinvest capital in higher-performing markets—something that Defendant Lopez and Akiona admitted after the SPOs; and

(b)   As a result, the disastrous costs and business disruptions associated with the acquisitions of Cadillac Jack and Integrity were already being borne by the Company.

## H.   Post-SPO Events

358.   On March 5, 2019, the Company published its 10-K Annual Report for the year ended December 31, 2018, reporting an increase in operating revenue and expenses with a substantial net loss.

359.   During the related earnings call, Defendant Akiona reported a "net loss of $10.3 million increased year-over-year from a net loss of $8.5 million in the prior year period, primarily caused by a pretax impairment of goodwill of $4.8 million" related to "our acquisition of RocketPlay back in 2015."  Addressing analysts concerns about growth during the earnings call, Defendant Lopez stated "[w]hen we're expanding in 2019, obviously, it's going to be sort of like equal opportunity sort of like placements for leases. But again, **we're going to be right back in our very strong jurisdictions like Oklahoma . . . .  [W]e've got real opportunities for recurring revenue growth in 2019 . . . . I think it's the usual suspect** that can -- when you look at the domestic opportunities **being led again -- once again by the state of Oklahoma**."  When analysts asked about whether EBITDA margins would be more consistent in 2019, Defendant Lopez noted "in 2019, it's going to change our sort of normal cadence and texture of our EBITDA production . . . .  little bit smoother than we've seen in the past."

360.    The Company's statements during the earnings call seemed to ease tension among the analysts. For example, Defendant Credit Suisse's analysts, on that same day, noted that "[a]ffirmation of flat 2019 margins and 15% revenue growth is a clear positive, given some investor concerns on margins in the past quarter and a potential leveling of market share." That same day, analysts from Defendant SunTrust commented that "[PlayAGS's] [n]et revenue of $72.1M was +3% ahead of us/Street - refuting concerns around recent industry surveys" because "[p]roduct sales came in well ahead of the 600-700 units implied in the Q4 Eilers Survey" and "management highlighted further penetration in Oklahoma, California and Wisconsin."

361.    Shortly after the March 2019 SPO, PlayAGS began disclosing negative results.

362.    On May 8, 2019, in the Company's 10-Q for the first quarterly period ended March 31, 2019, PlayAGS disclosed a decrease in domestic RPD and increase in gaming operations expenses its largest segment, the EGM segment, compared to first quarter 2018 despite the increase in revenue and installed EGM units.

363.    On that same day, during the related earnings call, Defendant Akiona claimed that "difficult weather conditions negatively impacted our Q1 results by approximately $1 million to $2 million in EGM recurring revenue, or a 2% to 4% impact on domestic EGM RPD."

364.    Despite what Defendant Lopez described as a "solid quarter" with "total revenue of $73 million, up 13% year-over-year" during the earnings call, analysts focused on fact that win-per-day was negatively impacted by 2-4% year-over-year.

365.    Specifically, on the same day as the earnings call, Defendant Credit Suisse's analysts reported "[s]evere weather impacted domestic revenue per day by x%, but management expects revenue per day to recover throughout the year," while Defendant Deutsche Bank's analysts reported "[t]onight, post close, AGS delivered in-line 1Q19 results . . . weather headwinds in the 1Q19 . . . hampered the RPD of the domestic install base."  The next day, on May 9, 2019, Telsey Advisory Group ("TAG") reported "win-per-day of $20.73 was a bit below our $22.09 forecast and was down y/y despite an increase in international win-per-day. Management noted that this was likely due to a $1-2M impact from weather in the quarter (which would have impacted win-per-day by 2-4% y/y)" while Defendant Roth Capital Partners'

1  analysts reported "AGS cited inclement weather in areas where it participates in EGM win per
2  day as negatively impacting 1Q19 EBITDA by ~$1mm to $2mm."

3     366.   On this news, PlayAGS's stock price fell by 8.43%. to close at $21.07 on May 9,
4  2019, on unusually heavy trading volume.

5     367.   On August 7, 2019, the Company published its 10-Q for the second quarter 2019
6  ended June 30, 2019, reporting a net loss of $7.6 million and a loss in domestic RPD and
7  adjusted EBITDA.  The report described the loss in revenue per day as attributable to "**new
8  installations in markets with lower revenue per day, as well as the inclusion of EGMs from
9  Integrity, which historically generated revenue per day lower than the Company's
10  average**."

11     368.   During the related earnings call, Defendant Akiona reported:

12        Domestic EGM revenue per day or RPD decreased from $26.16
13        compared to $27.79 in the prior year period. When we normalize for
          the impact of EGM's purchase from Integrity, which we estimate
14        that domestic RPD was $27.45 or down approximately 1%. **This
          decrease is due to a number of factors in Oklahoma, including,
15        one, product underperformance at 3 Oklahoma properties,
          which largely accounts for the decrease in RPD. Two, the
16        placement of approximately 800 incremental units into
          Oklahoma over the past year, which has a market yield, a lower
17        RPD than our domestic average.**

18     369.   During that same call, Defendant Lopez said:

19        we are experiencing some challenges in Oklahoma, where we have
          our largest base of recurring revenue EGMs. **We mentioned several
20        factors for decreased RPD earlier and one of the issues we are
          actively working to fix is product underperformance.** I'll give
21        you some color on what's driving this. **Over the past year, we have
          grown our Oklahoma footprint with 800 incremental units and
22        separately optimized numerous existing units. Some of the
          underperformance is a result of going too hard and fast into the
23        market with certain products.**

24        **We also went too deep into our portfolio of titles, where we
          should have focused on our most successful game themes.**

25     370.   When asked by an analyst from Defendant Stifel whether this is a temporary
26  issue, Defendant Lopez responded "[i]t's a transitory issue, it's not a long-term issue."

27     371.   This news shocked analysts on the earnings call.  During the question and answer
28  period of the earnings call, an analyst with Defendant Jefferies commented to Defendant Lopez

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

119

1  that "[w]e've gotten a fair amount of inputs throughout the course of the quarter, including

2  spending some time at GameON [event] and we get the surveys and the like.  And so I guess,

3  I'm likely not alone that this is a bit of a surprise."

4       372.  When asked by an analyst from Defendant Union Gaming about how quickly

5  things changed, Defendant Lopez suggested that problems that PlayAGS was experiencing in the

6  first quarter of 2019 was not in fact weather-related but rather due to underperformance in the

7  Oklahoma market. Specifically, Defendant Lopez stated:

8          [w]e did have weather in Oklahoma [in the second quarter], but it
        wasn't to the magnitude that we saw in Q1. So it just was very clear
9          for us to look at it and how it accumulated over time and we're able
        to understand it. **We could actually look back at Q1 and say, with**
10          **some of what we saw in Q1, like I referred, was it little bit of a**
        **head fake and it very well could have been. But now in Q2, it**
11          **just became much more clear to us.**

12       373.  Analyst coverage of this shocking earnings call showed the true financial impact

13  of PlayAGS's underperformance in Oklahoma.  On the same day as the earnings call, Defendant

14  Credit Suisse's analysts reported "EGM EBITDA of $36mm 10% below the Street driven by

15  higher costs and weakness in Oklahoma" and "2019 EBITDA has been lowered to $145-150mm

16  from $160-164mm" with "EGM sales now expected to be at the low end of guidance (~5,000

17  units)." Defendant SunTrust's analysts reported a "surprise miss" and believed "most of the

18  Street was surprised by the miss."

19       374.  On this news, the Company's share price fell $8.99, or nearly 52%, to close at

20  $8.31 per share on August 8, 2019, on unusually heavy trading volume.

21       375.  The significance of PlayAGS's underperformance in the Oklahoma market was

22  not only highlighted by the sharp decline in stock price, but also from management's continued

23  attempts to stop the bleeding for many months, and quarters, after.

24       376.  On November 7, 2019, the Company published its 10-Q for the third quarter 2019

25  ended September 30, 2019, reporting an even further decline in RPD from the previous quarter

26  and substantially lower RPD when compared to the same quarter in 2018.

27       377.  During the related earnings call, after acknowledging the "challenges [PlayAGS]

28  face[s] in [the] Oklahoma market," Defendant Lopez reported that PlayAGS had come to the

"conclusion that the issues are clearly twofold." "**First . . . we did have some product rollout game performance in analytics issues that negatively impacted our RPD performance in the state. Second is that it's clear that the influx of premium competitive product that entered this space in 2018 has continued to perform well and has taken Oklahoma 2 premium products share levels that rival some of the highest in the nation**."

378.   To address the first issue, Defendant Lopez stated that the Company "touched more than 900 units in Oklahoma." "Touches include any change we make to a unit, including game title changes, cabinet swaps or on floor relocations." Of those 900 units in Oklahoma, "[m]ost of [PlayAGS's] actions thus far have been title changes on specifically targeted lower performing units." As to the second issue, Defendant Lopez's objective was to "be prudent in 2020 with [PlayAGS's] utilization of new higher earning premium products such as Orion Rise and Orion 49C."

379.   During that same call, Defendant Akiona noted that "[d]omestic EGM revenue per day or RPD decreased by 8% to $25.08 compared to $27.14 in the prior year period. When normalized for the impact of EGMs purchased from Integrity, we estimate that domestic RPD was $26.55, down approximately 2%. The decrease is primarily due to product underperformance in Oklahoma." He went on to note that "**[PlayAGS's] Oklahoma units yield on average an RPD that is lower than [PlayAGS's] domestic average RPD**."

380.   Despite this, Defendant Lopez was confident that the problem was about to "level off" and that the Company has "seen the bottom."

381.   On November 8, 2019, analysts from Defendant Roth Capital Partners indicated that "[c]hecks continue to cite improvements in AGS' OK game performance and management indicated it has seen a 'bottom' in YoY win per day there ahead of a planned launch of premium cabinets" while Defendant SunTrust's analysts reported "[w]hile continuing to highlight faulty placements decisions (*e.g.* wrong cabinets, bad locations on the floor, etc.), management also mentioned for the first time that they see challenges from the ongoing market-wide pivot to more premium content."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

121

382.    On that same day and on this news, PlayAGS's stock price fell by 6.71% to $11.82 at close on November 7, 2019.

383.    On March 4, 2020, the Company published its 10-K Annual Report for the year ended December 31, 2019, reporting yet another decrease in domestic RPD for its EGM segment of $25.65 when compared to the $27.02 the prior year.  Again, PlayAGS attributed this substantial loss to "new installations in markets with lower revenue per day, as well as the inclusion of EGMs from Integrity, which historically generated revenue per day lower than the Company's average."

384.    During the related earnings call, in order to address this catastrophic loss, Defendant Lopez commented that:

> we have been working to better manage our footprint in Oklahoma…we believe the prudent thing to do is to **sell some of our underperforming units to generate cash** that can be invested in other higher-performing markets, **or we can choose to allocate some of those dollars to improve revenue per day in Oklahoma**.

385.    It was six months after initial disclosure of underperformance in Oklahoma and yet PlayAGS could not cure the issue.  This was not a "transitory" or short-term issue.

386.    In fact, Defendant Lopez, in response to an analyst's question during the earnings call regarding how much more needed to be done to optimize the Oklahoma market, stated "**[a]s far as how we're going to go out and touch the base, we've got about 10,000 -- roughly 10,000 units out there or so in Oklahoma, so we've touched 15% of it.**"

387.    On this news, PlayAGS's stock price fell by 18.70% to $6.65 at close on March 5, 2020, on unusually heavy trading volume.

388.    The bleeding did not stop.  On May 7, 2020, the Company published its 10-Q for the first quarter 2020 ended March 31, 2020, reporting a decrease in the installed base in Oklahoma and substantial decrease in domestic RPD when compared to the same quarter in 2019.  PlayAGS noted "[a]dditional decreases in gaming operations revenue are due to a decrease in our EGM installed base year over year due to sales of over 700 previously leased, lower yielding units to distributors (395 of which were sold in the current period) and the sale of 150 units of previously leased VLT EGMs."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

122

389.    On that same day, during the related earnings call, Defendant Lopez explained to analysts that in order to become more efficient and profitable in Oklahoma PlayAGS needed to "**pare back the install base in Oklahoma . . . essentially have a smaller install base**." However, this was not fully implemented as of May 7, 2020.  Defendant Lopez admitted that "**once we do that**, pare down the base, get the quality improved, **we'll be more efficient operationally** and also on an RPD basis, we actually believe **we can be more profitable in the state of Oklahoma if we manage that correctly**."  This was not a transitory issue.

390.    Analysts reporting from the earnings call on May 8, 2020 noted that PlayAGS's management believed it decelerated the decline, at best.  Defendant Jeffries' analysts reported "[m]gt noted the decline in OK has decelerated.  For the first two months, RPD in OK was $18.98, while lower than $21 in 1Q19, it was higher than 3Q and 4Q.  The company will continue to focus on pruning and selling underperforming units in OK."

391.    As of the filing of the initial complaint in this action, on August 4, 2020, PlayAGS common stock traded at $3.58, 88% less than the $29.25 SPO price on August 10, 2018 and 86% less than the $25.50 SPO price on March 20, 2019.

## VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### THIRD CLAIM FOR RELIEF
#### For Violation of Section 11 of the Securities Act
#### Against Defendant PlayAGS, the Individual Defendants, and Underwriter Defendants

392.    Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶1–4, 18–83 and ¶¶279–391 as if fully set forth herein, but only to the extent that such allegations do not allege fraud, scienter, or the intent of the Defendants named in this claim to defraud Lead Plaintiff or members of the Class within the scope of this cause of action.

393.    This cause of action is brought by Lead Plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of itself and relevant members of the Class within the scope of this cause of action, against Defendant PlayAGS, each of the Individual Defendants (except the claims against Defendant Freeman are brought only in connection with the March 2019 SPO), the August 2018 SPO Underwriter Defendants in connection with the August 2018 SPO, and the March 2019 SPO Underwriter Defendants in connection with the March 2019 SPO.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

123

394.    This cause of action does not sound in fraud.  For purposes of this cause of action, Lead Plaintiff does not claim that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent.  This cause of action is based solely on strict liability as to PlayAGS and negligence as to the remaining Defendants. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the SPOs are alleged to have been materially misstated statements of opinion or belief when made.

395.    The Shelf Registration Statement issued in connection with the SPOs was inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

396.    PlayAGS is the registrant and issuer of the common stock offered pursuant to the Shelf Registration Statement. As such, PlayAGS is strictly liable under Section 11 of the Securities Act to Lead Plaintiff and to relevant members of the Class within the scope of this cause of action for the materially inaccurate statements contained in the Shelf Registration Statement and the failure of the Shelf Registration Statement to be complete and accurate.

397.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Shelf Registration Statement were true and without omissions of any material facts and were not misleading.

398.    The Individual Defendants each signed the Shelf Registration Statement and/or was a director of PlayAGS at the time of the August 2018 SPO and/or March 2019 SPO, and are therefore statutorily liable under Section 11 of the Securities Act.  The Individual caused the issuance of the Shelf Registration Statement.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Shelf Registration Statement.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

124

1   make the statements misleading.  By virtue of each of the Individual Defendants' failure to

2   exercise reasonable care, the Shelf Registration Statement contained misstatements of material

3   facts and omissions of material facts.  As such, each of the Individual Defendants is liable under

4   Section 11 of the Securities Act to Lead Plaintiff and to the relevant members of the Class within

5   the Scope of this cause of action.

6      399.   Underwriter Defendants served as the underwriters for the SPOs, as alleged

7   herein, and qualifies as such according to the definition contained in Section 2(a)(11) of the

8   Securities Act, 15 U.S.C. § 77b(a)(1).  As such, Underwriter Defendants participated in the

9   solicitation, offering, and sale of the securities to the investing public pursuant to the Shelf

10  Registration Statement.  Underwriter Defendants, as underwriters of the securities offered in the

11  SPOs pursuant to the Shelf Registration Statement, had a duty to make a reasonable and diligent

12  investigation of the truthfulness and accuracy of the statements contained in the Shelf

13  Registration Statement.  Underwriter Defendants had a duty to ensure that such statements were

14  true and accurate and that there were no omissions of material fact that would make the

15  statements misleading.  By virtue of Underwriter Defendants' failure to exercise reasonable care,

16  the Shelf Registration Statement contained misstatements of material facts and omissions of

17  material facts necessary to make the statements therein not misleading.  As such, Underwriter

18  Defendants are liable under Section 11 of the Securities Act to Lead Plaintiff and to the relevant

19  members of the Class within the scope of this cause of action.

20     400.   None of the untrue statements or omissions of material fact in the Shelf

21  Registration Statement alleged herein was a forward-looking statement.  Rather, each such

22  statement concerned existing facts.  Moreover, the Shelf Registration Statement did not properly

23  identify any of the untrue statements as forward-looking statements and did not disclose

24  information that undermined the putative validity of those statements.

25     401.   Each of the Defendants named in this cause of action issued, caused to be issued,

26  and participated in the issuance of materially untrue and misleading written statements to the

27  investing public that were contained in the Shelf Registration Statement, which misstated and

28

failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

402.    Lead Plaintiff and other members of the Class within the scope of this cause of action acquired PlayAGS common stock pursuant to, or traceable to, the defective Shelf Registration Statement.

403.    Lead Plaintiff and Class members within the scope of this cause of action have sustained damages.  The value of PlayAGS common stock has declined substantially subsequent to and due to violations by Defendants named in this cause of action.

404.    At the time Lead Plaintiff and other members of the Class within the scope of this cause of action purchased PlayAGS common stock, they were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed between the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based and the time that this action was commenced.  Less than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time this action was commenced.

**FOURTH CLAIM FOR RELIEF**
**For Violation of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

405.    Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶1–4, 18–83 and ¶¶279–404 as if fully set forth herein, but only to the extent that such allegations do not allege fraud, scienter, or the intent of the Defendants named in this claim to defraud Lead Plaintiff or members of the Class within the scope of this cause of action.

406.    This cause of action is brought by Lead Plaintiff pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2), on behalf of itself and relevant members of the Class within the scope of this cause of action, against Defendant PlayAGS, each of the Apollo Defendants, each of the Individual Defendants (except claims against Defendant Freeman are brought only in connection with the March 2019 SPO), the August 2018 SPO Underwriter

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

126

1  Defendants in connection with the August 2018 SPO, and the March 2019 SPO Underwriter

2  Defendants in connection with the March 2019 SPO.

3       407.    This cause of action does not sound in fraud. For purposes of this cause of action,

4  Lead Plaintiff does not claim that any of these Defendants committed intentional or reckless

5  misconduct or that any of these Defendants acted with scienter or fraudulent intent.  This cause

6  of action is based solely on strict liability as to PlayAGS and negligence as to the remaining

7  Defendants.  Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in

8  these non-fraud claims except that any challenged statements of opinion or belief made in

9  connection with the SPOs are alleged to have been materially misstated statements of opinion or

10  belief when made.

11       408.    Each of the Defendants named in this Count were sellers, offerors, and/or

12  solicitors of purchasers of the Company's common stock pursuant to the defective Prospectus

13  Supplements.  The actions of solicitation by the Defendants named in this Count included

14  participating in the preparation of the false and misleading Prospectus Supplements, which are

15  part of the Shelf Registration Statement, and marketing the SPOs to investors, such as Lead

16  Plaintiff and the other members of the Class within the scope of this cause of action.

17       409.    The Prospectus Supplements contained untrue statements of material fact, omitted

18  to state other facts necessary to make statements made therein not misleading, and omitted to

19  state material facts required to be stated therein.

20       410.    Each of the Defendants named in this cause of action owed to Lead Plaintiff and

21  other members of the Class within the scope of this cause of action the duty to make a reasonable

22  and diligent investigation of the statements contained in the Prospectus Supplements to ensure

23  that such statements were true and that there was no omission to state a material fact required to

24  be stated in order to make the statements contained therein not misleading.  By virtue of each of

25  these Defendants' failure to exercise reasonable care, the Prospectus Supplements contained

26  misstatements of material facts and omissions of material facts necessary to make the statements

27  therein not misleading.

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

127

411.    Lead Plaintiff and other members of the Class within the scope of this cause of action purchased PlayAGS common stock pursuant to and traceable to the defective Prospectus Supplements.  Lead Plaintiff did not know, nor in the exercise of reasonable diligence could Lead Plaintiff have known, of the untruths and omissions contained in the Prospectus Supplements at the time Lead Plaintiff acquired PlayAGS shares.

412.    By reason of the conduct alleged herein, the Defendants named in this cause of action violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violation, Lead Plaintiff and the other members of the Class within the scope of this cause of action who acquired PlayAGS shares pursuant to the Shelf Registration Statement sustained substantial damages.  Accordingly, Lead Plaintiff and the other members of the Class within the scope of this cause of action who hold the shares issued pursuant to the Shelf Registration Statement have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members within the scope of this cause of action who have sold their PlayAGS shares seek damages to the extent permitted by law.

413.    This cause of action is brought within one year of when Lead Plaintiff discovered or reasonably could have discovered the untrue statements and omissions in the Prospectus Supplement and within three years of their effective dates.

**FIFTH CLAIM FOR RELIEF**
**For Violation of Section 15 of the Securities Act**
**Against the Individual Defendants and the Apollo Defendants**

414.    Lead Plaintiff repeats and realleges each and every allegation contained in ¶¶1–4, 18–83 and ¶¶279–413 above as if fully set forth herein, but only to the extent that such allegations do not allege fraud, scienter, or the intent of the Defendants named in this claim to defraud Lead Plaintiff or members of the Class within the scope of this cause of action

415.    This cause of action is brought by Lead Plaintiff pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of itself and relevant members of the Class within the scope of this cause of action, against each of the Individual Defendants (except the claims

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

128

against Defendant Freeman are brought only in connection with the March 2019 SPO) and each of the Apollo Defendants.

416.     This cause of action does not sound in fraud.  For purposes of this cause of action, Lead Plaintiff does not allege that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent.  This cause of action is based solely on strict liability as to PlayAGS and negligence as to the remaining Defendants.  Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the SPOs are alleged to have been materially misstated statements of opinion or belief when made.

417.     The Individual Defendants were each control persons of PlayAGS by virtue of their positions as directors and/or senior officers of PlayAGS.  The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of PlayAGS.

418.     Each of the Individual Defendants participated in the preparation and dissemination of the Shelf Registration Statement, and otherwise participated in the process necessary to conduct the SPOs.  Because of their positions of control and authority as senior officers and/or directors each of the Individual Defendants were able to, and did, control the contents of the Shelf Registration Statement, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

419.     The Apollo Defendants, by virtue of their stock ownership and their control of the Company's Board of Directors, controlled PlayAGS and each of the Individual Defendants.  The Apollo Defendants participated in the preparation and dissemination of the Shelf Registration Statement, and otherwise participated in the process necessary to conduct the SPOs.  Because of their positions of control and authority the Apollo Defendants were able to, and did, control the contents of the Shelf Registration Statement, which contained materially untrue information or

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

129

omitted material information required to be disclosed to prevent the statements made therein from being misleading.

420.    Each of the Individual Defendants and each of the Apollo Defendants were culpable participants in the violations of Section 11 and 12(a)(2) of the Securities Act alleged above, based on having signed the Shelf Registration Statement and/or having otherwise participated in the process that allowed the SPOs to be completed.

421.    As control persons of PlayAGS, each of the Individual Defendants and each of the Apollo Defendants are liable jointly and severally with and to the same extent as PlayAGS for its violation of Section 11 and 12(a)(2) of the Securities Act.

422.    As a result of the foregoing, Lead Plaintiff and other members of the Class within the scope of this cause of action have suffered damages.

## IX.    CLASS ACTION ALLEGATIONS

423.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who: (i) purchased or otherwise acquired the publicly traded common stock of PlayAGS during the period from January 26, 2018 through March 4, 2020, inclusive, and were damaged thereby (the "Class Period"); and/or (ii) purchased or otherwise acquired PlayAGS common stock pursuant and/or traceable to PlayAGS's August 2018 SPO or March 2019 SPO during the Class Period, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of PlayAGS during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) PlayAGS's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

424.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PlayAGS's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

130

and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by PlayAGS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

425.  There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)  whether the Exchange Act was violated by the PlayAGS Defendants;

> (b)  whether the Securities Act was violated by the Defendants;

> (c)  whether the Defendants mispresented material facts;

> (d)  whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

> (e)  whether the PlayAGS Defendants knew or recklessly disregarded that their statements were false and misleading;

> (f)  whether Defendants engaged in a scheme to defraud investors;

> (g)  whether Defendants' conduct impacted the price of PlayAGS common stock that are part of the defined Class;

> (h)  whether Defendants' conduct caused the members of the Class to sustain harm; and

> (i)  the extent of harm sustained by Class members and the appropriate measure of harm.

426.  Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

427.  Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

131

428.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment, as follows:

(a)   Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as a class representative, and appointing Labaton Sucharow LLP as lead class counsel pursuant to Rule 23(g);

(b)   Awarding Lead Plaintiff and the Class compensatory damages and equitable relief, including all damages and relief provide for under the Exchange Act and the Securities Act, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Lead Plaintiff's consulting and testifying expert witnesses; and

(d)   Granting such other and further relief as the Court deems just and proper.

## XI.   JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demands a trial by jury of all issues so triable.

DATED:  March 25, 2021                    Respectfully submitted,

/s/ Alfred L. Fatale III
**LABATON SUCHAROW LLP**
Jonathan Gardner (*pro hac vice* forthcoming)
Alfred L. Fatale III (admitted *pro hac vice*)
Jeffrey A. Dubbin (admitted *pro hac vice*)
Lisa Strejlau (admitted *pro hac vice*)
140 Broadway
New York, New York 10005

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
afatale@labaton.com
jdubbin@labaton.com
lstrejlau@labaton.com

*Lead Counsel for Lead Plaintiff*

**KEMP JONES, LLP**
Don Springmeyer (SBN 1021)
3800 Howard Hughes Parkway
Wells Fargo Tower, 17th Floor
Las Vegas, NV 89169
Telephone: (702) 385-6000
d.springmeyer@kempjones.com

*Liaison Counsel*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
CASE NO.: 2:20-CV-01209-JCM-NJK

133